UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
CASE NUMBER 17-20805-CR-KMW

UNITED STATES OF AMERICA

    **vs.**

JULIO CESAR ALVAREZ-MARTINEZ,

       Defendant

―――――――――――――――――――――――――――――――――――――

TRIAL PROCEEDINGS HELD 3-27-18
BEFORE THE HONORABLE KATHLEEN M. WILLIAMS
UNITED STATES DISTRICT COURT JUDGE

―――――――――――――――――――――――――――――――――――――

**APPEARANCES:**

| | |
|---|---|
| FOR THE UNITED STATES: | KEVIN QUENCER, A.U.S.A. |
| | SHARAD MOTIANI, A.U.S.A. |
| | **99 N.E. 4th Street** |
| | Miami, FL  33132 |
| | |
| FOR THE DEFENDANT: | JACK R. BLUMENFELD, ESQ. |
| | **2655 LeJeune** |
| | Coral Gables, FL 33134 |
| | |
| REPORTED BY: | PATRICIA SANDERS, RPR |
| | United States Court Reporter |
| | 400 North Miami Avenue, Suite 11-3 |
| | Miami, FL  33128 |
| | T: 305.523.5528 |
| | patricia_sanders@flsd.uscourts.gov. |

| | INDEX | | |
| --- | --- | --- | --- |
| | DIRECT | CROSS | REDIRECT |
| Chris Wilkins | 3 | | |

04:04  1          THE COURT: Government, call your first witness.

04:04  2          MR. QUENCER:  Yes, Your Honor.  The United States

04:04  3  calls, as its first witness, DEA Special Agent Chris Wilkins,

04:04  4  DEA Portland, Oregon.

5          WITNESS SWORN

6          COURTROOM DEPUTY:  Please state your full name for the

7  record.

8          THE WITNESS:  Christopher Wilkins.

9          DIRECT EXAMINATION

04:05  10  BY MR. QUENCER:

04:05  11  Q.  Special Agent Wilkins, if you could introduce yourself to

04:05  12  the jury and tell them where you're currently working.

04:05  13  A.  My name is Chris Wilkins.  I currently work in Portland,

04:05  14  Oregon for the Drug Enforcement Administration.

04:05  15  Q.  And how long have you worked for the Drug Enforcement

04:05  16  Administration?

04:05  17  A.  Approximately 14 years.

04:05  18  Q.  Where did you go college?

04:05  19  A.  University of North Texas.

04:05  20  Q.  When did you graduate from the University of North Texas?

04:05  21  A.  1999.

04:05  22  Q.  What year did you join the DEA?

04:05  23  A.  2003.  I graduated from the Academy in December of '03.

04:05  24  Q.  Where is the training academy for DEA agents?

04:05  25  A.  In Quantico, Virginia.

04:05  1   Q.   After you finished your initial training in Quantico,

04:05  2   Virginia, where did you go next for the DEA?

04:05  3   A.   I was stationed at the Los Angeles Field Division in Los

04:06  4   Angeles, California.

04:06  5   Q.   Let's talk a little bit about your time in Los Angeles.

04:06  6        How many years were you in Los Angeles?

04:06  7   A.   Approximately nine years.

04:06  8   Q.   So you're in LA for almost a decade.

04:06  9        What kinds of cases did you work?  You obviously worked for

04:06  10  the DEA, so what kind of cases did you work in LA?

04:06  11  A.   We ran the gamut of cases.  Mainly, we targeted Mexican

04:06  12  drug trafficking organizations that were smuggling cocaine into

04:06  13  the United States.

04:06  14  Q.   Did you do any domestic investigations?

04:06  15  A.   Yes, I was on a mobile enforcement team where we basically

04:06  16  targeted street level high-violence gangs dealing mostly

04:06  17  smaller amounts.

04:06  18  Q.   Were you involved in any wiretaps while you were in LA?

04:06  19  A.   Yes.

04:06  20  Q.   What kinds of things did you learn from the wiretaps that

04:07  21  you participated in?

04:07  22  A.   Just their trafficking patterns, their methods of movement,

04:07  23  how they -- the codes they used between the gang members,

04:07  24  amounts and prices.

04:07  25  Q.   Excellent.

04:07  1      I want to move on to your next duty assignment.  Where was

04:07  2   your next duty assignment after LA?

04:07  3   A.  I was in Guatemala City country office for about four

04:07  4   years.

04:07  5   Q.  So you're stationed in Guatemala City for four years.

04:07  6      What was your role there in Guatemala?

04:07  7   A.  I was the primary maritime trafficking coordinator.

04:07  8   Q.  Let's slow it down and explain it to the jury.

04:07  9      What was the primary type of case you were tasked with

04:07  10  investigating while you were in Guatemala?

04:07  11  A.  My primary mission was to target drug trafficking

04:07  12  organizations.  I use DTOs for short -- the (unintelligible) --

04:07  13          THE COURT:  You're going to have to slow down a

04:07  14  little, Agent.

04:07  15          THE WITNESS:  We targeted drug trafficking

04:08  16  organizations that dealt with the movement of cocaine from

04:08  17  Colombia and Ecuador through the Eastern Pacific to Central

04:08  18  America, specifically Guatemala.

04:08  19   BY MR. QUENCER:

04:08  20  Q.  Approximately how many investigations were you involved in

04:08  21  as the maritime coordinator in Guatemala City?

04:08  22  A.  Well over 50.  Could be 100.  It's hard to say exactly.

04:08  23  Q.  As part of those investigations, what did you learn about

04:08  24  the drug trafficking organizations you were investigating?

04:08  25  A.  We learned their habits, their -- how they moved cocaine to

04:08  1    the rivers, through the ocean, their methods, how they were

04:08  2    able to gain fuel.  Basically everything we needed to know

04:09  3    about them we knew.

04:09  4    Q.  As part of those investigations, did you also debrief

04:09  5    witnesses?

04:09  6    A.  Yes.

04:09  7    Q.  Approximately how many witnesses who were participating

04:09  8    members of drug trafficking organizations did you debrief while

04:09  9    you were in Guatemala City?

04:09  10   A.  Hundreds.

04:09  11   Q.  When I say "debrief", if you could explain that for the

04:09  12   jury.

04:09  13   A.  A debrief is basically just a conversation we will have

04:09  14   with the boat crews that we would arrest.  We would just talk

04:09  15   to them and interview them, if they're willing to talk, and

04:09  16   find out about who they are, what they were doing, try to learn

04:09  17   more about their habits.

04:09  18   Q.  What did you learn, overall, from your debriefs of those

04:09  19   hundreds of witnesses that were involved?

04:09  20   A.  The methods of movement from -- movement of cocaine from

02:02  21   Ecuador, Colombia through the Eastern Pacific to Guatemala, the

04:09  22   kind of boats they used, how they gained fuel, the routes.

04:10  23   Q.  How about confidential sources?  Did you work with any

04:10  24   confidential sources when you were in Guatemala City?

04:10  25   A.  Yes.

Q.  What kinds of things did you learn from confidential

sources?

A.  A lot of the things we learned from the confidential

sources was mostly that the Guatemalans, they were usually the

receiving end of these transactions.  So they were receiving

the cocaine that had been shipped over from Ecuador and

Colombia.

Q.  How about maritime conferences?  As the lead maritime

coordinator out of Guatemala City for DEA, did you attend any

sort of maritime trafficking conferences?

A.  Yes.

Q.  Why don't you describe for the jury what kind of

conferences you attended.

A.  Sure.  Every six months or so there would be a conference

that they would move around to different countries.  It was

basically people from the Coast Guard, all of the South

American countries, their counterparts, as well as the U.S.

Navy, U.S. Army, and U.S. Coast Guard, and the Governmental

agencies.

    We would discuss the new trends that each country was

seeing as far as the movement of cocaine through the specific

country and what they're doing to combat it.

Q.  Can you give us an example of the sorts of countries that

were at these conferences with you.

A.  Pretty much all of South America; Colombia, Ecuador, Chile,

04:11  1  Peru, Brazil, Costa Rica, Central America.  We had pretty much

04:11  2  the French, Canadian, U.S.  It ran the gamut.  Even African

04:11  3  countries.

04:11  4  Q.  What kinds of things did you learn at these conferences?

04:11  5  A.  We would learn what each country was saying and how they

04:11  6  were combating the movement of cocaine from South America to

01:47  7  Central America.

04:12  8  Q.  Approximately how many maritime conferences did you attend

04:12  9  as a maritime coordinator in Guatemala City?

04:12  10  A.  Probably eight.

04:12  11  Q.  Did you ever have occasion, while you were in Guatemala

04:12  12  City, to go out on any operations?

04:12  13  A.  Yes.

04:12  14  Q.  If you could describe for the jury what an operation might

04:12  15  be that you would go out on.

04:12  16  A.  I wouldn't go on necessarily the deep water operations.  We

04:12  17  would target the river mouths and set up -- we would stop boats

04:12  18  and see what's going on in the rivers.  We would do patrol,

04:12  19  patrol the rivers, looking for movement of cocaine, money, or

04:12  20  gas.

01:50  21      We know that once they get in from the ocean and get into

01:51  22  these river mouths, they kind of ghost.  We never know what

23  happens to them after that.  We were trying to gain intel on

24  what was going on with these rivers.

25  Q.  As part of your investigations, did you ever review any

1   intercepted communications made by drug trafficking

2   organizations?

3   A.   Yes.

4   Q.   What did you learn from those intercepted communications,

5   just generally speaking?

04:13   6   A.   Basically, again, we learned the manners and methods of

04:13   7   moving cocaine from Ecuador and Colombia through the Eastern

04:13   8   Pacific to get into Guatemala.

04:13   9           MR. QUENCER:  At this time, Your Honor, the United

02:03   10   States would tender Special Agent Wilkins as an expert witness

02:03   11   in drug trafficking from Ecuador and Colombia through maritime

04:13   12   trafficking to Guatemala.

04:13   13           THE COURT:  Mr. Blumenfeld?

04:13   14           MR. BLUMENFELD:  No objection.

04:13   15           THE COURT:  Special Agent Wilkins will be qualified as

04:13   16   an expert in those matters and may testify accordingly.

04:13   17   BY MR. QUENCER:

04:13   18   Q.   Where is cocaine produced?

04:13   19   A.   Primarily Ecuador and Colombia.

04:13   20   Q.   In what sort of regions?

04:13   21   A.   Mountainous regions far from the reach of law enforcement.

04:13   22   Q.   And after it's produced, with regard to maritime

04:14   23   trafficking, where does it go next?

04:14   24   A.   It's moved down off the mountains, get it to a river, and

04:14   25   eventually get it to the coast for movement.

04:14  1   Q.  Once it reaches the coast, what's the primary type of

04:14  2   vessel that's used to transport those narcotics elsewhere?

04:14  3   A.  Generally, we saw 18 to 24-foot open hull boats with two,

04:14  4   possibly three engines.

04:14  5   Q.  What was the slang that you all used to describe those

04:14  6   vessels?

04:14  7   A.  Go-fast vessels.  It's nothing like a cigarette boat.

04:14  8   Q.  Is it faster or slower than a cigarette boat?

04:14  9   A.  It's slower for sure.

04:14  10  Q.  Tell us a little about it.

04:14  11      What else would you find on one of these typical go-fast

04:14  12  boats?

04:14  13  A.  Generally, you would find two to three engines, blue

04:15  14  barrels full of gas, 55-gallon drums, several GPSs, satellite

04:15  15  phones, and their personal property, usually a backpack with a

04:15  16  change of clothes and some money, usually a passport as well.

04:15  17  Q.  Did you ever find narcotics on board these go-fast vessels?

04:15  18  A.  Yes.

04:15  19  Q.  What was the average approximate amount that you would find

04:15  20  on one of these go-fast vessels?

04:15  21  A.  Generally, to make the trip worth it, it ranges between 500

04:15  22  and 700 kilograms of cocaine.  Anything more than 700 is going

04:15  23  to be too much.

04:15  24  Q.  Was there ever anything attached to the narcotics found on

04:15  25  these boats?

A.   Yes.   We would find GPS buoys that they would attach to narcotics in case they were ever detected by law enforcement. They could throw it overboard, and then they'll circle around and pick it up later because the buoy will give them a GPS coordinate of its current location.

Q.   Was there any other kind of equipment found on these boats that maybe wasn't illegal?

A.   Radios, satellite phones, GPSs, handheld GPSs.

Q.   Would you find fishing equipment on board these vessels?

A.   Yes.   Nets, hooks, and buoys for the nets for the fishing equipment, which had nothing to do with the narcotics.   It gave the allure that they were actually out there fishing.

Q.   Tell us a little bit about the routes that you saw as the maritime trafficking coordinator.

A.   We would see boats coming out of Northern Ecuador.   They basically go due west to the Galapagos Islands.   From there, they can go straight north to hit Central America, Guatemala, El Salvador, Mexico.

        MR. QUENCER:   Judge, with your permission, I would like to show the witness what has been previously marked as Government's Exhibit 8.

        THE COURT:   All right.   Is this going to be introduced or used as a demonstrative aid?

        MR. QUENCER:   We'll introduce it, Judge.

        THE COURT:   All right.   Mr. Blumenfeld, do you have

04:17  1   any objection to Government's 8?

04:17  2        MR. BLUMENFELD:  We have no objection.

04:17  3        THE COURT:  It will be introduced, and you may put it

04:17  4   up on the ELMO.

04:18  5   BY MR. QUENCER:

04:18  6   Q.  Do you see a map in front of you that's marked as

04:18  7   Government's Exhibit 8?

04:18  8   A.  Yes.

04:18  9   Q.  Can you demonstrate for the jury the route that you just

04:18  10  described on the record, please.

04:18  11  A.  They'll leave Ecuador, head due west, hit the Galapagos

04:18  12  Islands, and from there it's a straight shot to Guatemala, El

04:18  13  Salvador, Mexico.

04:18  14        MR. QUENCER:  Let the record reflect the witness has

04:18  15  drawn a line from approximately the northwest coast of Ecuador,

04:18  16  out around the Galapagos Islands, and then up to Guatemala, El

04:18  17  Salvador, and Mexico.

04:18  18  BY MR. QUENCER:

04:18  19  Q.  Let's talk a little bit about the trip.

04:18  20      Could they make it all in one segment without refueling?

04:18  21  A.  No.

04:18  22  Q.  Why not?

04:18  23  A.  It's too far.  They need to refuel at least once, maybe

04:19  24  twice, depending on where they do it.

04:19  25  Q.  How would they find fuel out in the middle of the ocean?

A.   Generally, we believed, through debriefings, they would get fueled up around the Galapagos Islands, and from there they could possibly make it straight to Guatemala.

If not, they would send out boats from Costa Rica, Nicaragua, and meet somewhere out here to get refueled on the way.

Q.   How do they find their refueling vessels halfway between the Galapagos Islands and Guatemala?

A.   They're either given predetermined coordinates, as well as every boat that I saw was equipped with a satellite phone to update if they're late, where they're going to meet, if the coordinates have changed.

If they see the Coast Guard vessel, they may move it 50 miles this way or that way.  But they could definitely talk with land either by text or just a straight phone call from the sat phone.

Q.   Other than the satellite phone, what was the other piece of equipment that was needed for that type of coordination?

A.   The GPS.

Q.   So they would use GPS and satellite phones to dictate where they were and then meet up with their fuel suppliers?

A.   Yes.

Q.   You worked in Guatemala, correct?

A.   Yes.

Q.   When these boats approached their destination, Guatemala or

04:20  1   another location, what would happen when they got closer to

04:20  2   shore?

04:20  3   A.  When it got closer to shore, approximately 200 to

04:20  4   300 miles, that would be the point where they would offload

04:20  5   their load onto receiving vessels coming from Guatemala.

04:20  6       Usually, they would coordinate that through satellite

04:20  7   phones or a premeditated time and coordinate.  If they were

04:20  8   going to run late, there needs to be a lot of coordination.

04:21  9   Usually they will talk over the satellite phone and say, "We're

04:21  10  meeting at these coordinates at this time."

04:21  11      The receiving boat -- the delivery boat --

04:21  12          THE COURT:  Slow down.

04:21  13   BY MR. QUENCER:

04:21  14  Q.  Did they sometimes use radios?

04:21  15  A.  Yes.

04:21  16  Q.  Anything in particular about radios and their use?

04:21  17  A.  They would send out coded messages.  We would find other

04:21  18  boats -- cheat sheets, letters and numbers would be designated,

04:21  19  and they could call out various letters to the radio, and from

04:21  20  those letters they could put together the coordinates.

04:21  21      So if someone was listening to the radio, they wouldn't

04:21  22  know exactly what they're talking about.

04:21  23  Q.  So much like the refueling, they would use GPS devices and

02:19  24  satellite phones and potentially radios to meet up with people

02:19  25  coming up from Guatemala to meet and take the drugs back onto

04:21  1  land?

04:21  2  A.  Yes.

04:21  3  Q.  Once the narcotics reached Guatemala, where did they go

04:22  4  from there?

04:22  5  A.  They hit the river systems and they would -- generally

04:22  6  around the Mexican border, they get in these river systems and

02:21  7  get offloaded to several trucks that are then just driven

04:22  8  across the border into Mexico.

04:22  9  Q.  You testified earlier that you had worked with confidential

04:22  10  sources, correct?

04:22  11  A.  Yes.

04:22  12  Q.  During the time that you were in Guatemala, did anything

04:22  13  negative happen to confidential sources or informants who were

04:22  14  passing information about drug trafficking organizations?

04:22  15  A.  Yes, we had one --

04:22  16       MR. BLUMENFELD:  Objection, Your Honor.

04:22  17       THE COURT:  Yes, approach.

04:22  18       PROCEEDINGS AT SIDEBAR FOLLOW:

04:22  19       MR. BLUMENFELD:  I would object to talking about

04:23  20  something negative happening to informants.

04:23  21       First of all, there aren't any informants in here.

04:23  22       THE COURT:  Let me ask; where are you going, Mr.

04:23  23  Quencer?

04:23  24       MR. QUENCER:  We have talked to him beforehand.  We

04:23  25  want him to be very limited in the things that he talks about.

04:23  1   The defense raised, in their opening argument, the fact that

04:23  2   the client was potentially afraid of violence by the drug

04:23  3   trafficking organizations in this case.

04:23  4        MR. BLUMENFELD:  My client was not afraid.  I didn't

04:23  5   raise that.

04:23  6        THE COURT:  No, no, the people on the boat wanted to

04:23  7   not abandon the drugs, but said it was okay to bring them in

04:23  8   and get arrested by the police --

04:23  9        MR. BLUMENFELD:  They were not informants --

04:23  10       THE COURT:  No, that's how he got the information.

04:23  11  He's establishing a predicate as to how he would know --

04:24  12       MR. QUENCER:  That drug trafficking organizations are

04:24  13  violent.

04:24  14       THE COURT:  Right.  Here's the thing.  Unless he's

04:24  15  going to tell us that drug trafficking organizations would

04:24  16  penalize you if you left it and wouldn't penalize you if you

04:24  17  got arrested, then I would say that was pretty germane.

04:24  18       But the fact that they're violent I think is not a

04:24  19  question that anyone has any problem with.  Everyone knows

04:24  20  that.

04:24  21       MR. BLUMENFELD:  You could almost take judicial

04:24  22  notice.

04:24  23       MR. QUENCER:  I will accept the Court's ruling with

04:24  24  the upmost respect.  However, our point was just a little more

04:24  25  targeted than drug trafficking organizations are violent.

04:24  1          It is that you inform or you get in trouble with drug

04:24  2  trafficking organizations, you risk the violence of drug

04:24  3  trafficking organizations.

04:25  4          If the Court would still prefer that we stay away from

04:25  5  it, we'll stay away from it.

04:25  6          THE COURT:  I would.  Again, it's this idea that

04:25  7  abandonment meant repercussions, but getting arrested did not.

04:25  8  He could say, "No matter what, you're going to pay."  I don't

04:25  9  think he's prepared, right now, to say that.  So let's stay

04:25  10  away from that area.

04:25  11          We will see what Mr. Blumenfeld says on cross.  If you

04:25  12  open the door, Mr. Blumenfeld, of course they're going to want

04:25  13  to walk through it.

04:25  14          MR. BLUMENFELD:  I don't think there will be much on

04:25  15  cross, Your Honor.

04:25  16          PROCEEDINGS IN OPEN COURT FOLLOW:

04:25  17          THE COURT:  All right.  You may continue, Mr. Quencer.

04:25  18  BY MR. QUENCER:

04:25  19  Q.  Let's talk about drug prices.

02:25  20     In your experience, did you become familiar with the

02:25  21  various types of drug prices from Central America up to the

02:25  22  United States?

04:26  23  A.  Yes.

04:26  24  Q.  Tell the jury a little bit about what you learned.

04:26  25  A.  This was as of 2017.  A kilogram of cocaine in Colombia was

04:26  1  approximately $2,000 to $2,500 a kilo.

04:26  2      In Guatemala, they were generally running from $12,500 to

04:26  3  $13,500 per kilo.

04:26  4      Then you take that to Los Angeles, we're talking $22,000,

04:26  5  and in New York, 30 to $31,000 per kilo.  So quite a mark-up.

04:26  6  Q.  Based on your experience, where would most of the narcotics

04:26  7  that were traveling through Guatemala ultimately head to?

04:26  8  A.  The bulk of it was going to the U.S.

04:26  9  Q.  Why is that?

04:26  10  A.  Demand, prices.  It's a lot more lucrative to get it to the

04:27  11  States than selling it in Guatemala or Mexico.

04:27  12  Q.  Are you familiar with the price of gas in Guatemala?

04:27  13  A.  Yes.

04:27  14  Q.  How are you familiar?

04:27  15  A.  About every quarter or every couple months I would buy our

03:04  16  counter-parts about $10,000 worth of gas, just to keep their

03:05  17  boats running.

03:05  18  Q.  And so what was the approximate price of gas when you were

03:05  19  in Guatemala?

03:05  20  A.  As of a year ago, approximately, it was between $3.50 and

03:05  21  $4 a gallon.

04:27  22  Q.  And you were last in Guatemala when?

04:27  23  A.  I left in April of 2017.

04:27  24      MR. QUENCER:  Thank you.  No further questions.

04:27  25      THE COURT:  Cross-examination, Mr. Blumenfeld.

04:27  1          MR. BLUMENFELD:  Thank you, Your Honor.  I have no

04:28  2   questions.

04:28  3          THE COURT:  Thank you, Agent; you may step down.

04:28  4              WITNESS EXCUSED.

01:04  5          THE COURT:  All right.  Ladies and gentlemen, it's

01:04  6   been a long day so I am going to excuse you for the evening.

01:04  7          So, you will go home and your spouse, your boyfriend,

01:05  8   your girlfriend or roommate will say; how was your day?

01:05  9          It was a good day. What happened? I got chosen as a

01:05  10  juror.  Really; what is the case about?  And that's the end of

01:05  11  that conversation.  Because you cannot talk about the case, not

01:05  12  to anyone.

01:05  13         You can tell whoever is interested that you are a

01:05  14  juror but that's it; no other conversation. You cannot have any

01:06  15  discussion online or in person, even with each other. You are

01:06  16  not permitted to talk about the case.

01:06  17         So go home, have a good dinner get a good night's rest

01:06  18  and be back here tomorrow at nine a.m. and we will proceed in

01:06  19  this case.

01:06  20         COURT SECURITY:  All rise.

01:06  21             JURY EXCUSED

01:07  22         THE COURT: All right.  Is there anything further we

01:07  23  need to take up before we resume tomorrow?

01:07  24         MR. QUENCER: No, Your Honor.

01:07  25         MR. BLUMENFELD: No, Your Honor.

01:07   1              THE COURT:  All right.  I will see you back here then

01:07   2    at nine a.m.

3                         COURT IN RECESS

25                              -   -   -

**C E R T I F I C A T E**

    I hereby certify that the foregoing is an accurate transcription of proceedings in the above-entitled matter.


                                    /S/PATRICIA SANDERS

_____                    _____
DATE FILED                        PATRICIA SANDERS, RPR