UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
CASE NUMBER 17-20805-CR-KMW

UNITED STATES OF AMERICA

    vs.

JULIO CESAR ALVAREZ-MARTINEZ,

        Defendant

---

TRIAL PROCEEDINGS HELD 3-28-18
BEFORE THE HONORABLE KATHLEEN M. WILLIAMS
UNITED STATES DISTRICT COURT JUDGE

---

**APPEARANCES:**

| | |
|---|---|
| FOR THE UNITED STATES: | KEVIN QUENCER, A.U.S.A. |
| | SHARAD MOTIANI, A.U.S.A. |
| | **99 N.E. 4th Street** |
| | Miami, FL  33132 |
| FOR THE DEFENDANT: | JACK R. BLUMENFELD, ESQ. |
| | **2655 LeJeune** |
| | Coral Gables, FL 33134 |
| REPORTED BY: | PATRICIA SANDERS, RPR |
| | United States Court Reporter |
| | 400 North Miami Avenue, Suite 11-3 |
| | Miami, FL  33128 |
| | T: 305.523.5528 |
| | patricia_sanders@flsd.uscourts.gov. |

I N D E X

|  | DIRECT | CROSS | REDIRECT |
|---|---|---|---|
| Patrick O'Donnell | 3 | 29 | 33 |
| Taylor Andrews | 34 | 44 | 45 |
| Joel Edwards | 46 | 62 | |
| Kevin Mallory | 63 | | |
| Sean Regan | 79 | | |
| John Shine | 90 | 92 | 93 |
| Jose Bautista Vasquez | 94 | 108 | 112 |
| Julio Alvarez Martinez | 130 | 149 | |
| Kevin Mallory | 159 | | |

1          THE COURT:  Bring in the jury, please.

2          COURT SECURITY OFFICER:  All rise, please.

3          THE COURT:  Everyone may be seated.

09:12  4          Good morning, ladies and gentlemen.  You will note, as

09:12  5     we go on, that we will all remain standing in the courtroom

09:12  6     until you are all seated.  This is a sign of our respect for

09:13  7     the role you have as judges of the facts.  So when you come in,

09:13  8     you may immediately be seated.

09:13  9          Government, call your next witness.

09:13  10         MR. QUENCER:  Thank you, Your Honor.  The United

09:13  11    States calls Lieutenant Commander Robert O'Donnell of the

09:13  12    United States Coast Guard.

09:13  13                    WITNESS SWORN

09:13  14         COURTROOM DEPUTY:  Please state your full name for the

09:14  15    record.

09:14  16         THE WITNESS:  My name is Lieutenant Commander Patrick

09:14  17    Robert O'Donnell.

09:14  18         THE COURT:  You may proceed, Mr. Quencer.

09:14  19         MR. QUENCER:  The United States would like to move

09:14  20    into evidence a series of photographs that have been marked as

09:14  21    Government's Exhibit 1A through D, 2A through D, and 3A through

09:14  22    D, along with 4.  That is without objection.

09:14  23         THE COURT:  All right, without objection, Mr.

09:14  24    Blumenfeld?

09:14  25         MR. BLUMENFELD:  Yes, Your Honor.

09:14  1           THE COURT:  Government's Exhibit 1A through D, 2A

09:14  2  through D, 3A through D, and Government's 4 will be admitted

09:14  3  without objection.

09:14  4           DIRECT EXAMINATION

09:14  5  BY MR. QUENCER:

09:14  6  Q.  Lieutenant Commander Robert O'Donnell, where do you work?

09:15  7  A.  I am currently stationed in Jacksonville, Florida at

12:32  8  Helicopter Interdiction Tactical Squadron, HITRON, where we

09:15  9  specialize in counter narcotics.

09:15 10  Q.  How long have you been in the Coast Guard?

09:15 11  A.  I have been in the Coast Guard active duty just about

09:15 12  11 years.

09:15 13  Q.  I want to go backwards a little bit.

09:15 14       What state were you born and raised in?

09:15 15  A.  I was born in Connecticut.

09:15 16  Q.  Where did you go to college?

09:15 17  A.  I went to the U.S. Coast Guard Academy in New London,

09:15 18  Connecticut.

09:15 19  Q.  After you graduated from the academy, where did you go

09:15 20  next?

09:15 21  A.  After that, I went to flight school in Pensacola, Florida

12:37 22  where I trained for just about two years.  The first phase is

12:37 23  learning how to fly airplanes, and the second phase is flying

12:37 24  helicopters.

12:37 25  Q.  After you were done with your training in Pensacola, where

12:37  1    did you go next?

09:15  2    A.   I went to North Bend, Oregon and did search and rescue off

09:16  3    the Oregon Coast.

09:16  4    Q.   Where did you go next?

09:16  5    A.   After North Bend, we went to Jacksonville, Florida to

09:16  6    HITRON.

09:16  7    Q.   So you have been in HITRON since then?

09:16  8    A.   Yes, sir.

09:16  9    Q.   I want to talk to you just a little bit about how you ended

09:16  10   up on the James.

09:16  11       Tell us a little bit about what you do at HITRON.

09:16  12   A.   Yes, sir.   At HITRON, like I said, we specialize in counter

09:16  13   narcotics, and so we will use airborne use of force to compel

09:16  14   vessels to comply.

09:16  15       Normally, we're operating off the Eastern Pacific or

09:16  16   Western Caribbean areas, the transit zones, and basically

09:16  17   looking for vessels that are running illicit contraband from

09:16  18   South and Central America on the high seas.

09:16  19   Q.   So when you attach yourself to a ship, how long do you go

09:16  20   with that ship?

09:16  21   A.   Typically, when we're deployed, it's anywhere from 30 to 60

09:17  22   days.   This deployment, in particular, was a little longer.   It

09:17  23   was just short of 80 days.   So we're normally just patrolling

09:17  24   international waters and getting different targets pointed out

09:17  25   to us to investigate.

09:17  1   Q.   So if I've got this right, you are based out of

09:17  2   Jacksonville?

09:17  3   A.   Yes, sir.

09:17  4   Q.   And then, when ordered to, you go with various different

09:17  5   Coast Guard cutters out on deployment?

09:17  6   A.   Correct.  In my five years at HITRON, I've gone on about

09:17  7   nine different ships, anywhere from 30 to about 80 days.

09:17  8   Q.   And what do you do in your down time, if you will, when

09:17  9   you're back in Jacksonville?

09:17  10  A.   In Jacksonville, we do a lot of training.  So we will do a

09:17  11  lot of training flights simulating what we will see when we're

09:17  12  deployed.  We have a training boat that we'll basically chase

09:18  13  around that simulates these go-fast vessels.  We practice a

09:18  14  lot, so we're very proficient at what we're doing.

09:18  15  Q.   When did you first arrive onboard the Coast Guard Cutter

09:18  16  James?

09:18  17  A.   We got onboard about July 19th of last year.

09:18  18  Q.   I want to direct your attention to August 31st, 2017.

09:18  19       What happened onboard the Coast Guard cutter once a target

09:18  20  of interest was spotted in the area?

09:18  21  A.   Typically, what will happen is we get notified via an

12:39  22  announcement -- we call it a pipe -- on the shipboard

12:39  23  announcement system.  It will be set to go-fast still.

12:39  24       Once we receive that announcement, I will send the rest of

09:18  25  my crew to the helicopter and to the flight deck to prepare the

helicopter to go fly, and then I will run up to CIC, Combat and

Command, and there we come up with a game plan.

    It's myself, the ship's commanding officer, the operations

officer, the boarding team, basically all the key players that

are essential to have a safe and efficient interdiction.  So

we'll come up with a game plan and do a risk assessment.

    At that point, when we're all comfortable with the

operation, then we'll actually head back out to the flight deck

and prepare to fly.

Q.   So, on August 31st, did you go to the command and control

center?

A.   Yes, sir.

Q.   And you came up with a game plan?

A.   Yes.

Q.   And then you went to the helicopter?

A.   Yes.

Q.   What did you do once you got to the helicopter onboard the

James?

A.   I always do a pre-flight; so looking around to make sure

everything is operating, especially some of our lighting

systems.  We have a specific light to illuminate part of the

helicopter so we can announce that we are the U.S. Coast Guard

for nighttime interdictions.

    Then we completed all of our normal checklists to make sure

everything was operating and that the aircraft was safe to fly.

Q.  And did you launch?

A.  Yes, sir, we did.

Q.  Now, where did you go once you elevated or launched from

the Coast Guard Cutter James?

A.  At that point, there was another aircraft called a maritime

patrol aircraft who initially spotted the target of interest.

So we received a last known position and then course and speed

of the target of interest, and that was approximately 20 miles,

30 miles away from our current position.  So we took off and

started heading in that direction.

Q.  If you could, briefly describe how a maritime patrol

aircraft differs from your helicopter.

A.  The maritime patrol aircraft, the MPA, is kind of

a four-engine airplane.  It's a large aircraft with kind of

radar and things like that.

    So they're normally flying at a very high altitude, whereas

we're only a couple hundred feet above the water.

Q.  The MPA, does that take off from a ship or from land?

A.  No, that's land-based.

Q.  So you have a land-based MPA that has spotted this target

of interest and is directing you on how to find it?

A.  Yes, sir.

Q.  Do you recall first seeing the target of interest or the

go-fast vessel in this case?

A.  I do.

Q.  And what is the first thing that you are trying to do once you actually come into visual contact, either through your eyeballs or through your systems when you see that?

A.  In this case, the first time that I witnessed the target of interest was using our camera.  It's called a FLIR camera.  We have a little screen where we're able to see and pick it up visually.

So what I'm trying to look at first is to make sure it's the correct boat and there are no other boats in the vicinity so that we can have a positive handoff from the maritime patrol aircraft.

So I want to confirm the number of people onboard, the number of outboard engines, and if there are any fuel barrels or visible contraband, which is typically like a rectangle shape.

Once we have that information, I relay that back to the cutter so we could relay all that pertinent information up to the District 11 Coast Guard commander.

Q.  Why are you looking for those specific things like fuel barrels, engines, packages on deck?

A.  There are several different criteria that we look for on a typical go-fast vessel, and as a part of our procedures, we have to make sure it is suspected of illicit maritime activities.

In this case, with the fuel barrels, the amount of POB's,

09:23  1  and more importantly, operating at night with no navigation

09:23  2  lights really fell in line with our procedures to make sure

09:23  3  that this was, indeed, suspected of illicit maritime activity.

09:23  4  Q.  You said the number of POB's; is that persons onboard?

09:23  5  A.  Yes, persons onboard.

09:23  6  Q.  Let's talk about the camera before we go into some of that

09:23  7  video.

01:21  8      Is that like a camera I would use like on my iPhone?  Or

01:21  9  how is it different?

01:21  10  A.  No, this camera is a little more sophisticated and has the

09:23  11  ability to track heat signatures.  So we have different modes

09:23  12  that we use.  There's an infrared mode that we can use black

09:23  13  showing the increased heat signature, and then also white will

09:23  14  show the increased heat signature.

09:23  15      We can go back and forth in order to get the best contrast

01:22  16  and resolution possible.

01:22  17  Q.  Is this at nighttime or during the day?

01:22  18  A.  It was at night.

01:22  19  Q.  So you couldn't visually see the go-fast vessel from your

01:22  20  helicopter?

01:22  21  A.  At that point, no, but as we made our approach to get

01:22  22  closer, then we could see it under -- we have night vision

01:22  23  goggles, so we could see it under night vision goggles.

09:24  24  Q.  So you were able to see it on the FLIR before you were able

09:24  25  to see it with your night vision goggles?

09:24  1    A.   Yes, sir.

09:24  2    Q.   There were no running lights?

09:24  3    A.   There were no operating running lights, so the vessel was

09:24  4    completely dark.

09:24  5           MR. QUENCER:  Permission to approach?

09:24  6           THE COURT:  Yes.

09:24  7    BY MR. QUENCER:

09:24  8    Q.   I'm showing you what is marked as Government's Exhibit 5.

09:24  9         What is that?

09:24  10   A.   Those are my initials and the date I reviewed it.

09:24  11   Q.   What is on this disc?

09:24  12   A.   This is the video of the target of interest.

09:25  13   Q.   Prior to your testimony here today, did you review some of

09:25  14   the videos on this disc?

09:25  15   A.   Yes, sir.

09:25  16   Q.   Are they a fair and accurate representation of what the

09:25  17   FLIR camera was able to observe that night?

01:24  18   A.   Yes, sir.

09:25  19           MR. QUENCER:  Your Honor, the United States would move

09:25  20   for the admission of Government's Exhibit 5.

09:25  21           MR. BLUMENFELD:  No objection.

09:25  22           THE COURT:  It is admitted.

09:25  23           MR. QUENCER:  Permission to publish?

09:25  24           THE COURT:  You may.

09:26  25           VIDEOTAPE PLAYED FOR THE RECORD

BY MR. QUENCER:

Q.   Can you see the video on your screen?

A.   Yes, sir.

Q.   I want to talk a little bit about what we're seeing here to educate the jury.

     What is at the top left of the screen there?

A.   At the very top left we have the date and the local time. That time will be about plus or minus one hour of what the actual time was because of Daylight Savings Time.  It gets the time from a GPS signal.

     Directly below that is the position, the latitude and longitude of where we physically are on the earth.  The other part that I'm circling is the elevation, which was about 300 feet over the surface of the water, and also our heading. So that's the physical direction that the helicopter is flying at that point.

Q.   At the bottom of the screen you see the words "white hot".

     What does that mean?

A.   Right there it says "IR white hot".  So that means anything that you see as kind of white is going to be what's giving us the hot heat signature.  That specific part will go from white to black.

     So you will be able to see down there on the bottom left. If it says black, it means we're using black hot, showing black as being the hottest part on the vessel.

Q.   Finally, there's a wheel in the center bottom of the video.

What is that wheel?

A.   If you just imagine that that is the helicopter, the 12

o'clock portion of that wheel, that's going to be the nose of

the helicopter.   The bottom part, the six o'clock, will be the

tail of the helicopter.

That line that's pointing at the 12 o'clock position is

where the camera is pointed to.   So we can rotate that camera

360 degrees.   So that just gives us a reference of where the

target is in relation to the helicopter.

Again, it's very, very dark, especially for the pilots up

front, so we may not always exactly know where that camera is

pointing so that's why that line is important to us.

Q.   We're going to just watch a little bit of this for a

minute.

A.   Okay.

VIDEOTAPE PLAYED FOR THE RECORD.

BY MR. QUENCER:

Q.   It just switched to a different color scheme.

Is that what you were talking about earlier?

A.   So we switched to black hot to see if we could get a little

better resolution on the video.

Q.   The white spots that you're seeing on the screen, based on

your experience, what are those white spots?

A.   It's exposed skin; people's faces and heads.

09:30    1                    VIDEOTAPE PLAYED FOR THE RECORD

09:30    2      BY MR. QUENCER:

09:30    3      Q.  What just happened there?

09:30    4      A.  I believe the person, the forward right -- I think that's

09:31    5      when we were initially detected.  So we were spotted.  It

09:31    6      appeared to me that someone pointed to us.  I saw a couple

09:31    7      heads turn in the direction of the helicopter.

09:31    8      Q.  What is the timestamp in the top left?

09:31    9      A.  21:03:34 local.

09:31   10                    VIDEOTAPE PLAYED FOR THE RECORD.

09:31   11      BY MR. QUENCER:

09:31   12      Q.  What did we see in the last 15 seconds or so?

09:31   13      A.  The last 15 seconds, it definitely appeared that they

09:31   14      acquired us visually.

09:31   15                    MR. BLUMENFELD:  I would object to speculation.

09:32   16                    THE COURT:  Based on your experience with reviewing

09:32   17      these types of films, what did you see happen in the last

09:32   18      15 seconds?

09:32   19                    THE DEFENDANT:  They spotted us.  By pointing at me,

09:32   20      that absolutely indicates that we've been spotted and to

09:32   21      continue on with our procedures.

09:32   22                    VIDEOTAPE PLAYED FOR THE RECORD

09:32   23      BY MR. QUENCER:

09:32   24      Q.  What did you just observe the two people in the front do in

01:27   25      the last 15 or so seconds of the video?

A.   They both kind of knelt down and appeared to hide

themselves.

                    VIDEOTAPE PLAYED FOR THE RECORD

 BY MR. QUENCER:

Q.   What is the person in the back manning the engines, what

does he appear to be doing during the last ten seconds with his

heads?

A.   It looked like he was kind of looking back at us and also

talking to the occupants of the vessel to essentially come up

with their plan.

Q.   At this point, on the helicopter, what was the opinion

about whether or not you had been spotted or not?

A.   We discussed it as a crew, and we absolutely felt that we

had been spotted at that point.  We call it going overt, so we

were overt at that point, which is why we felt comfortable

staying close to the vessel so we could update our risk

assessment and also get any amplifying information on this boat

to really confirm it was the number of outboards we were

expecting, the number of POB's, looking for any sort of weapons

that could be used against us, and also any indication of

nationality; meaning does this boat belong to another country?

Is it registered?

     Because that's all information we will provide to our

superiors as we continue on with this interdiction.

Q.   As you're passing this information back to your superiors,

1  what is it that you are waiting for, for them to say yes or no

2  on?

3  A.  It's called a statement of no objection, an SNO.

4  Basically, that goes to the Coast Guard District 11 Commander,

5  who is in Almeida, California, and he gives us the actual

6  authority to use airborne use of force to compel a vessel to

7  compliance.

8      Once that SNO is granted from the District 11 Commander, he

9  will release it to the cutter commander.  Then the cutter

10  commander does what is known as -- he retains the SNO and gives

11  us the authority to go through our procedures to potentially

12  use warning shots and disabling fire to execute the

13  interdiction.

14  Q.  While you were waiting for that authority to attempt to

15  stop the vessel, what did you and your crew do during that time

16  period?

17  A.  We prepared our cabin.  What that means is our gunner, who

18  sits behind us, he opened up the sliding door and then swung

19  out the weapons system that we utilize, which is a larger

20  machine gun to deliver the warning shots and then a sniper

21  rifle to deliver the disabling fire to the engines.

22  Q.  Physically, what was your helicopter doing as it relates to

23  the go-fast vessel?

24  A.  We were physically kind of orbiting, flying circles around

25  the go-fast vessel so we could maintain close contact, remain

09:36 | 1   visual, and then also continue looking for any indications of

09:36 | 2   -- that this is a normal fishing boat or suspected of illicit

09:36 | 3   maritime activity.

09:36 | 4   Q.  I notice on the screen that there are the letters E-L-E-V

01:36 | 5   followed by 177F.  I think you have already told us about that,

09:36 | 6   but if you could explain again to the jury, what is your

09:36 | 7   altitude at this moment?

09:36 | 8   A.  At this moment, we're at 177 feet above the surface of the

09:36 | 9   water.

09:36 | 10  Q.  If you could just estimate, how tall do you think the roof

09:36 | 11  of this courtroom is?

09:36 | 12  A.  It's probably 40 feet, between 30 and 40 feet.

09:36 | 13  Q.  So you were approximately four times, maybe five times as

09:36 | 14  high as the roof of this courtroom?

09:37 | 15  A.  Yes, sir.

09:37 | 16  Q.  I'm showing you Video 4 on the disc.  The timestamp is

01:39 | 17  21:09:06.

01:39 | 18          VIDEOTAPE PLAYED FOR THE RECORD

01:39 | 19   BY MR. QUENCER:

09:37 | 20  Q.  What is different about the go-fast vessel now and its

09:37 | 21  movement?

09:37 | 22  A.  After we were detected by the go-fast, it appeared to

09:37 | 23  increase its velocity, its speed, to go a little faster.  That

09:37 | 24  was apparent to me at the time by the amount of wake that's now

09:37 | 25  coming off the bow.  So we were definitely going faster than

09:37   1   when we initially detected the go-fast.

09:38   2   Q.  At this point in time, what are you still waiting for?

09:38   3   A.  We're still waiting for that SNO, the statement of no

09:38   4   objection.

09:38   5   Q.  Can you see the two people in the front or the bow portion

09:38   6   of the go-fast?

09:38   7   A.  A little bit.  It's definitely a lot more difficult to pick

09:38   8   up those heat signatures the way they're sitting down in the

09:38   9   front of the vessel.

09:39  10        MR. QUENCER:  If we could have a moment.

09:39  11        THE COURT:  All right.

09:39  12   BY MR. QUENCER:

09:39  13   Q.  I'm showing you what is in evidence as Government's

09:39  14   Exhibit 1D.

09:39  15      Lieutenant Commander, what is this a picture of?

09:39  16   A.  This is a pretty similar model of our aircraft.  It's an

09:39  17   inaccurate representation of what we would have had on that

09:39  18   particular night.

09:39  19      A couple exceptions would be this basket down here.  Since

09:39  20   we don't do search and rescue, we don't fly with a rescue

09:39  21   basket.  So we wouldn't have that onboard.

09:39  22      Our gunner sits kind of where you see that person that's

09:39  23   operating the hoist.  When I mentioned preparing the cabin,

01:39  24   that sliding door, we open that up and that's where those

09:40  25   weapons systems would be staged out of along with our gunner.

| | | |
|---|---|---|
| 09:40 | 1 | Some other key things to note on the helicopter is this |
| 09:40 | 2 | logo.  That's the Coast Guard seal.  That indicates to whoever |
| 09:40 | 3 | we're pursuing that we're the U.S. Coast Guard. |
| 09:40 | 4 | At nighttime, we actually have a light that's right about |
| 09:40 | 5 | there.  It's kind of hard to see in that photo.  It's a white |
| 09:40 | 6 | light that we turn on to illuminate that logo so they can see |
| 09:40 | 7 | exactly who we are. |
| 09:40 | 8 | Then, lastly, there is a blue rotating strobe light like |
| 09:40 | 9 | you would see on a police car that we would turn on to indicate |
| 09:40 | 10 | that we are a law enforcement entity and we just want the |
| 09:40 | 11 | vessel to stop so we can figure out what's going on. |
| 09:40 | 12 | MR. QUENCER:  Let the record reflect that the witness |
| 01:40 | 13 | has circled the basket dangling from the helicopter and has |
| 01:40 | 14 | circled the open door to demonstrate where the gunner sits. |
| 09:41 | 15 | He has circled a white emblem on the rear of the aircraft |
| 09:41 | 16 | and a little bump on the bottom as the blue light. |
| 09:41 | 17 | THE COURT:  All right. |
| 09:41 | 18 | BY MR. QUENCER: |
| 09:41 | 19 | Q.  I would like to talk to you about what happens once you get |
| 09:41 | 20 | the statement of no objection. |
| 09:41 | 21 | A.  Yes, sir. |
| 09:41 | 22 | Once when we receive the SNO, we would typically descend. |
| 01:44 | 23 | In this case, we were already fairly low at 177 feet, but we'll |
| 01:45 | 24 | go anywhere between 75 and 100. |
| 01:45 | 25 | We will maneuver ourselves to be right off of the left side |

05:54  1   of the vessel.  At that point, I illuminated that logo light

09:41  2   and also that blue law enforcement light.  So we're signaling

09:41  3   the vessel to stop.

09:41  4       I also made a call-out in English and in Spanish to

05:54  5   announce who we were as the U.S. Coast Guard and also request

05:55  6   them to stop their vessel.

09:41  7       At that point, if the vessel doesn't comply, then we move

09:42  8   into warning shots.  So we move the helicopter just forward of

09:42  9   the vessel and fire about three stitches of warning shots

09:42  10  anywhere from 15 to 30 rounds no closer than ten yards off of

09:42  11  the vessel's bow.

09:42  12      At that point, if the vessel still doesn't comply, then we

09:42  13  move into disabling fire.  So we'll stay at about that 75 to

09:42  14  100 foot altitude and ask for our gunner to execute rounds of

09:42  15  disabling fire to compel compliance to get that vessel to stop.

09:42  16  Q.  In this case, did you illuminate the light?

05:58  17  A.  Yes, sir, we did.

05:58  18  Q.  With the emblem illuminated, did they stop?

09:42  19  A.  No, sir, they continued on.

09:42  20  Q.  You were 75 feet in the air approximately how far away from

09:42  21  this boat?

09:42  22  A.  Anywhere between about 75 to 100 yards.  So we were

09:43  23  immediately apparent to the vessel that we were along side and

09:43  24  that we were part of the U.S. Coast Guard.

09:43  25  Q.  So this was nighttime, 300 miles out to sea?

09:43  1    A.  Yes, sir.

09:43  2    Q.  In your experience, would that helicopter have been highly

09:43  3    visible to anybody nearby?

09:43  4    A.  Yes, absolutely.

09:43  5    Q.  Not only the emblem, but what else did you activate that

06:00  6    was a light?

06:00  7    A.  We also activated that law enforcement blue light, the blue

06:00  8    strobe that was underneath the aircraft.

09:43  9    Q.  Does that flash?

09:43  10   A.  Yes, it flashes.  It looks just like a police car strobe

09:43  11   with their lights.

09:43  12   Q.  With that illuminated and flashing like a police car

09:43  13   strobe, did they stop?

09:43  14   A.  No, sir, they continued on.

09:43  15   Q.  Then you made warnings over Maritime Channel 16?

09:43  16   A.  Yes.

09:43  17   Q.  If you don't have a radio on the boat, are you going to

09:43  18   hear those warnings?

09:43  19   A.  No, sir, you're not going to hear the warnings.

09:44  20   Q.  But if you have a radio on the boat?

09:44  21   A.  Then you will hear the warnings, and I believe that they

09:44  22   should have a radio when they're operating that far just as

09:44  23   part of international law.

09:44  24          MR. QUENCER:  We would like to go back to the video.

09:44  25          THE COURT:  All right.  It may take a moment.

09:44   1          MR. QUENCER:  Thank you, Judge.

09:44   2          VIDEOTAPE PLAYED FOR THE RECORD

09:45   3    BY MR. QUENCER:

09:45   4    Q.  For the record, the timestamp is 21:15:23.

09:45   5        At this point, what's going on?

09:45   6    A.  At this point, we're still completing our risk assessment

09:45   7    and threat assessment as we position ourselves.  Just doing our

09:45   8    final preparations after receiving that SNO to put the

09:45   9    helicopter in a safe position.

09:45   10   Q.  What is the speed of the boat at this time?

09:45   11   A.  They're doing anywhere between 35 and 40 knots, which would

06:03   12   be approximately 40 to 45 miles per hour.

09:45   13   Q.  21:16:04, what is happening?

09:45   14   A.  You'll see that red arrow; that's just indicating that

09:45   15   we're turning and the camera may lose a little bit of its

09:46   16   acuity on the target.  We're still kind of doing our final

09:46   17   preparations for receiving the SNO.

09:46   18          VIDEOTAPE PLAYED FOR THE RECORD

09:46   19   BY MR. QUENCER:

09:46   20   Q.  21:26:48, what is happening right now?

09:46   21   A.  Right now we have received the SNO, and I'm preparing to do

09:46   22   that signaling phase by making those radio call-outs,

09:46   23   illuminating our lights to indicate that we're the U.S. Coast

09:46   24   Guard.

06:04   25       We're just doing one kind of last quick turn to get

06:05  1  ourselves into that safe position.

09:47  2  Q.  Why do you position yourselves off of the port bow of the

09:47  3  vessel?

09:47  4  A.  Because the weapons systems are off of the right side of

09:47  5  the aircraft, and also, the pilot that's manipulating the

06:08  6  controls is on the right side of the aircraft, so they can

09:47  7  maintain visual.

09:47  8  Q.  The camera just zoomed out.  Why did they do that?

09:47  9  A.  At this point, our gunner is now on the weapons system and

06:10  10  no longer manipulating the camera, because he's actually the

06:10  11  person that's rotating the camera all the way around and

09:47  12  maintaining visual.

09:47  13     So he's on the machine gun, and I'm right about here.  I'm

09:47  14  making those call-outs and illuminating our lights to indicate

09:47  15  that we're the U.S. Coast Guard and asking the vessel to stop.

09:47  16          VIDEOTAPE PLAYED FOR THE RECORD

09:47  17   BY MR. QUENCER:

09:47  18  Q.  What did we just see?

09:47  19  A.  You just saw one stitch of warning shots, which is kind of

06:11  20  the white splashes into the water.

09:47  21  Q.  And this is obviously nighttime, so can anyone see the

09:48  22  bullets?

09:48  23  A.  Yes, because we also have tracers on every five rounds,

09:48  24  which is kind of a red flash that comes out of the gun and is

09:48  25  immediately apparent.  It almost looks like a firework kind of

09:48   1   going off.

09:48   2           VIDEOTAPE PLAYED FOR THE RECORD

09:48   3    BY MR. QUENCER:

09:48   4   Q.   What did we just see there?

09:48   5   A.   You just saw another round, a series of warning shots.   You

09:48   6   could also see a kind of bright, kind of white flash, which is

09:48   7   one of those tracer rounds that was going in front of the

09:48   8   target.

09:48   9   Q.   After you fired the warning shots, did the vessel stop?

09:48   10   A.   No, they did not stop.   They reduced their speed.   A common

06:15   11   tactic that I've seen is a vessel will reduce their speed and

09:48   12   turn down-wind because they feel that we're not able to fly

09:48   13   with them as close.

09:48   14       It's something I've seen that they typically do to evade us

09:48   15   from doing disabling fire.

09:49   16   Q.   For the record, the time stamp is now 21:21.

09:49   17           VIDEOTAPE PLAYED FOR THE RECORD

09:49   18    BY MR. QUENCER:

09:49   19   Q.   What did we just see?

09:50   20   A.   Warning shots.

09:50   21   Q.   What is the timestamp on the top left?

09:50   22   A.   21:18:02.

09:50   23   Q.   Approximately how much time elapsed between when they first

06:21   24   noticed you and when you fired warning shots?

09:50   25   A.   It was about 15 minutes.

Q.   The timestamp is now 21:21:47.

VIDEOTAPE PLAYED FOR THE RECORD

BY MR. QUENCER:

Q.   What did we just see there?

A.   The first round of disabling fire.

Q.   What did we see there?

A.   That was the second round of disabling fire.

The reason why the boat is kind of going from left to right is because we're actually flying backwards at this point because we wanted to keep the nose of the helicopter into the wind.  So Lieutenant Andrews, the other pilot, he was flying backwards, which is why we have that kind of profile.

Q.   Lieutenant Commander, it appears as though this boat is moving quite a bit slower than it was prior to the warning shots.

Why is it that you actually took disabling fire at the engines in this case?

A.   Yes, sir.  As long as the vessel is making way -- it's called underway and making way, meaning it's still moving.  Part of our procedures has us complete disabling fire in order to compel compliance.

To me, the vessel did not comply with our order to stop with warning shots and the signaling phase because the person driving the vessel was still at the throttle, and you can actually still see white water coming from the propellers, and

| | | |
|---|---|---|
| 06:29 | 1 | the vessel is still moving forward at 4 to 5 knots. |
| 09:52 | 2 | In my experience, that gives them an opportunity to still |
| 09:52 | 3 | attempt to evade us.  They were not complying with our order to |
| 09:52 | 4 | stop. |
| 09:52 | 5 | Q.  At this moment, with his hands in the air and both engines |
| 09:52 | 6 | shot out, he is complying? |
| 09:52 | 7 | A.  Yes, sir.  That's when we ceased our disabling fire.  We |
| 06:31 | 8 | completed two rounds of disabling fire, and once he raised his |
| 06:31 | 9 | hands and moved forward into the vessel, we were satisfied that |
| 06:31 | 10 | the vessel has now complied with our order to stop. |
| 09:53 | 11 | Q.  The timestamp is now 21:22:06? |
| 09:53 | 12 | A.  Yes, sir. |
| 09:53 | 13 | Q.  For the record, the timestamp is 21:25:02. |
| 09:53 | 14 | VIDEOTAPE PLAYED FOR THE RECORD |
| 09:53 | 15 | BY MR. QUENCER: |
| 09:53 | 16 | Q.  What is the person in the rear of the vessel doing at this |
| 09:53 | 17 | point? |
| 09:53 | 18 | A.  It appears he is messing with something, potentially trying |
| 09:53 | 19 | to scuttle the vessel. |
| 09:53 | 20 | MR. BLUMENFELD:  Objection, speculation. |
| 09:54 | 21 | THE COURT:  Sustained. |
| 09:54 | 22 | BY MR. QUENCER: |
| 09:54 | 23 | Q.  Can you actually see what he is doing? |
| 09:54 | 24 | A.  You can't completely see what he's doing, but it looks like |
| 06:32 | 25 | he's messing with something. |

09:54 1   Q.  And he was reaching down?

09:54 2   A.  Yes, sir.

09:54 3          VIDEOTAPE PLAYED FOR THE RECORD

09:54 4    BY MR. QUENCER:

09:54 5   Q.  What is he doing now?

09:54 6   A.  It still looks like he was reaching down there trying to do

09:54 7   something.

09:55 8   Q.  What is he doing there?

09:55 9   A.  It appears that he lit a cigarette and was starting to

09:55 10  smoke.

09:55 11         VIDEOTAPE PLAYED FOR THE RECORD

09:55 12   BY MR. QUENCER:

09:55 13  Q.  The two people in the bow, how are they positioning their

09:55 14  bodies?

09:55 15  A.  They're still kind of low.  It looks like they're reducing

09:55 16  their heat signatures, making it difficult for us to remain

06:40 17  visual with them.

09:55 18  Q.  What does the person in the back appear to be doing from

09:55 19  what you can observe?

09:55 20  A.  It appears that he's still bending down trying to reach for

09:55 21  something in the bottom of the vessel.

09:55 22         VIDEOTAPE PLAYED FOR THE RECORD

09:56 23   BY MR. QUENCER:

09:56 24  Q.  Now what is the person in the back of the boat doing?

09:56 25  A.  Looks like he's still smoking a cigarette, just sitting

09:56    1    there waiting.

09:56    2    Q.  At 21:03, you observed members of this crew pointing at

09:56    3    you?

09:56    4    A.  Yes, sir.

09:56    5    Q.  At 21:18, you fired warning shots across the bow of the

09:56    6    vessel, the vessel slowed, and at 21:22 you fired disabling

09:56    7    fire into the engines?

09:56    8    A.  Yes, sir.

09:56    9    Q.  You could see the engines exploding right next to the

09:56   10    person in the back?

09:56   11    A.  Yes.

09:56   12    Q.  After all that is done, what did you observe -- what could

09:57   13    you observe the defendant doing?  I'm sorry, the person in the

09:57   14    back doing?

09:57   15    A.  It appeared that he was smoking a cigarette and also doing

09:57   16    something kind of down on the deck on the bottom part of the

09:57   17    boat.

09:57   18    Q.  Just to be clear, you have no idea who's in the back of the

09:57   19    boat?

09:57   20    A.  No, I have no idea who is manipulating -- as you can see,

09:57   21    we don't have the best resolution to get that kind of detail

09:57   22    with this camera.

09:57   23    Q.  While the people in the forward part of the boat cower

09:57   24    below the center line, he's smoking a cigarette?

09:57   25    A.  Yes, sir.

09:58    1              MR. QUENCER:  Thank you, Lieutenant Commander.  No

09:58    2   further questions.

09:58    3              THE COURT:  Cross-examination.

09:58    4              MR. BLUMENFELD:  Briefly.

09:58    5              CROSS-EXAMINATION

09:58    6   BY MR. BLUMENFELD:

09:58    7   Q.  Commander, what we just saw were your warning shots at

09:58    8   21:18, and less than a minute later the vessel slowed almost to

09:58    9   a stop?

09:58   10   A.  Yes, sir, the vessel did slow down.

09:58   11   Q.  When the vessel was going 35 to 40 knots, that's your

09:58   12   estimate, correct?

09:58   13   A.  Yes, sir.

09:58   14   Q.  How fast does your helicopter go?

09:58   15   A.  It can cruise at about 120 knots.

09:58   16   Q.  Did you interpret him going 35 to 40 knots as trying to

09:59   17   evade a helicopter?

09:59   18   A.  Yes, sir, I did.

09:59   19   Q.  And when he slowed up, that was an attempt to evade the

07:10   20   helicopter?

09:59   21   A.  Yes, sir, because of the way that they maneuvered the

09:59   22   vessel by turning down-wind.  That's a common tactic that I've

09:59   23   seen in my five years of experience at HITRON.

09:59   24   Q.  But you didn't know anything about this vessel?

07:12   25   A.  The only thing I did know is that he turned down-wind.

Q.   What is turning down-wind?

A.   Instead of running with the wind blowing towards the vessel and the helicopter, he did a 180-degree turn and now the wind is behind, which makes it a little more difficult for us to fly.

Q.   You were circling around him, weren't you?

A.   Yes, sir, but when we come into a hover, because of the air dynamic factors of the helicopter and the design of it, it does not perform nearly as well with a tailwind.

Q.   Do you have any way to know whether the person driving the boat knew the aerodynamic quality of the U.S. Coast Guard helicopter?

A.   No, sir, I don't.

Q.   Also, when he was bending down, the person in the back of the helicopter (sic), you're speculating he was messing with something?

A.   The person in the helicopter or the person on the vessel?

Q.   Did I say helicopter?  I apologize.

A.   Yes, sir.

Q.   You said the person in the rear of the helicopter (sic) was bending down, correct?

A.   The person in the vessel was bending down.  The person in the helicopter, our gunner, he would have been on the weapons system.

Q.   The person in the vessel was bending down.  You speculated

1    he was messing with something --

2          THE COURT:  Let me stop you.  I didn't allow Mr.

3    Quencer to ask that question because you objected.  Now you

4    want to get into that?  That's fine.  You may answer.

5    BY MR. BLUMENFELD:

6    Q.  Do you know whether he was --

7    A.  It did appear that he would have been messing with

8    something on the vessel.  In my experience, that's typically a

9    scuttling valve or something in order to cause the vessel to

10   sink with whatever contraband may be in it.

11   Q.  Do you know whether any life vests or life jackets were on

12   the boat?

13   A.  No, sir, I do not.

14   Q.  So if the boat sunk, the occupants would have sunk also?

15   A.  No, sir, they wouldn't.  We actually train for that because

16   we are the U.S. Coast Guard, so we do search and rescue.  And

17   if it turns into a search and rescue situation, we have

18   self-inflating life rings in the helicopter.

19       At that point, I would go into a search and rescue mode.

20   As the mission commander of the aircraft, my job is to ensure

21   the safe and efficient execution of the mission, but also the

22   safety of the occupants on the vessel.

23       So I have genuine concern to make sure that they are okay

24   during this entire process.  So they wouldn't sink.  We would

25   come overhead and drop them one of those self-inflating life

1   rings and ensure that they had the opportunity to swim to it

2   and grab ahold of it and maintain afloat.

3   Q.   The water is cold out there, isn't it?

4   A.   No, sir, it's probably about 78, 80 degrees.

5   Q.   300 miles out in the Pacific?

6   A.   Yeah.  In the Eastern Pacific, we're pretty close to the

7   equator where we're operating.

8   Q.   So you saw him bend down.  You thought he was messing with

9   something, correct?

10   A.   Yes, sir.

11   Q.   But you didn't know what he was doing, correct?

12   A.   I couldn't particularly say at that moment what he was

13   doing.  Just on my experience in executing a lot of these

14   interdictions.

15   Q.   When he stood up, he was smoking a cigarette?

16   A.   Yes, sir.

17   Q.   So he could have been lighting a cigarette?

18   A.   I believe in the video it shows him lighting the cigarette

19   as he was standing up.

20   Q.   Do you know if he was getting papers for the boat,

21   preparing for the boarding?

22   A.   I'm not sure, sir.  I'm not part of that boarding phase.

23           MR. BLUMENFELD:  That's it, Judge.  Thank you.

24           THE COURT:  Any redirect?

25           MR. QUENCER:  Briefly, Your Honor.

10:03  1          THE COURT:  All right.

10:03  2   BY MR. QUENCER:

10:03  3   Q.  Mr. Blumenfeld asked you how is this guy going to know the

07:24  4   aeronautical capabilities of the helicopter.

07:24  5          Has there ever been a TV show similar to this that has

07:24  6   revealed the --

07:24  7          MR. BLUMENFELD:  Objection, Your Honor.

07:25  8          THE COURT:  Sustained.

07:25  9   BY MR. QUENCER:

10:04  10  Q.  Have you ever seen vessels use a similar tactic in trying

10:04  11  to avoid a helicopter, in your experience?

10:04  12  A.  Yes, sir, I've seen that tactic fairly often.

10:04  13  Q.  So it could be a coincidence?

10:04  14  A.  Potentially.

10:04  15          MR. QUENCER:  Your Honor, if I could have the video

10:04  16  screen.

10:04  17          THE COURT:  All right.

10:04  18          MR. QUENCER:  For the record, we are showing what has

10:05  19  been previously entered as Government's Exhibit 5.

10:05  20          The timestamp is 21:25.

10:05  21  BY MR. QUENCER:

10:05  22  Q.  Mr. Blumenfeld said he could have just been reaching down

10:05  23  for a cigarette.

10:05  24          If we could just watch the video for a moment.

10:05  25          VIDEOTAPE PLAYED FOR THE RECORD

10:05  1   BY MR. QUENCER:

10:05  2   Q.  Is the cigarette lit, Lieutenant Commander?

10:05  3   A.  Yes, sir, it appears to be lit.

10:06  4   Q.  What does the person at the back of the boat appear to be

10:06  5   doing?

10:06  6   A.  It looks like he's reaching down for something on the deck.

10:06  7   Q.  Is this before or after the cigarette was lit?

10:06  8   A.  This is after the cigarette was lit.

10:06  9        MR. QUENCER:  Nothing further.

10:06  10        THE COURT:  You may step down, Lieutenant Commander.

10:06  11        WITNESS EXCUSED

10:06  12        THE COURT:  Government, call your next witness.

10:06  13        MR. MOTIANI:  The United States would call Lieutenant

10:06  14   Taylor Andrews to the stand.

10:06  15                    WITNESS SWORN

10:06  16        COURTROOM DEPUTY:  Please state your full name for the

10:06  17   record.

10:07  18        THE WITNESS:  My name is Taylor Andrews.

10:07  19        DIRECT EXAMINATION

10:07  20   BY MR. MOTIANI:

10:07  21   Q.  Good morning, sir.

10:07  22   A.  Good morning.

10:07  23   Q.  Where are you employed?

10:07  24   A.  I am employed at Coast Guard Air Station HITRON in

10:07  25   Jacksonville, Florida.

10:07  1   Q.   What does HITRON stand for?

10:07  2   A.   Helicopter Interdiction Tactical Squadron.

10:08  3   Q.   How long have you been assigned there?

10:08  4   A.   Almost three years.

10:08  5   Q.   Briefly describe for the members of the jury your

10:08  6   educational background.

10:08  7   A.   I went to high school in the Northeast and then immediately

10:08  8   went to the Coast Guard Academy for four years.

10:08  9        When I graduated from the Coast Guard Academy in 2008, I

10:08  10  went to flight school in Pensacola, Florida for about two

10:08  11  years.

10:08  12       After graduating flight school -- that's about the extent

10:08  13  of my education.

10:08  14  Q.   What is your current position with HITRON?

10:08  15  A.   I am an aircraft commander, a mission commander, and an

10:08  16  instructor pilot at HITRON.

10:08  17  Q.   What is an aircraft commander?

10:08  18  A.   The aircraft commander essentially allows you to have the

10:08  19  keys to the car, and they say that I can accept the aircraft

07:28  20  and be responsible for the people and the mission that we are

10:08  21  about to go on.

10:09  22  Q.   What is a mission commander?

10:09  23  A.   A mission commander is specific to HITRON, my unit.  It's

10:09  24  the only unit in the Coast Guard that does our mission, and it

07:29  25  says that I am qualified and proficient in the airborne use of

07:29  1    force for counter-drugs.

10:09  2    Q.  You just mentioned use of force.

10:09  3        What is that exactly?

10:09  4    A.  Airborne use of force is something that we employ at

10:09  5    HITRON, and it is allowing us to use up to non-deadly force in

10:09  6    order to compel compliance of vessels, and that is the

10:09  7    deployment of a sniper rifle and a machine gun from the

10:09  8    helicopter.

10:09  9    Q.  You previously mentioned that you were involved in training

10:09  10   as well, correct?

10:09  11   A.  Correct.  I'm an instructor pilot for both normal aircraft

07:33  12   missions and for counter-drug missions for HITRON.

10:10  13   Q.  How many deployments have you been assigned to while at

10:10  14   HITRON?

10:10  15   A.  I have done five deployments.

10:10  16   Q.  And when I use the word "deployment", what does that

10:10  17   exactly mean?

10:10  18   A.  That means that we prepare a crew and an aircraft to embark

07:34  19   on another Coast Guard ship for a period of roughly two months

10:10  20   at a time, and we are attached to that unit while they go on a

10:10  21   patrol on the Pacific or Caribbean Ocean.

10:10  22   Q.  Were you deployed onboard a United States Coast Guard

10:10  23   cutter on August 31st, 2017?

10:10  24   A.  Yes, I was.

10:10  25   Q.  What cutter was that?

A.   That was Coast Guard Cutter James.

Q.   And were you on patrol on August 31st, 2017?

A.   Yes, I was.

Q.   Do you recall what happened that evening?

A.   That evening, we were launched to investigate a target of interest that a marine patrol aircraft -- which is a high-flying plane -- had located in order for us to gather more information for the commanding officer of the ship that I was attached to.

Q.   When you say "we were launched", who is we?

A.   Myself, Lieutenant Commander Robert O'Donnell, and AMT1 Joel Edwards.

Q.   What were your duties during that launch?

A.   Our duty was to locate the target of interest, observe them, and compile and relay information back to our ship for them to decide what to do with that information in terms of what sort of permissions or actions that they would request from the higher-ups back on the mainland.

Q.   What was your specific role?  Were you a pilot, a co-pilot, were you a marksman?

A.   I was a pilot in the right seat, and I was doing the active flying.  The other pilot, Lieutenant Commander O'Donnell in the left seat, was assuming the communication relays, navigation, as well as the overall big picture.

     My role was more to keep us safe and to keep us in the

1   right positions.

2   Q.  Keep you out of the water, correct?

3   A.  Correct.

4   Q.  Now, you said that there was a target of interest in this

5   case that you were alerted to, correct?

6   A.  That's correct.

7   Q.  Was there ever a point that you flew towards the direction

8   of this target of interest?

9   A.  Yes, we did.  After taking off from the ship, we were in

10   communication with the marine patrol aircraft, and they gave us

11   directions and positions updated as the target of interest was

12   moving in order to vector us in or get us as close to the point

13   that we could pick up the target with our sensors.

14   Q.  Tell the jury, during the evening of August 31st, 2017, was

15   it daylight or night outside?

16   A.  We took off after the sun had set, so it was nighttime.  It

17   was an overcast layer of clouds, so any ambient light did not

18   make it down to the surface.  It was good visibility underneath

19   an overcast layer, but it was very dark.

20   Q.  When it's dark outside, do you or does anyone on your team

21   use any sort of infrared to be able to see what's happening in

22   the ocean?

23   A.  We do.  We use night vision goggles that are attached to

24   our helmets.  Every crew member has their own set of night

25   vision goggles; as well as a FLIR, which is a forward looking

10:14  1    infrared camera that is attached underneath the helicopter.

10:14  2        That is operated by our Precision Marksman AMT1 Joel

10:14  3    Edwards.  That is used to pick up energy that's available in

10:14  4    the environment that you can't necessarily see with your eyes.

10:14  5    It picks up differences in energy and heat signatures and

10:14  6    relays them back to essentially a TV screen that we have in the

10:14  7    helicopter.

10:14  8    Q.  During that mission, were you using the FLIR?

10:14  9    A.  No, I was not.  I have the ability to bring it up on a

10:14  10   screen in front of me, but with the darkness and complexity of

10:15  11   trying to fly the helicopter and keep us safe, it's distracting

07:42  12   to bring that screen up in front of me when I'm also trying to

10:15  13   look outside.

10:15  14   Q.  I'm showing you what is in evidence as Government's

10:15  15   Exhibit 1D.

10:15  16       Do you see that, sir?

10:15  17   A.  Yes.

10:15  18   Q.  What is that?

10:15  19   A.  It is a MA-65 helicopter.  It is a slightly older model

07:43  20   than the one that I currently fly.

10:15  21   Q.  Is it similar to the helicopter that you flew on

10:15  22   August 31st, 2017?

10:15  23   A.  Yes, it's very similar.  I've mentioned that there is a

10:15  24   FLIR, or a forward looking infrared camera underneath the

10:15  25   helicopter, and this model does not have that.

Q.  It also identifies who you are.  It says United States Coast Guard on the helicopter as well, correct?

A.  Correct.

Q.  As well as the emblem for the Coast Guard, right?

A.  That's correct.

Q.  Now, can you tell the members of the jury, was there a point where your helicopter came into contact, visually or through using the FLIR, and saw the target of interest?

A.  Yes.  We picked up the target of interest on our FLIR. AMT1 Edwards was the first one to find it.  Then, listening to his instructions, he was able to guide me in to a point where I could physically see the vessel with my night vision goggles.

Q.  Could you describe what you saw or what the vessel looked like.

A.  Not with great detail.  It was extremely dark.  So at that point, I am listening to AMT1 Edwards describe what he can see with his more enhanced sensors than the goggles I am using.

    I can see it's a ship underway, making way.  There are some people on it.  At that point, I don't know that I could see how many.

Q.  You used the term underway and making way; what does that mean?

A.  Underway means that you're not moored up to a buoy or tied off to a pier.  You're actually out on the water.

    Making way means that you have a method of propulsion or

07:46  1  you are making course over ground.

10:17  2  Q.  At this point, are you waiting for something?

10:17  3  A.  At this point, as AMT1 Edwards is seeing this information

10:17  4  on his FLIR, he is relaying that to us via internal

10:18  5  communication, and the other pilot, Lieutenant Commander

10:18  6  O'Donnell, is relaying that information back to the ship.

10:18  7      The ship compiles that information in order to give the

10:18  8  commanding officer the comfort to request what's called a

10:18  9  statement of no objection, or an SNO, from our commanders at

10:18  10  our district.

10:18  11  Q.  What is a statement of no objection?

10:18  12  A.  A statement of no objection is a -- it's not direction from

10:18  13  an admiral.  It is setting the limits with which that admiral

10:18  14  is comfortable where they say, "I do not object to you taking

10:18  15  up to this amount of action," but he's not saying this is what

10:18  16  you need to do.

10:18  17      He is giving the commanding officer of the ship the

07:47  18  discretion to act up to a certain point.

10:18  19  Q.  Do you know if a statement of no objection was granted?

10:18  20  A.  Yes, a statement of no objection was granted by the

10:19  21  District 11 Commander.

10:19  22  Q.  Are there certain steps that you must follow once a

10:19  23  statement of no objection is given?

10:19  24  A.  Yes, there are.

10:19  25  Q.  What are those steps?

A.  We go through a series of steps to announce ourselves,
describe or give a direct order for what we are asking the
vessel to do, and then, depending on their reactions after
those steps, determine what our next actions are.

Q.  Do you know if the helicopter on that evening activated a
blue strobe light -- if a blue strobe light was activated
underneath your helicopter?

A.  Yes.  After being granted a statement of no objection, we
pulled alongside the vessel, illuminated a blue law enforcement
light, as well as a white light focused on the emblem of the
helicopter, and made a call over Channel 16, which is maritime
hailing and distress.

     We identified ourselves as the U.S. Coast Guard and told
the vessel to stop in both English and in Spanish.

Q.  Do you know if the vessel stopped?

A.  The vessel did not stop.

Q.  So what's the next step that is taken?

A.  We continue with a visual signal to stop.  That was via
warning shots.  So we use an M240 machine gun to send multiple
what we call strips of warning shots in front of and
perpendicular to the vessel.  We used 16 in total that night
across three different strips.

     It is a very unambiguous signal to stop, which is also
visible at night due to the tracers that are spaced out at
least one per every five rounds.

1  Q.  Do you know if the vessel came to a stop at that point?

2  A.  The vessel slowed, but it did not come to a stop.

3  Q.  Is there a step that you take after that?

4  A.  Yes.

5  Q.  What is that step?

6  A.  After giving them a lawful order to stop, both visually and

7  over the radio, and they do not comply with that order, we deem

8  them a non-compliant vessel, at which point we can proceed with

9  the use of disabling fire, and that is using non-deadly force

10  to shoot out their engines to force or compel compliance with

11  that order to stop.

12  Q.  And Precision Marksman Edwards was the one who fired the

13  disabling shots, correct?

14  A.  That's correct.

15  Q.  Do you know what happened after the disabling fire was

16  done?

17  A.  After the disabling fire was complete, we entered an orbit

18  around the vessel and AMT1 Edwards went back to the use of his

19  FLIR camera to continue recording while we were waiting for a

20  boarding team to make it on scene.

21  Q.  Why are you orbiting the vessel?

22  A.  We orbit for the safety of our boarding team, to make sure

23  that we know what's going on with the occupants of the vessel.

24  If things are being thrown overboard, we can get that on video,

25  and to ensure that we have what we call a positive handoff so

10:23 1   there is no possible mistake that the boarding team isn't

10:23 2   coming to the right vessel.

10:23 3   Q.  Do you know if the boarding team showed up?

10:23 4   A.  Yes, the boarding team did show up.

10:23 5   Q.  Are you aware of how many vessels showed up?

10:23 6   A.  I do not recall.

10:23 7   Q.  Do you know if that was also recorded from your helicopter?

10:23 8   A.  Yes, it was.

10:23 9         MR. MOTIANI:  I have nothing further, Your Honor.  We

10:23 10  tender the witness.

10:23 11        THE COURT:  Cross-examination, Mr. Blumenfeld.

10:23 12        MR. BLUMENFELD:  Briefly.

10:23 13        CROSS-EXAMINATION

10:24 14  BY MR. BLUMENFELD:

10:24 15  Q.  Sir, when you radioed the vessel on Channel 16, the only

10:24 16  way they can hear that is if there's a functioning radio turned

10:24 17  to Channel 16; is that correct?

10:24 18  A.  They would need a functioning radio that would have access

10:24 19  to Channel 16.

10:24 20  Q.  So if they didn't have a functioning radio or one that

10:24 21  wasn't on Channel 16, they wouldn't have heard your admonition

10:24 22  to stop?

10:24 23  A.  That's correct.

10:24 24  Q.  You didn't hail them with a loud speaker, did you?

10:25 25  A.  No, sir, we do not have loud speaker.

|       |    |                                                                            |
|-------|----|----------------------------------------------------------------------------|
| 10:25 | 1  | MR. BLUMENFELD:  Nothing further.                                          |
| 10:25 | 2  | THE COURT:  Redirect.                                                      |
| 10:25 | 3  | MR. MOTIANI:  One quick question, Your Honor.                             |
| 10:25 | 4  | REDIRECT EXAMINATION                                                       |
| 10:25 | 5  | BY MR. MOTIANI:                                                            |
| 10:25 | 6  | Q.  Before the warning is given over the radio, what steps do             |
| 10:25 | 7  | you take before that?                                                      |
| 10:25 | 8  | MR. BLUMENFELD:  Objection, this is repetitious.  It                      |
| 10:25 | 9  | all came out on direct.                                                    |
| 10:25 | 10 | THE COURT:  Overruled.                                                     |
| 10:25 | 11 | THE WITNESS:  Prior to giving the radio call, we turn                     |
| 08:08 | 12 | on our blue law enforcement light and our white light                     |
| 08:09 | 13 | illuminating our Coast Guard emblem.                                       |
| 10:25 | 14 | BY MR. MOTIANI:                                                            |
| 10:25 | 15 | Q.  So even if the vessel doesn't necessarily hear an                     |
| 10:25 | 16 | announcement, what can the vessel see?                                     |
| 10:25 | 17 | A.  They can see a large orange helicopter with a blue light              |
| 10:25 | 18 | and white light illuminating U.S. Coast Guard off their side.             |
| 10:26 | 19 | Q.  And it has the Coast Guard emblem as well?                             |
| 10:26 | 20 | A.  Yes.                                                                   |
| 10:26 | 21 | MR. MOTIANI:  Nothing further, Your Honor.                                |
| 10:26 | 22 | THE COURT:  Thank you, Lieutenant.  You may step down.                    |
| 10:26 | 23 | THE WITNESS:  Thank you, Your Honor.                                       |
| 10:26 | 24 | WITNESS EXCUSED                                                            |
| 10:26 | 25 | THE COURT:  Ladies and gentlemen, let's take our                         |

10:26  1   morning break for some coffee and some juice.  We'll be back

10:26  2   here in about ten minutes.

10:26  3                         RECESS TAKEN

10:26  4            THE COURT:  Bring in the jury, please.

10:26  5            COURT SECURITY OFFICER:  All rise, please.

10:44  6            THE COURT:  Everyone may be seated.

10:44  7            Government, call your next witness.

10:45  8            MR. MOTIANI:  The United Sates calls Joel Edwards.

10:45  9                       WITNESS SWORN

10:45  10           COURTROOM DEPUTY:  Please state your full name for the

10:45  11  record.

10:45  12           THE WITNESS:  Joel Edwards

10:45  13                     DIRECT EXAMINATION

10:45  14  BY MR. MOTIANI:

10:45  15  Q.   Good morning, sir.

10:46  16  A.   Good morning.

10:46  17  Q.   Where are you employed?

10:46  18  A.   United States Coast Guard HITRON.

10:46  19  Q.   What is your current position with HITRON?

10:46  20  A.   I'm an AMT1, and my current position is a precision

10:46  21  marksman aviation counter-drugs.

10:46  22  Q.   What does a precision marksman do?

10:46  23  A.   The more common term that we use is a sniper.

10:46  24  Q.   What kind of training or experience did you go through to

10:46  25  become a precision marksman?

A.   I spent a great deal of time in aviation to get experience in flying aircraft.  I then applied for the precision marksman program where I was evaluated by my instructor for my suitability and sent to a school at Special Missions Training Center at Camp Lejeune, North Carolina where I was taught the ins and outs of precision marksman.

From there, we go to another training course in Mobile, Alabama.  It's called the Counter Drug School, which basically circles around the aviation counter-drug mission.

From there, you go back to your home unit and start the training position to become completely qualified.

Q.   What does a precision marksman do?

A.   Our primary goal is to have the ability to place safe and efficient fire onto a go-fast vessel to render their motors in-op while still maintaining the safety of the occupants.

Q.   When you say "in-op", you mean inoperable, correct?

A.   Correct.

Q.   Now, in addition to being a precision marksman, you're also a mechanic with the United States Coast Guard, correct?

A.   That's correct.

Q.   Tell the members of the jury about that.

A.   Well, I've been doing it for about 12 years now; basically working on helicopters and maintaining the fleet.

Q.   Can you fly a helicopter?

A.   I probably could.  I'm not allowed to.



Q.   But you can definitely shoot out of one?

A.   I can definitely shoot out of one.

Q.   How long have you been assigned to HITRON?

A.   Just under six years now.

Q.   Were you ever assigned to the United States Coast Guard Cutter James?

A.   Yes.

Q.   Were you assigned to the James in August of 2012?

A.   Yes, I was.

Q.   How many interdictions have you been involved in, in your career?

A.   In my entire HITRON career, I've done 27 interdictions.

Q.   I used the word "interdiction".

     What does that mean?

A.   Our basis for interdiction is any time that we have -- that our actions stop an illicit drug trafficker; whether it be through the use of officer presence, which is just us going on scene and asking them to stop, or eventually going all the way to the point of disabling fire.

Q.   In those 27 interdictions, were you always the precision marksman?

A.   Yes.

Q.   Turning your attention to the evening of August 31st, 2017.

     You were on the James that evening, correct?

A.   I was.

Q.   What were you doing that evening?

A.   Normal boat life, staying ready for the launch alarm to go off.   That's the night we were launched on this particular case.

Q.   So the launch alarm did go off that evening?

A.   Yes, it did.

Q.   When it went off, what did you do?   What is your role?

A.   The first thing I do is run up to the plane.   It's on deck, and obviously it's outside.   So it has covers on it, like a car cover on it basically.

     My job is to get all that stuff off along with the maintenance crew that we have and get myself ready with all my survival gear, make sure my guns are ready to go and all my equipment is ready.

Q.   Can you describe for the members of the jury the types of firearms you had to get ready that evening.

A.   Sure.   I have multiple firearms onboard that I can use at my discretion.   We have an M240 machine gun, which is a rapid fire weapon that we use to fire in front of the vessel as a signal.   It is an international signal to stop.

     I also have two precision rifles.   I have a 308 or a smaller rifle, and then I also have a .50-caliber precision rifle that I can use as well.

Q.   Do you use night vision goggles as well?

A.   I do.

Q.  When you were deployed that evening, it was at nighttime, correct?

A.  Yes, it was very dark.

Q.  Who were you deployed with?

A.  My mission commander was Lieutenant Commander Robert O'Donnell and the safety pilot was Lieutenant Andrews.

Q.  Do you recall how you were seated on the helicopter?

A.  That particular night, Lieutenant Andrews was in the right seat, which was the primary pilot, and Lieutenant Commander Robert O'Donnell was running the mission from the left seat.

Q.  And where were you were seated?

A.  The center behind them in the cabin.

Q.  Why are you seated in that position?

A.  It gives me the ability to look for and see all their gauges and provide them a safety backup to make sure that they're not basically going to fly us into the water.

    It also gives me the ability to maneuver around, get the guns to the door, and I also have a screen that -- a joy stick where I operate the camera.

Q.  Tell the members of the jury about that camera.

A.  The camera has three different lenses on it.  One picks up infrared light, which is basically the heat coming off an object.

    The other camera is just a normal color camera.

    Then I also have a low light camera, which basically allows

10:52  1    you to see color when there's not a lot of light at dusk or

10:52  2    dawn.

10:52  3    Q.  Do you know if the pilots on the helicopter can also see

10:52  4    what's on your screen?

10:52  5    A.  They do have the ability to bring up what I'm seeing on one

10:52  6    of their screens.

10:52  7    Q.  Is it true that you're primarily responsible for operating

10:52  8    that camera?

10:52  9    A.  Yes, we try to keep the pilots from bringing up the screen

10:52  10   because of situations like spacial disorientation.  I don't

01:08  11   know if you've ever been watching a moving and it's moving

10:52  12   around and you're moving.  It can have a negative affect on

10:52  13   their ability to fly.

10:52  14   Q.  We wouldn't want that to happen.

10:52  15   A.  No.

10:52  16   Q.  Why were you deployed the evening of August 31st, 2017?

10:52  17   A.  Our sole mission at HITRON is to act as an end game asset

10:53  18   to stop high seas drug traffickers.

10:53  19   Q.  Do you know what a marine patrol aircraft is?

10:53  20   A.  I do.

10:53  21   Q.  What is that?

10:53  22   A.  It's a fixed wing aircraft similar to what you're used to

10:53  23   seeing in commercial aircraft.  They have cameras and sensors.

10:53  24   They're the primary use of finding vessels that we go and

10:53  25   inspect, basically.

10:53   1   Q.  Do you know if that aircraft alerted the James about a

10:53   2   vessel in the Eastern Pacific?

01:11   3   A.  That was the information that I was passed when we were

01:11   4   launched, yes, that a marine patrol aircraft had located a

01:12   5   vessel.

01:12   6   Q.  Was there a point, during the evening of August 31st, 2017,

01:12   7   that you came into contact with the vessel in the Eastern

10:53   8   Pacific?

10:53   9   A.  Yes, there was.

10:53   10  Q.  Tell the members of the jury about that.

10:54   11  A.  Basically, my role in the back is to operate that camera,

10:54   12  and using that infrared camera I can see heat signatures.  From

10:54   13  several miles away, I can start to pick up this vessel, and my

10:54   14  role, as we move in, is to record as much evidence as possible

10:54   15  and pass as much information up to my mission commander, who

10:54   16  then passes it back to the ship that's controlling us.

10:54   17      As we're flying in and getting closer, I am basically

01:18   18  passing all the raw information that I see; number of

10:54   19  personnel, number of engines, whether they're operating, the

10:54   20  direction the vessel is headed, any small details that I can

10:54   21  pass.

10:54   22  Q.  Do you recall what the vessel looked like that evening?

10:54   23  A.  Yes, I do.

10:54   24  Q.  What did it look like?

10:54   25  A.  It looks like what we refer to as Panga style vessel.

1  Panga is a company that builds boats.  It's a primary used

2  vessel for drug trafficking.

3      It had two engines and multiple people onboard.  I believe

4  there were five people total onboard.  There was a high flyer

5  rack on the left side, which a high flyer rack is just an area

6  that fishermen use to put their flags out of the way of the

7  deck, and then there was what looked like trash and drums and

8  things like that onboard.

9  Q.  So you were gathering intelligence on this vessel at this

10 time, correct?

11 A.  Correct.

12 Q.  Were you waiting for anything?

13 A.  Yes, sir.  At the point that I'm passing all that

14 information, we're waiting on what we call a statement of no

15 objection for us to ask the vessel to stop.

16 Q.  And do you know if a statement of no objection granted?

17 A.  It was granted.

18 Q.  What steps do you have to follow once a statement of no

19 objection is given?

20 A.  Once the statement of no objection is given to us, we go

21 through our process.  What's required of us is basically to

22 give audible and visual signs, including lights and radio

23 call-outs through common channels, to ask the vessel to stop.

24     Once those are ineffective, we move into warning shots,

25 which is the international sign for a vessel to stop, which is

10:56  1    firing rounds in front of the vessel as a visual means to say,

10:56  2    "Hey, we'd like you to stop."

10:56  3    Q.   Okay.   When you're talking about the lights, you're talking

10:56  4    about the blue strobe light on the helicopter was illuminated?

10:56  5    A.   Correct.

10:56  6    Q.   And the white light illuminates the Coast Guard emblem on

10:56  7    the helicopter?

10:56  8    A.   That is correct.

10:56  9    Q.   Do you recall who gave the maritime warning over Channel

10:56  10   16?

10:56  11   A.   Not particularly, but commonly it's done by the person in

10:56  12   the left seat because the person in the right seat is focused

10:56  13   on flying.

10:57  14   Q.   And that would be Lieutenant Commander O'Donnell?

10:57  15   A.   That's correct.

10:57  16        MR. MOTIANI:   With the Court's permission, could I

10:57  17   play Government's Exhibit 5?

10:57  18        THE COURT:   Yes, and video for all screens.

10:57  19        VIDEOTAPE PLAYED FOR THE RECORD

10:57  20    BY MR. MOTIANI:

10:57  21   Q.   Is there a picture on the screen?

10:57  22   A.   There is.

10:57  23   Q.   What is that on the screen?

10:57  24   A.   That's what I would call a Panga style vessel with two

10:57  25   operating outboard engines and multiple people.

10:57  1    Q.   There seems to be a bar on the top.

10:57  2    A.   That's right.

10:57  3    Q.   What is that exactly?

10:57  4    A.   That's what I referred to as a high flyer rack.  It's where

10:58  5    fishermen sometimes use those high flyers to flag their line so

10:58  6    they can see it from distances.  They typically have streamers

10:58  7    or flags with bright colors on the end so you can see them from

10:58  8    far distances.

10:58  9    Q.   Do you know if fishing vessels are also supposed to have

10:58  10   navigational lights?

10:58  11   A.   They are.

10:58  12   Q.   From your recollection of the events on August 31st, 2017,

10:58  13   do you recall if that vessel had any navigational lights?

10:58  14   A.   They definitely did not have any navigational lights.

10:58  15   Q.   How dark was it that evening?

10:58  16   A.   Zero illumination.  Basically, the absence of all light.

10:58  17   Q.   What does it appear the vessel is doing at this time?

10:58  18   A.   It looks to me like they are moving at a high rate of

10:59  19   speed.  I can tell, through the numbers on the screen, that

10:59  20   they're in a northbound direction.

10:59  21   Q.   Do you recall if, at this time, your presence was already

10:59  22   known?

10:59  23   A.   I believe our presence was already known.

10:59  24   Q.   You have already illuminated your blue strobe light,

10:59  25   correct?

10:59   1    A.  At this point, no.

10:59   2    Q.  No?

10:59   3    A.  I don't believe so.

10:59   4    Q.  When did you do that?

10:59   5    A.  I believe it's coming up here pretty soon in the video.

10:59   6    I'll be able to tell by the function that I put the camera

10:59   7    into.  I move it to a programmed position.

11:00   8           VIDEOTAPE PLAYED FOR THE RECORD

11:00   9    BY MR. MOTIANI:

11:00  10    Q.  I'm showing you, for the record, Government's Exhibit 5,

11:00  11    video number 6.

11:00  12           VIDEOTAPE PLAYED FOR THE RECORD

11:00  13    BY MR. MOTIANI:

11:00  14    Q.  What's going on here?

11:00  15    A.  At this point, I know there are five occupants onboard

01:33  16    because I've already seen them previously.  There is one

01:33  17    driving, two in the back, and there's actually two up forward

01:33  18    that appear to be hiding.

01:33  19       At this point right here, you can see the screen change,

01:33  20    and I'm moving the camera to a pre-programmed position, which

01:33  21    tells me that, in the back of the plane, I'm taking my focus

01:34  22    off of the camera and shifting over towards the guns.

01:34  23       We do this as soon as we turn on the lights because we're

01:34  24    coming in fairly close to them, so we know without a shadow of

01:34  25    a doubt that they can see us.

01:34  1      We also call that inside small arms range where they would

11:01  2  have the ability to shoot back at us.  So for force protection

01:36  3  reasons, I move to the guns to protect our helicopter.

11:01  4  Q.  All right.  What appeared on your screen right there?

11:01  5  A.  That was warning shots.  You can see the stitches through

11:01  6  the water.

11:01  7  Q.  Do you recall how many rounds of warning shots you fired?

11:01  8  A.  Not exactly, but we're required to do three stitches.  So

11:01  9  it's three strips of rounds.

11:01  10  Q.  How would those warning shots be visible?

11:01  11  A.  Every fifth round there's what we call a tracer round,

11:01  12  which has a piece of metal that burns on it so it's lit through

11:01  13  the air.  As that round travels through the air, you can see

11:02  14  it.  Not to mention the splashes and those rounds kind of light

11:02  15  up in the water as well.

11:02  16          VIDEOTAPE PLAYED FOR THE RECORD

11:02  17  BY MR. MOTIANI:

11:02  18  Q.  What was that that we just saw?

11:02  19  A.  Those were the other two stitches of warning shots.

11:02  20          MR. QUENCER:  If we could play video 7, please.

11:02  21          VIDEOTAPE PLAYED FOR THE RECORD

11:03  22          THE WITNESS:  At this point, it's right after warning

11:03  23  shots.  So we're basically evaluating the situation and trying

11:03  24  to determine whether the vessel is going to be compliant or not

11:03  25  and also figure out where the boarding team is, where the

11:03  1    cutter is, that kind of thing.  So there's a lot going on in

11:03  2    the cockpit at that point.

11:03  3     BY MR. MOTIANI:

11:03  4    Q.  Do you know if the vessel was compliant?

11:03  5    A.  We determined it to be non-complaint.

11:03  6    Q.  Why did you determine that?  It seems like the vessel had

06:08  7    slowed down.

11:03  8    A.  It did slow down, but the operator of the engines still had

11:03  9    the engines running and it was still moving forward in a

01:40  10   direction that was going to make it impossible for our boarding

01:40  11   team to catch up and board.

11:03  12          MR. MOTIANI:  If I can have video number 8, please.

11:03  13          VIDEOTAPE PLAYED FOR THE RECORD

11:03  14   BY MR. MOTIANI:

11:03  15   Q.  You're going to see the vessel appear on the screen.  If

11:04  16   you would let the members of the jury know if the vessel has

01:42  17   stopped at this time or if it's still moving.

11:04  18   A.  I can tell by the wake on the front that it's still moving

11:04  19   as it's pushing through the waves.  When the vessel stops, you

05:54  20   can clearly see a difference between the movement now and when

05:54  21   it's completely stopped.

11:04  22   Q.  There appears to be something that's on the screen on the

05:54  23   top right-hand corner; what was that?

11:04  24   A.  That was my first round of disabling fire.

11:04  25       At this point, I can see the operator.  He was still at the

11:04  1    engine.   That was my second round of disabling fire, and now

11:04  2    the operator of the engine has thrown his hands up.   We know

11:04  3    that, at that point, they're going to be compliant.

11:04  4    Q.   They're going to be compliant because it's actually not

11:04  5    going to be able to move?

11:04  6    A.   Yes.

11:05  7            MR. MOTIANI:   If I could get video number 10, please.

11:05  8            VIDEOTAPE PLAYED FOR THE RECORD

11:05  9    BY MR. MOTIANI:

11:05  10   Q.   Tell us what's happening, and I would point your attention

11:05  11   to the person at the rear of the vessel.

11:05  12   A.   It looks like he's rummaging around on the floor.   He's

11:05  13   pretty low on the floor.   He could be doing anything.   One of

11:05  14   the common things that we see -- which is why we video and pay

11:05  15   attention when it's so dark -- is possibly a scuttling valve or

11:05  16   getting ready to throw some evidence overboard, which we

11:05  17   typically try to record.

11:05  18   Q.   Just for the record, that is at 21:28:10.

11:05  19           VIDEOTAPE PLAYED FOR THE RECORD

11:05  20   BY MR. MOTIANI:

11:05  21   Q.   Why is the helicopter still there?

11:06  22   A.   At this point, I'm on the camera and trying to record

11:06  23   evidence.   This is a typical time when if they have anything

11:06  24   incriminating they would through it overboard; satellite phones

11:06  25   or paperwork that tells what they were doing, even jettisoning

11:06  1   any kind of contraband they may have.

11:06  2   Q.  What does that mean, "jettisoning"?

11:06  3   A.  It means to just throw it overboard.

11:06  4   Q.  At this point, was there a boarding team that was

11:06  5   approaching this vessel?

11:06  6   A.  There was, yes.

11:06  7   Q.  At this time, the boarding team approaches the vessel,

11:06  8   correct?

11:06  9   A.  Soon, yes.

11:06  10  Q.  Was there a point that you stay on scene, or does your

11:06  11  helicopter leave the area?

11:06  12  A.  We stay on scene until the boarding team reports that they

11:06  13  have positive control of the situation.  Basically, it's a fine

11:07  14  balance between how much fuel we have left and staying on scene

11:07  15  to record or if we have to go back to the ship to get fuel.

11:07  16  Q.  What did you do?

11:07  17  A.  We stayed on scene for a little bit, and then we left and

11:07  18  returned to the ship.

11:07  19  Q.  In the process of returning to the ship, did you encounter

11:07  20  another vessel?

11:07  21  A.  I believe the MPA told us about a vessel, and we still had

05:57  22  to go back and refuel and relaunch for that vessel.

05:57  23  Q.  So you refuel where?  At the Cutter James?

11:07  24  A.  At the Cutter James.

11:07  25  Q.  Do you relaunch that evening?

11:07  1    A.   We did.

11:07  2    Q.   Okay.

11:07  3    A.   We were directed to another vessel by the same MPA that

11:07  4    directed us to this vessel.

11:07  5         MR. MOTIANI:   If I could have video 18, please.

11:07  6         VIDEOTAPE PLAYED FOR THE RECORD

11:08  7    BY MR. MOTIANI:

11:08  8    Q.   What is the date of this?   Is it August 31st, 2017?

11:08  9    A.   It is.

11:08  10   Q.   The timestamp is 22:33:42.

11:08  11        What's depicted on your screen, sir?

11:08  12   A.   It's another vessel that's stopped in the water somewhere.

11:08  13   It's obviously a different vessel because it doesn't have the

11:08  14   high flyer rack like the other one.   I believe this one has

11:08  15   three engines instead of two engines.

11:08  16        THE COURT:   Slow down, please.

06:04  17        THE WITNESS:   It has some other characteristics of a

06:05  18   go-fast.   That tower in the back is where they typically have

11:08  19   their radios and communication devices.   It just looks like a

11:08  20   typical drug smuggling vessel.

11:08  21   BY MR. MOTIANI:

11:08  22   Q.   This is the vessel that the MPA alerted you to?

11:09  23   A.   Yes, that's correct.   I remember it specifically because

11:09  24   the cutter was very concerned with finding out whether or not

11:09  25   it was -- it looked like somebody was in distress.

1    They were concerned with whether they needed to rescue

2    someone.  When you see a vessel out in the middle of the ocean,

3    the Coast Guard's first instinct is to determine whether

4    somebody is in danger.

5        For this particular one, they were concerned with whether

6    or not the engines were operating, if they had the safety

7    devices plugged in.

8        We hovered in low and shined our lights on it, and I used

9    my scope on my rifle so I could see closer to make certain

10   nothing looked out of place.  The safety devices were still in

11   the engine.

12   Q.   Did you see anyone in distress?

13   A.   No one was in distress.  There were drinks and stuff

14   onboard and a great deal of water onboard as well.

15   Q.   Anything else you recall that was on that vessel?

16   A.   Nothing.

17            MR. MOTIANI:  At this time, we tender the witness.

18            THE COURT:  Mr. Blumenfeld, cross-examination.

19            CROSS-EXAMINATION

20    BY MR. BLUMENFELD:

21   Q.   Sir, one area as to the Panga; that is a boat company out

22   of California, correct?

23   A.   I'm not sure where they're out of.

24   Q.   They are commercially manufactured vessels?

25   A.   Yes.

11:10  1    Q.  You weren't suggesting that the only reason somebody would

11:10  2    have a Panga is for drug trafficking?

11:10  3    A.  No, I'm not.  It's commonly used for fishing.  But in my

01:04  4    experience -- that's why we call them a Panga vessel.  It's

11:10  5    kind of like vice grips.  Multiple companies make them, but it

11:10  6    carries the common name.

11:10  7            MR. BLUMENFELD:  Thank you.

11:10  8            THE COURT:  Any redirect, Mr. Motiani?

11:10  9            MR. MOTIANI:  No, Your Honor.

11:10  10           THE COURT:  Thank you, Officer.  You may step down.

11:10  11               WITNESS EXCUSED

11:10  12           THE COURT:  Government, call your next witness.

11:10  13           MR. QUENCER:  Yes, Your Honor.  The United States

11:10  14   calls ME1 Mallory, United States Coast Guard.

11:10  15               WITNESS SWORN

11:10  16           COURTROOM DEPUTY:  Please state your full name for the

11:10  17   record.

11:12  18           THE WITNESS:  Maritime Enforcement Officer Kevin

11:12  19   Mallory.

11:12  20               DIRECT EXAMINATION

11:12  21    BY MR. QUENCER:

11:12  22   Q.  How long have you been in the Coast Guard, Petty Officer

11:12  23   Mallory?

11:12  24   A.  I've been in 15 years.

11:12  25   Q.  Where did you do your initial training?

11:12  1    A.   I entered the Coast Guard through a training center in Cape

11:12  2    May, New Jersey where I went through basic training.   The other

11:12  3    initial training to get my rating designator, I went through

11:12  4    Yorktown, Virginia.   It was a gunner's school.

06:20  5         Then I switched to Maritime Enforcement Specialist in 2010,

06:20  6    and I went through Boarding Officer School in the Federal Law

11:12  7    Enforcement Training Center in Charleston, South Carolina.

11:12  8    Q.   When did you first report aboard the United States Coast

11:13  9    Guard Cutter James?

11:13  10   A.   I actually reported before there was the James.   I'm a

11:13  11   plank owner, which is the original crew of the ship.   I

11:13  12   reported in December 2014, and the ship was commissioned in

11:13  13   August of 2015.

11:13  14             MR. QUENCER:   Your Honor, may I have the ELMO?

11:13  15             THE COURT:   Yes.

11:13  16    BY MR. QUENCER:

11:13  17   Q.   I'm showing you what has been marked and admitted as

11:13  18   Government's Exhibit 1C.

11:13  19        Officer Mallory, please tell us what that is.

11:13  20   A.   That is the Coast Guard Cutter James, WMSL 754.   It's a

11:13  21   418-foot national security cutter.

11:13  22   Q.   Now I'm showing you what has been previously marked as

11:13  23   Government's Exhibit 1A.

11:14  24        What does that look like?

11:14  25   A.   It looks like an over-the-horizon small boat Mark IV.

1  Those are the vessels that we use to conduct interdictions in
2  the Eastern Pacific.
3  Q.  Now I'm showing you what has been previously marked as 1B.
4    What is that?
5  A.  That is our long-range interceptor.  It's a 35-foot boat
6  with a twin jet drive inboard.
7  Q.  Where were you on August 31st, 2017?
8  A.  I was on the Coast Guard Cutter James assigned as a
9  maritime enforcement specialist first class.  On that
10  particular night, I was the primary boarding officer on the
11  case in question.  I was also the pursuit mission commander for
12  the case.
13  Q.  When you're on the cutter and there's a target of interest
14  in the area, what happens?
15  A.  When there's a target of interest, they pull us into the
16  Combat Information Center, which is our command center on the
17  ship.
18    They will brief us on the course and speed of the target of
19  interest, and we will go through our pre-mission planning
20  phases, which will cover emergency situations to
21  communications, what radio channels we will be on to
22  de-conflict any communication problems, and then we'll do a
23  general assessment of risk.
24    Once that is complete, we will go down and gear up and arm
25  up and start heading out.

11:15    1    Q.  On that night, do you remember someone setting a go-fast

11:15    2    bill?

11:15    3    A.  Yes, sir.

11:15    4    Q.  And I assume you did what you just described, which is arm

06:27    5    up, gear up, and head to the Mark IV?

11:15    6    A.  Yes.  If you look at the picture of the James, which is on

11:16    7    the hip -- so that boat is center line on the cutter.  That's

11:16    8    the Mark IV.

11:16    9    Q.  And you can circle on the screen if you would like.

11:16   10         MR.  QUENCER:  Let the record reflect he has circled

11:16   11    an orange vessel approximately the center line of the Coast

06:31   12    Guard cutter in Government's Exhibit 1C.

06:31   13         THE COURT:  All right.

11:16   14    BY MR.  QUENCER:

11:16   15    Q.  After you launch, where are you headed?

11:16   16    A.  The cutter will vector us to the position of the boat and

11:16   17    get us the best course for intercept.  We will also coordinate

11:16   18    with the helicopter, who, once we get closer, will take control

11:17   19    of us to vector us in so we can get a good approach to avoid

11:17   20    friendly fire situations.

11:17   21        So they cover us with mitigating the risk of us getting

11:17   22    between the gunner and the target of interest.

11:17   23    Q.  Are you able to hear what the helicopter is saying back to

11:17   24    the ship?

11:17   25    A.  When we start getting closer, I will change the channel on

11:17   1   my headset.  I wear a headset underneath my helmet that

11:17   2   monitors the radio frequencies and the crew communication on

11:17   3   our boat, and the helicopter is talking directly to us to

11:17   4   vector us in.

11:17   5   Q.  What speed are you going -- slow, medium, fast -- on the

11:17   6   Mark IV as you're trying to get out to the target of interest?

11:17   7   A.  We're moving at a good clip.  We will try to top out speed

11:18   8   so we can get there before any jettisons may occur.

11:18   9       It's also a safety thing as well.  We want to get there as

11:18  10   fast as we can to avoid detection, so we'll go lights out and

11:18  11   come alongside.  Once we're alongside, then we'll flip on the

11:18  12   lights.  That's just for our safety.

11:18  13   Q.  Are you trying to make up ground on the go-fast?

11:18  14   A.  We are.  Oftentimes, the helicopter will disable the

11:18  15   vessel.  In cases sometimes they don't or we may not have a

11:18  16   helicopter, so it's common practice to go as fast as we can to

11:18  17   the vessel.  We don't want to delay on it.

11:19  18   Q.  Over your radio, did you hear when warning shots were

11:19  19   fired?

11:19  20   A.  I did hear the helicopter use warning shots, and I saw them

11:19  21   as well.  We were about a mile out, and I saw the tracers

11:19  22   coming from the helicopter.  It was at night, and when they

11:19  23   fire at night, the tracers are very visible.

11:19  24       It's a one-to-5 ratio, so every fifth round is a tracer.

11:19  25   So you see them streaking down from the helicopter.

Q.   Were you able to eventually catch up with the go-fast boat?

A.   Yes, sir.

Q.   What did you do once you first saw with your eyes the go-fast boat?

A.   I had the advantage on my boat.  I also am equipped with night vision, so even though the vessel can't see us and the majority of my crew can't see the vessel, I can.  I will alert the person driving the boat the position of the vessel and kind of walk them in.

Once we get alongside -- for this particular case, we had a right of visit statement of no objection from the Coast Guard to conduct a boarding so we could get on.

As soon as we came alongside, myself, Petty Officer Regan, and Seaman Calventi went over the railing and got on the boat and took positive control of the vessel.

Q.   If you could tell the jury what happened, the very first thing, when you stepped from your boat onto the go-fast boat.

A.   Before I jump over the boat, one of the main things I need to look for is how the vessel is riding.  That gives me a pretty good indicator whether or not it's for me safe to be onboard.  It also gives clues as to what's going on.

This particular vessel was riding very heavy in the water. It didn't have good communication with the sea, which means it was riding differently than how a vessel would if it wasn't loaded down.

11:21  1    As soon as I came alongside, Petty Officer Regan went over,

11:21  2  Seaman Calventi went over, and when I went over, I jumped on to

11:21  3  what was the -- where a normal boat would have a fish hold and

11:21  4  have a fiberglass cover over top of it.

11:21  5    As soon as I jumped over, I landed on top of that cover and

11:21  6  the cover slipped out from underneath me, and I landed on

11:22  7  cocaine.   The boat had a number of bales inside the fish hold,

11:22  8  which are normal for the use of transporting bales -- kilograms

11:22  9  of cocaine.

11:22  10  Q.   I'm showing you what has been previously marked as

11:22  11  Government's Exhibit 2A.

11:22  12    Based on your experience, why is this photo a little

11:22  13  blurry?

11:22  14  A.   One, our camera wasn't the best.   We have corrected that.

11:22  15  But it's mainly blurry because it's night.   We have our law

11:22  16  enforcement blue lights on.   We're using spotlights to watch

11:22  17  the subjects and stuff.   You can clearly see the cover that I

11:22  18  landed on and the bales of cocaine.

11:23  19    Would you like me to circle those?

11:23  20  Q.   The bales, yes.

11:23  21    I think you said the cover to the bales came off as you

11:23  22  stepped onboard?

11:23  23  A.   Yes, sir.

11:23  24  Q.   How many persons were onboard the vessel?

11:23  25  A.   There was five on this boat.

11:23  1    Q.   How many engines?

11:23  2    A.   There were two Yamaha 75-horsepower engines.

11:23  3    Q.   How many fuel drums, if you can recall, approximately?

11:23  4    A.   20 -- 22 I believe onboard.   22 25-galloon drums.

11:24  5    Q.   22 25-gallon drums?

11:24  6    A.   Yes, sir, as far as I remember.

11:24  7    Q.   So roughly the capacity to hold 550 gallons of gasoline?

11:24  8    A.   Yes, sir.

11:24  9    Q.   How about any electronic equipment?  What did you find

11:24  10   onboard as far as any electronic equipment?

11:24  11   A.   I found a Garmin GPS, a handheld radio, a cellular phone,

11:24  12   and what we call a UFO GPS marker, which is essentially a

11:24  13   marker buoy that looks kind of like a typical UFO.

11:24  14   Q.   Based on your training and experience, what is a UFO buoy?

11:24  15   A.   The UFO GPS marker buoy marker has a clear top on it and is

11:25  16   solar powered.  It is often used by smugglers to mark bale

11:25  17   drops.  They will tie off the contraband to the GPS and

11:25  18   jettison and allow for someone else to come and pick it up

11:25  19   later.

11:25  20   Q.   How many interdictions have you done at sea, ballpark?

11:25  21   A.   I was involved in every interdiction this patrol, so there

06:36  22   were 12 this patrol.  I was involved in three the previous.

11:25  23   Q.   Do you know if bales float or sink?

11:25  24   A.   Depending on how they're wrapped, sometimes they float and

11:25  25   sometimes they sink.  Oftentimes, they will float for a little

11:25   1    bit and then sink.

11:25   2    Q.   So what is the purpose of the buoy in relation to the

11:26   3    bales?

11:26   4    A.   The purpose of the buoy in relation to the bales is to mark

11:26   5    it for someone else to come pick it up.   The people that are

11:26   6    driving the vessel that is transporting aren't necessarily

11:26   7    carrying the transponder.   They're just transporting.   Somebody

11:26   8    else will monitor where the bales are.

11:26   9        Think of it as like the U.S. Postal service where you can

11:26   10   track your packages.   That kind of thing.

11:26   11   Q.   So you could potentially, if they didn't sink, just throw

11:26   12   the drugs overboard attached to the buoy and find them later?

11:26   13   A.   Yes, sir.

11:26   14   Q.   I'm showing you what has been previously admitted as

11:26   15   Government's Exhibit 4.

11:26   16       What is that?

11:26   17   A.   On the lower right, that is the Garmin GPS.   That is the

11:27   18   handheld radio with two batteries.   That is the GPS marker

11:27   19   buoy.

11:27   20   Q.   Did you find any fishing equipment onboard this boat?

11:28   21   A.   The area that I just circled are bamboo sticks that we call

11:28   22   high flyers.   Those are used by fishermen to mark long line,

06:38   23   which is a technique used for fishing shark.

11:28   24       Forward is where they would hold their hooks.   It's

11:28   25   essentially on a rack, and you will see a bunch of hooks on

11:28  1    there.

11:28  2        As far as line, there wasn't that much onboard.  What was

11:28  3    onboard was on the bow of the boat or the front of the bow.

11:29  4    Q.  I'm showing you what has been previously marked as

11:29  5    Government's Exhibit 2D.

11:29  6        What do we see there?

11:29  7    A.  That is a picture that I took that was looking forward on

11:29  8    the boat.  I was standing exactly in the middle of the boat,

11:29  9    and I took a picture looking forward.

11:29  10       Right here are the fishing hooks on the rack.  Forward of

11:29  11   that, underneath some miscellaneous stuff that they have

11:29  12   onboard, there's a little bit of line.  Not very much.  The

11:30  13   condition of the hooks were very rusty, which indicated to me

11:30  14   that they hadn't been used in quite some time.

11:30  15       Just after that, where that line is, I'm covering up a

11:30  16   number of fuel barrels, and right here is where the narcotics

11:30  17   are.

11:30  18   Q.  I'm showing you what has been marked as Government's

11:30  19   Exhibit 3A.

11:30  20       What is that?

11:30  21   A.  That's what I landed on when the cover fell off.  Those are

11:30  22   the bales.

11:30  23   Q.  Government's Exhibit 3B, what is that?

11:30  24   A.  That is an individual kilo of cocaine.

11:30  25   Q.  What is Government's Exhibit 3C?

A.   That is me testing the cocaine using the narcotics

identification kit.

Q.   That white powder, where did it come from?

A.   It came from that bale.   If you look right there on the

inside of that line, in between that and the knife, you will

see the slit that I made to extract the white powdery

substance.

Q.   I'm showing you Government's Exhibit 3D.

     What is that?

A.   That is our total bulk contraband picture that we took of

all the contraband that came off of that vessel.

Q.   Where was that photo taken?

A.   That's on our cutter.

Q.   So all of that was loaded on that boat?

A.   Yes, sir.

Q.   Government's Exhibit 2C, what is the blue object there?

A.   The blue object is another fuel barrel.

     The white object is a jug where they often keep personal

effects, IDs, phones, things you don't want to get wet.   They

have a cap on top of that.

Q.   You mentioned before that you had seen some fishing

equipment onboard, but the hooks were rusty and there wasn't a

lot of line.

A.   Yes, sir.

Q.   Were the high flyers rigged?

11:32  1    A.   No, sir.

11:32  2    Q.   Was there any fish onboard the boat?

11:32  3    A.   No, sir, there was no fish that they caught or bait fish.

11:32  4    There was also no indication of them ever having bait fish or

11:32  5    fish.

11:32  6         Oftentimes, with fishing boats, when you get on a

11:32  7    legitimate fishing boat, you will see cut marks or actual blood

11:32  8    from the bait fish when they bait the hooks.  There wasn't any

11:32  9    of that on there.  It was actually pretty clean as far as blood

11:32  10   wise, which is an indication they, one, haven't brought on any

11:32  11   catch or cut up any bait fish in quite some time.

11:33  12   Q.   What was the temperature of the air during your deployment

11:33  13   there in the Eastern Pacific?

11:33  14   A.   At night, 80 degrees.  During the day it would get pretty

11:33  15   hot.

11:33  16   Q.   And you're 300 miles out to sea?

11:33  17   A.   Yes, sir.

11:33  18   Q.   Any ice onboard?

11:33  19   A.   I didn't see any ice whatsoever on the boat.

11:33  20   Q.   Did you smell anything like fish had been onboard?

11:33  21   A.   No, sir, just the musty smell of the bales.

11:33  22   Q.   Was there anything about what you saw when you boarded the

11:33  23   boat that led you to believe, based on your experience, that

11:33  24   fishing was occurring on that boat?

11:33  25   A.   No, sir.

Q.   I want to talk a little bit about the safety of this

vessel.

What was one of the first things that you noticed when you

came onboard?  What else was onboard other than the dope and

the drums and the equipment?

A.   There was a lot of water inside the boat, which was

concerning to myself and Petty Officer Regan.  One of the first

things we do when we get onboard is we make sure that the

people are secured and then make sure that the vessel is safe

for us to be onboard.

This boat, there was about eight inches of water inside the

hull.  When we came onboard, we were worried that they were

trying to scuttle the boat and sink it with us onboard and them

onboard.

Afterwards, we looked and noticed that the scuttling valves

were still in place.  I can circle where it's at.  The

scuttling valve is normally around that area.

Q.   I'm showing you what has been previously marked as

Government's Exhibit 2B.

What is this?

A.   This is a picture giving you an indication of how it looked

when it was riding.  As you can see, it had a low free board,

and a free board is the distance between the water and the

gunnel, which is right here.  That distance is an indication of

how the vessel is riding.  The lighter it's riding, the higher

11:35  1    up it's going to be.

11:35  2        It was also listing pretty heavily to starboard.  You're

07:07  3    actually looking at the starboard side right now.  One of my

11:35  4    concerns, based on the sea conditions -- the seas were about

11:35  5    three-foot waves and a five-foot swell -- was that a wave could

11:36  6    splash over the side and capsize the boat.

11:36  7        The reason for that is what's called the free surface

07:08  8    effect.  So when you put a liquid inside of a boat, when the

11:36  9    boat rolls, all that water is going to go over to one side,

11:36  10   which could overturn it or upset the balance of the boat.

11:36  11       That's one thing that I look for when I go on a boat.  My

11:36  12   concern was that if I didn't balance out the boat -- I had to

11:36  13   move around some fuel drums to balance it out -- is a wave

11:36  14   would come over and capsize the boat with us onboard.  So you

11:36  15   have to pay attention when you're going over.

11:37  16   Q.  Based on your recollection, about how much free board did

11:37  17   the boat have in this picture here?

11:37  18   A.  That would be about one foot max.

11:37  19   Q.  Based on your recollection, what was the sea state that

11:37  20   night?

11:37  21   A.  So a swell -- swells are big and oftentimes you don't even

11:37  22   notice them unless you're on a ship.  When you're on a small

07:09  23   boat, unless you're going fast, you don't really notice them.

07:09  24   Think of it as a hill.

07:10  25       Waves, which are driven by wind, peak a little more.  So a

11:37   1   swell looks like this, and a wave looks like this.  So when a

11:37   2   swell hits you, it's not very noticeable.  Oftentimes, it's no

11:37   3   big deal.  But with the waves, which were three feet, think of

11:37   4   that as three-foot mini walls slapping up against the boat.

11:38   5       With a one-foot free board, we were getting water splashing

07:10   6   over the side into the boat, which put more water into the

07:10   7   boat, which could affect the stability of the boat.

11:38   8   Q.  Had you previously pointed to where the scuttling valve

11:38   9   was?

11:38   10  A.  I did.  It was on the transom, the previous picture.

11:38   11  Q.  Can you mark again on this photo the approximate location.

11:38   12  A.  It would be right back there.

11:38   13  Q.  That's where the person who's driving the boat is sitting?

11:38   14  A.  Yes.

11:38   15  Q.  If a person was sitting there, how would they reach

11:38   16  something like the scuttling valve?

11:38   17  A.  They would have to turn around, reach back, and reach

11:38   18  downward to pull the valve.

11:38   19  Q.  Could they put it back in after they pulled it out?

11:39   20  A.  Absolutely.  We've had cases in the past where we found the

07:12   21  plug after they pulled it and we had to put it back in to make

11:39   22  sure it didn't sink with us onboard.

11:39   23  Q.  If you had encountered this vessel in the United States,

11:39   24  what would you have done as a member of the Coast Guard?

11:39   25  A.  I would have terminated the voyage for manifestly unsafe

11:39  1    voyage.

11:39  2    Q.   What does that mean exactly?

11:39  3    A.   It's not safe for anyone to be on the way it was riding,

11:39  4    the way it was loaded down, the amount of stuff they had

11:39  5    onboard.   It was very unstable, and it wouldn't have been safe.

11:39  6    It was very overloaded.

07:13  7         So here in the States, if I would have encountered that, I

07:13  8    would have terminated the voyage and immediately escorted them

11:39  9    back to a marina, and they would have stayed terminated until

11:39  10   they fixed the problems and made it safer to be on or

11:39  11   something.   But they wouldn't have been out on the water.

11:40  12   Q.   Do you see anyone in this courtroom today who you also saw

11:40  13   as one of the crew members on the boat that night?

11:40  14   A.   Yes, sir.

11:40  15   Q.   Can you point him out for the jury.

11:40  16   A.   The gentleman in the back corner.

11:40  17   Q.   What is he wearing?

11:40  18   A.   He's wearing a -- it looks like a tan shirt and a gray

11:40  19   blazer.

11:40  20   Q.   Does he have any memorable physical features that you

11:40  21   remember from that night?

11:40  22   A.   Yes, sir.   He has a scar from his mouth to his ear right

11:40  23   here.

11:40  24   Q.   Based on your observations that night, what role did he

11:40  25   play on that boat?

| | |
|---|---|
| 11:40 | 1 |

A.   When we came onboard, one of the first things I do, once I

determine that the vessel is safe for us to be on, is myself

and my translator will ask who the master of the vessel is.

When my translator asked that question, he answered in the

affirmative.

Q.   So he was the master?

A.   Yes, sir.

Q.   In charge?

A.   Yes, sir.

       MR. QUENCER:  Petty Officer Mallory, thank you for

your testimony.  I have no further questions.

       THE WITNESS:  Thank you, sir.

       THE COURT:  Cross-examination.

       MR. BLUMENFELD:  No questions.

       THE COURT:  You are excused.

       THE WITNESS:  Thank you.

         WITNESS EXCUSED

       THE COURT:  Government, call your next witness.

       MR. MOTIANI:  Yes, Your Honor.  The United States

would call Petty Officer Sean Regan.

         WITNESS SWORN

       COURTROOM DEPUTY:  Please state your full name for the

record.

       THE WITNESS:  My name is Petty Officer Sean Regan.

BY MR. MOTIANI:

Q.  Where are you employed, sir?

A.  I'm employed with the Coast Guard.

Q.  What is your current position with the Coast Guard?

A.  I'm a Petty Officer Second Class.

Q.  What does that mean?

A.  It means my primary job is being a boat driver.  On the ship I am stationed at, I am also a navigation Petty Officer.

Q.  What is your current rank?

A.  I'm an E5 in the Coast Guard.

Q.  Describe for the members of the jury the training you have received with the Coast Guard.

A.  I received law enforcement training at the Federal Law Enforcement Academy.  I also received multiple trainings involving boat driving.

Q.  Have you received any fishery training?

A.  I have.

Q.  Describe that for the members of the jury.

A.  Sure.  When I was stationed in California, I went to California Living Marine Resources School, which qualified me to be a fishery sporting officer.

Q.  What is it exactly?  You're qualified as a fishery officer.  What did they teach you about?

A.  When I went to the Living Marine Resources School, they taught me how to identify fish, identify different types of

07:21  1   fishing boats, the proper installation of fishing gear, and

07:21  2   keeping fishermen within --

11:44  3          MR. BLUMENFELD:  If he could repeat the last part of

11:44  4   the answer.

11:44  5          THE COURT:  If you would speak slowly and speak into

11:44  6   the microphone.

11:44  7          THE WITNESS:  Yes, ma'am.

11:44  8    BY MR. MOTIANI:

11:44  9   Q.  Could you repeat the last part of your answer, please.

11:44  10  A.  When I went to school, they taught me how to identify

11:44  11  fishing gear, identify fish, ensure fishermen are within the

11:44  12  U.S. laws when they're conducting their fishing and doing their

11:44  13  job in California.

11:44  14  Q.  Did they also teach you about hooks and nets?

11:44  15  A.  Yes, they taught me all about fishing gear that fishermen

11:44  16  are supposed to use.

11:44  17  Q.  How it's kept?

11:44  18  A.  Yes, sir.

11:44  19  Q.  I want to turn your attention to August 31st, 2017.

11:45  20      Were you on a deployment at that time?

11:45  21  A.  Yes, I was.

11:45  22  Q.  Where were you?

11:45  23  A.  I was in the Eastern Pacific Ocean.

11:45  24  Q.  What cutter were you aboard?

11:45  25  A.  The Coast Guard Cutter James.

11:45  1   Q.  Did anything happening that evening?

11:45  2   A.  That evening, we were tasked with interdicting a suspected

11:45  3   target of interest.

11:45  4   Q.  And what was your role specifically?

11:45  5   A.  On that mission in particular, I was a boarding team member

11:45  6   as well as a pursuit crew member.

11:45  7   Q.  A boarding team member, what is that exactly?

11:45  8   A.  As a boarding team member, your job is to assist the

11:45  9   boarding officer in conducting a law enforcement boarding.

11:45  10  Q.  Who was the boarding officer in your case?

11:45  11  A.  Petty Officer Mallory was my boarding officer.

11:45  12  Q.  You said you had another role as well; what was that?

11:45  13  A.  Pursuit crewman.

11:45  14  Q.  What is that?

11:45  15  A.  In our case, we were using a helicopter.  The pursuit teams

11:46  16  are a contingency plan to the airborne unit.  If they are

11:46  17  unable to stop a vessel, we would have to go in and use force

11:46  18  to stop that vessel.

11:46  19  Q.  Was it the objective in this case to interdict a particular

11:46  20  vessel?

11:46  21  A.  Yes, it was.

11:46  22  Q.  How many interdictions have you been involved in, in your

11:46  23  career?

11:46  24  A.  I've been involved in 22 interdictions.

11:46  25  Q.  In those 22 interdictions, how many vessels have you

11:46 1    boarded?

11:46 2    A.   I've been onboard 12 of them.

11:46 3    Q.   Have you held various roles?

11:46 4    A.   Yes, I have.

11:46 5    Q.   In this case, did you actually interdict a vessel?

11:46 6    A.   The helicopter stopped the vessel with disabling fire prior

11:46 7    to us getting there, so all we had to do was conduct the

11:46 8    boarding.

11:46 9    Q.   Do you recall what that vessel looked like when it first

11:46 10   appeared?

11:46 11   A.   When we first approached, it was white in color.  It had

11:47 12   two outboard engines, and it had the name Ian written on the

11:47 13   forward bow.

11:47 14           MR. MOTIANI:  Permission to use the ELMO?

11:47 15           THE COURT:  Yes.

11:47 16    BY MR. MOTIANI:

11:47 17   Q.   I'm showing you what has been admitted into evidence as

11:47 18   Government's Exhibit 2A.

11:47 19       What is depicted on the screen?

11:47 20   A.   On the screen, this is from the perspective of the

11:47 21   long-range interceptor.  There are five personnel on the bow of

11:47 22   the Ian, and that is me sitting on the center fish hold right

11:47 23   there.  I am ensuring that the personnel up forward are safe

11:47 24   and secure.

11:47 25   Q.   Can you circle yourself there.

11:47   1   A.   (Witness indicates.)

11:47   2   Q.   Now, that's you on there.

11:48   3        How many occupants did you say there were?

11:48   4   A.   There were five personnel on the Ian when we approached,

11:48   5   and myself, Petty Officer Mallory, and Seaman Calventi, who was

11:48   6   our translator, hopped onboard.

11:48   7   Q.   Do you recall what you saw while you were on the Ian?

11:48   8   A.   While I was onboard the Ian, I saw, in the center fish

11:48   9   hold, what appeared to be a fish hold full of packages as well

11:48  10   as five personnel on the boat.

11:48  11        I saw multiple fuel canisters, and I saw the bow was filled

11:48  12   with what appeared to be trash and personal effects.   I also

11:48  13   noticed later that the bow section of the boat was taking on a

11:48  14   substantial amount of water.

11:48  15   Q.   I want to slow you down for a second.

11:48  16        I'm showing you what has been admitted as Government's

11:48  17   Exhibit 3A.

11:49  18        Are these the packages that you're referring to, sir?

11:49  19   A.   Yes, they are.

11:49  20   Q.   Do you recall how many packages were there?

11:49  21   A.   I do not recall.

11:49  22   Q.   But you recall seeing them, correct?

11:49  23   A.   Yes, I do.

11:49  24   Q.   And you said you saw them in the fish hold?

11:49  25   A.   That's correct.

11:49   1   Q.   Did you have a chance to search this vessel?

11:49   2   A.   I did not, no.

11:49   3   Q.   But did you have the chance to do a security sweep of this

11:49   4   vessel?

11:49   5   A.   Yes, we did.

11:49   6   Q.   So you actually had a chance to see what was physically

11:49   7   located on the vessel?

11:49   8   A.   Yes, I did.

11:49   9   Q.   I'm showing you what has been admitted into evidence as

11:49   10   Government's Exhibit 2D.

11:49   11       Do you see what's on your screen, sir?

11:49   12   A.   Yes, sir.   In the center of the screen, there is a rack of

11:49   13   fish hooks.   The forward portion of the boat right there is

11:49   14   full of trash and personal effects, and there are extra fuel

11:49   15   canisters on the bottom portion of that.

11:50   16   Q.   Let's take it step by step.

11:50   17       Would you mind circling the fuel canisters or at least

11:50   18   drawing a line through it.

11:50   19   A.   (Witness indicates.)

11:50   20   Q.   So you've drawn a line through the fuel canisters.

11:50   21       What about the fish hooks?   Where is that located on the

11:50   22   screen?

11:50   23   A.   They are situated on a rack.

11:50   24   Q.   Describe that.   What do you mean?

11:50   25   A.   It almost looks like a washboard with multiple poles going

11:50  1   across, and they set the fish hooks actually on the poles.

11:50  2   Q.  Do you recall the conditions of those fish hooks?

11:50  3   A.  They were rusty and appeared to be unused because there was

11:50  4   not any line attached to it.

11:50  5   Q.  You have been trained in fishery, correct?

11:50  6   A.  That is correct.

11:50  7   Q.  Did you see any indication of any fish onboard the vessel?

11:50  8   A.  No.

11:50  9   Q.  How about any blood?

11:50  10  A.  No blood.

11:50  11  Q.  Did you see any indication of ice?

11:50  12  A.  I didn't see any ice.

11:51  13  Q.  When you first get on the vessel, what is your primary

11:51  14  objective?

11:51  15  A.  When we first approach the vessel, our job is to gain

11:51  16  positive control of the vessel, which means that we ensure the

11:51  17  safety of our crew, ensure the safety of the personnel onboard

11:51  18  the vessel, and ensure that the vessel is seaworthy.

11:51  19  Q.  Was it seaworthy?

11:51  20  A.  When we first approached, no, it wasn't.  There was a

11:51  21  substantial amount of water in the forward portion of the boat

11:51  22  because they had so much weight up forward.  When I stepped up

11:51  23  there, I was about knee-deep in water, and I believe that the

11:51  24  vessel was taking on water.

11:51  25  Q.  What did you do in response to this?

11:51  1   A.   We evacuated the personnel from their vessel onto our

11:51  2   long-range interceptor.

11:51  3   Q.   You say "we"; is that you and Petty Officer Mallory?

11:51  4   A.   Yes, sir.

11:52  5   Q.   How many personnel did you evacuate?

11:52  6   A.   We evacuated the five crew members onboard the Ian as well

11:52  7   as our translator.

11:52  8   Q.   Where did they go to?

11:52  9   A.   They went to the long-range interceptor.

11:52  10  Q.   What did you do?

11:52  11  A.   I finished gaining positive control.  I ensured that the

11:52  12  vessel wasn't actively taking on water.  I inspected the entire

11:52  13  hold seeing if they may have pulled a plug to force it to take

11:52  14  on water, and we determined that, at the time, it wasn't

11:52  15  actively taking on water.

11:52  16  Q.   What do you do next?

11:52  17  A.   From then, we determine that we have positive control of

11:52  18  the vessel, and we conduct the boarding as necessary.

11:52  19  Q.   What happened?  Were you involved in removing the packages

11:52  20  that you previously spoke about?

11:52  21  A.   After we gained positive control, I stepped off the vessel

11:52  22  and I took over as boat driver for the long-range interceptor

11:52  23  because, when we initially launch, we have two crews launch.

11:53  24  In order for our crews to get rest, we ensure that the second

11:53  25  crew goes back, and I relieved the boat driver of the LRI so he

11:53  1    could go back and get some rest.

11:53  2    Q.  So who is on your vessel at this time?

11:53  3    A.  On my vessel, it was myself, my engineer, and Seaman

11:53  4    Calventi, our linguist.

11:53  5    Q.  And do you stay on scene or do you head back?

11:53  6    A.  I stay on scene with the boarding team.

11:53  7    Q.  And you waited for the boarding team to finish?

11:53  8    A.  That is correct.

11:53  9    Q.  Are you aware of what the boarding team is doing at this

11:53  10   time?

11:53  11   A.  At this time, they were waiting for a statement of no

11:53  12   objection so they can perform the boarding.

11:53  13   Q.  Was that eventually given?

11:53  14   A.  Yes, it was.

11:53  15   Q.  Do you know if anything was removed from the vessel Ian?

11:53  16   A.  Yes.

11:53  17   Q.  Do you know what was removed?

11:54  18   A.  Some personal effects, some electronic devices, as well as

11:54  19   the packages.

11:54  20        MR. MOTIANI:  No further questions.

11:54  21        THE COURT:  Cross-examination.

11:54  22        MR. BLUMENFELD:  We have no questions.

11:54  23        THE COURT:  Thank you, Officer.  You may step down.

11:54  24        THE WITNESS:  Thank you, ma'am.

11:54  25             WITNESS EXCUSED

11:54  1          THE COURT:  All right, ladies and gentlemen.  We're

11:54  2   going to break for lunch.  Don't talk about the case with each

11:54  3   other or anyone else.  Don't even think about the case.  Find a

11:54  4   place to have lunch and be back here at ten after 1:00 and we

11:55  5   will resume testimony in the case.

11:55  6          COURT SECURITY:  All rise.

11:55  7                    JURY EXCUSED

11:55  8          THE COURT:  We'll go today until 5:00.  I have to take

11:55  9   a matter up tomorrow at 3:30.  Depending on how far we get

11:56  10  today, I just want you to know that that's the time I have

11:56  11  available tomorrow.

11:56  12         MR. QUENCER:  We have two witnesses before we rest.

11:56  13  One is going to be like this for venue and a quick defendant's

11:56  14  statement, and then we're going to put on a co-codefendant, who

11:56  15  may take longer.  So we could be done by 2:30, 3:00.

11:56  16         THE COURT:  Then obviously, Mr. Blumenfeld, you will

11:56  17  have your motion.  But if you have a witness and we are

11:56  18  concluded with the Government at even 3:45 or so I would like

11:56  19  to do at least an hour of that witness.

11:57  20         All right.  See you back here at ten after 1:00.

01:13  21                    LUNCH RECESS

01:13  22         THE COURT:  Bring in the jury, please.

01:13  23         COURT SECURITY OFFICER:  All rise, please.

01:13  24         THE COURT:  Everyone may be seated.

01:13  25         Mr. Motiani, call your next witness.

01:14  1          MR. MOTIANI: The United States would call DEA Special

01:14  2   Agent John Shine.

01:14  3                        WITNESS SWORN

01:14  4          COURTROOM DEPUTY:  Please state your full name for the

01:14  5   record.

01:14  6          THE WITNESS: My name is John Shine.

01:14  7   Q.   Where are you employed, sir?

01:14  8   A.   The Drug Enforcement Administration.

01:14  9   Q.   How long have you been employed with the Drug Enforcement

01:14 10   Administration?

01:14 11   A.   About 21 years.

01:14 12   Q.   What is your current position?

01:14 13   A.   Special agent with the Drug Enforcement Administration.

01:14 14   Q.   What are your duties and responsibilities?

01:14 15   A.   We investigate and bring to prosecution violations of the

01:15 16   U.S. drugs laws.

01:15 17   Q.   Do you know someone by the name of Julio Cesar Alvarez

01:15 18   Martinez?

01:15 19   A.   Yes.

01:15 20   Q.   How do you know him?

01:15 21   A.   I accompanied him to the United States from overseas.

01:15 22   Q.   Where did you accompany him to specifically in the United

01:15 23   States?

01:15 24   A.   The Fort Lauderdale International Airport.

01:15 25   Q.   Was that your first port of entry in the United States?

01:15  1   A.   Yes.

01:15  2   Q.   Do you see a person in the courtroom today -- you can get

01:15  3   up and look around -- that you recognize as Julio Cesar Alvarez

01:15  4   Martinez?

01:15  5   A.   I do.

01:15  6   Q.   Can you point him out and identify him by an article of

01:15  7   clothing?

01:15  8   A.   He is sitting over there with the brown coat.

01:15  9           MR. MOTIANI: Let the record reflect the witness has

01:15 10   identified the defendant.

01:15 11   Q.   Did you ever take a statement from the defendant?

01:15 12   A.   I did.

01:16 13   Q.   Tell us what you did, if anything, before you took the

01:16 14   statement from him.

01:16 15   A.   Sure.   I first reviewed the Coast Guard report surrounding

01:16 16   the interdiction of the vessel the defendant was on.

01:16 17   Q.   And did you give the defendant his Miranda Rights?

01:16 18   A.   I did.

01:16 19   Q.   Did he waive those rights?

01:16 20   A.   Yes.

01:16 21   Q.   And did he make a statement?

01:16 22   A.   Yes.

01:16 23   Q.   And what was the statement?

01:16 24   A.   The defendant said he and another crew member were far off

01:16 25   the coast of Guatemala where he saw another boat accompanied by

01:16   1    three crew members; and those crew members were signaling the

01:16   2    defendant to come over.

01:16   3         Which the defendant told me that he did.  And the crew

01:16   4    members from the other boat asked the defendant if they could

01:16   5    transport those crew members and the cocaine they had onboard

01:16   6    their boat to the shore -- to the coast of Guatemala.

01:17   7    Q.   Did he tell you anything else?

01:17   8    A.   He did.  He said that the other crew members said that they

01:17   9    would be in a lot of trouble if they did not deliver the

01:17  10    cocaine to the shore of Guatemala.

01:17  11    Q.   Did he make any other statements?

01:17  12    A.   He said ultimately their destination was going to be a

01:17  13    Guatemalan Naval base.

01:17  14              MR. MOTIANI: Tender the witness.

01:17  15              THE COURT:  Cross examination.

01:17  16    Q.   The statement that Mr. Alvarez Martinez made to you was

01:17  17    prior to being brought before a Judge and having an attorney

01:17  18    appointed; is that correct?

01:17  19    A.   Correct.

01:17  20    Q.   He told you that this cocaine was being brought to the

01:18  21    Guatemalan Navy?

01:18  22    A.   He changed his story. He said initially it was going to the

01:18  23    coast of Guatemala; and he changed the story to say it was

01:18  24    going to go to the Guatemalan Navy.

01:18  25    Q.   The Navy Base you said?

01:18  1    A.   I believe it could have been the Naval Base.

01:18  2            MR. BLUMENFELD:  Nothing further.

01:18  3            THE COURT:  Redirect.

01:18  4            MR. MOTIANI:  Briefly.

01:18  5    Q.   You said he made a statement to you and your response to

01:18  6    his statement was what?

01:18  7    A.   The response to the statement that the ultimate destination

01:18  8    was the Naval Base was -- I found it unbelievable.

01:18  9            MR. BLUMENFELD: I am would object as to his opinion.

01:18  10           THE COURT:  Was this a part of the conversation that

11:45  11   you had with Mr. Martinez?

11:45  12           THE WITNESS:  Yes.

11:45  13           THE COURT:  If you would tell us what he said and what

01:18  14   you then said.

01:18  15           THE WITNESS:  He said initially during the course of

11:47  16   the interview that their ultimate destination for the crew

11:47  17   members and the cocaine -- that they were taking onboard their

11:47  18   boat, the receiving boat, the defendant's boat; that they were

01:19  19   going to the shore of Guatemala.

01:19  20           And then after that statement he said their ultimate

01:19  21   destination was going to be a Naval Base in Guatemala.

01:19  22           And that is when I discontinued the interview -- I

01:19  23   found it unbelievable -- and said we were done.

01:19  24           MR. MOTIANI: Nothing further.

01:19  25           THE COURT:  Thank you, agent; you may step down.

01:19  1   Ladies and gentlemen, I wanted to tell you earlier that I am

01:19  2   the Duty Judge so I may have to take short five minute recesses

01:19  3   throughout the afternoon to speak with other lawyers about

01:19  4   matters that need to be addressed immediately.

01:19  5          So right now we will take those five minutes; and then

01:19  6   we will have our next witness ready for you when you come back

01:19  7   out.  If you would step into the jury room.

01:20  8                    COURT SECURITY:  All rise.

       9                         JURY EXCUSED

      10          THE COURT:  All right. The marshals may bring out our

      11   next witness.

      12          Bring in the jury, please.

      13          COURT SECURITY OFFICER:  All rise, please.

01:28 14          THE COURT:  Everyone may be seated. Call your next

01:28 15   witness, Mr. Quencer.

01:28 16          MR. QUENCER: United States calls Jose Ricardo Bautista

01:28 17   Vasquez.

01:29 18                       WITNESS SWORN

01:29 19   Q.  Mr. Bautista, what country are you from?

01:29 20   A.  Ecuador.

01:29 21   Q.  How old are you?

01:29 22   A.  24.

01:29 23   Q.  24 years old. Tell us a little about the jobs you had in

01:29 24   Ecuador.

01:29 25   A.  Well, I was a fisherman.

01:29  1   Q.   Before you were a fisherman what did you do?

01:30  2   A.   I played football. I was also a bartender, and I was also a

01:30  3   tourist guide.

01:30  4   Q.   Were you like a paid football player?

01:30  5   A.   Yes.

01:30  6   Q.   And after you had those jobs did you ever become a

01:30  7   fisherman?

01:30  8   A.   I would fish since I was little. My father was a fisherman;

01:31  9   so I would learn from him. And when I had my wife and my two

01:31  10  children then I began to earn a living as a fisherman.

01:31  11  Q.   And how much money per week or per month did you make

01:31  12  fishing?

01:31  13  A.   You know, it's not something where you make money daily. I

01:31  14  mean, it depends on the day you go out. If you fish then you

01:31  15  make money. If you don't fish then you go home without any

01:32  16  money.

01:32  17  Q.   How much -- just a guess -- how much money you would make

01:32  18  fishing?

01:32  19  A.   Well per week like $80.

01:32  20  Q.   U.S.?

01:32  21  A.   Yes, American.

01:32  22  Q.   So $80 a week; about $300 a month?

01:32  23  A.   More or less, yes.

01:32  24  Q.   And that was dependent on whether you would catch fish?

01:32  25  A.   Yes.

01:32  1   Q.  Did someone approach you about making a lot more money than

01:32  2   that?

01:32  3   A.  Yes.

01:33  4   Q.  And how much money did they offer you?

01:33  5   A.  Between 10,000 to $15,000.

01:33  6   Q.  And what did you have to do to earn the money?

01:33  7   A.  I had to take a trip to South America.

01:33  8   Q.  Who approached you about taking the trip?

01:33  9   A.  He contacted me over the phone.

01:33  10  Q.  Do you know their name?

01:33  11  A.  Yes.

01:33  12  Q.  What was the name?

01:33  13  A.  Fernando Ortiz.

01:33  14  Q.  Did you ever take that trip that Fernando Ortiz offered

01:34  15  you?

01:34  16  A.  Yes.

01:34  17  Q.  Where did you go to begin that trip?

01:34  18  A.  To Ezmeralda.

01:34  19  Q.  That is in Ecuador?

01:34  20  A.  In Ecuador.

01:34  21  Q.  Who was with you when you started the trip?

01:34  22  A.  Of the crew I was coming with?

01:34  23  Q.  Yes.

01:34  24  A.  Jorge Ortiz and Juan David Cadena.

01:35  25  Q.  And did that boat have drugs on them?

01:35  1    A.   When we arrived at the port, no.

01:35  2    Q.   And when did you get those drugs?

01:35  3    A.   Outside the shores of Ezmeralda.

01:35  4    Q.   And who else was there when you got to that spot?

01:35  5    A.   There were two boats with men.   There was gas and cocaine.

01:35  6    Q.   Did you get on the boat with the cocaine?

01:35  7    A.   Yes.

01:35  8    Q.   What else was on the boat with you and the cocaine?

01:35  9    A.   There were all the tools to be able to take that trip.

01:36  10   There was cocaine, there was a satellite phone, there was a

01:36  11   navigator, there was a satellite buoy that was tied to the

01:36  12   drugs.   There was food, there was a water suit; everything that

01:36  13   was required.

01:36  14   Q.   When you say there was a satellite do you mean a satellite

01:36  15   phone?

01:36  16   A.   A phone.

01:36  17   Q.   When you say the navigator what do you mean -- it was a

01:36  18   device?

01:37  19   A.   To a GPS.

01:37  20   Q.   Okay.   So there was a satellite phone, a GPS, there were

01:37  21   drugs, there was food, there was water, all the equipment you

01:37  22   needed to make this trip?

01:37  23   A.   Yes; also fuel.

01:37  24   Q.   A little bit of fuel or a lot of fuel?

01:37  25   A.   There were about 35 drums, containers.

01:37  1   Q.   How long was the boat you were on mas or menos?

01:38  2   A.   We describe it as an 1100.

01:38  3   Q.   Do you know how many feet that is?

01:38  4   A.   Yes; about more than 8.5 meters.

01:38  5   Q.   Here in the United States we don't use meters so I am going

01:38  6   to demonstrate to see if you can tell me how long it was.

01:38  7        Was it longer than from me to you?

01:38  8   A.   Yes, a bit longer.

01:38  9   Q.   More or less?

01:39  10  A.   Yes; right there.

01:39  11  Q.   How many people were onboard with you when you started the

01:39  12  trip?

01:39  13  A.   When we left only three; those who went on the trip were

01:39  14  three of us.

01:39  15  Q.   Do you remember the names of the other two people?

01:39  16  A.   Yes. Jorge Issac Ortiz, Preciado, Juan David Cadena.

01:39  17  Q.   Once you got going how long did you go before you first

01:39  18  stopped?

01:40  19  A.   All night and then the next day at 10:00 a.m.

01:40  20  Q.   Why did you stop at 10:00 a.m.?

01:40  21  A.   Well, because we had to stop because we ran out of fuel.

01:40  22  And then the captain started to write something -- I could not

01:40  23  see what he was writing -- but then a while later another boat

01:40  24  came with fuel.

01:40  25  Q.   Let's talk about what the captain did. First of all, who

01:40  1  was the captain?

01:41  2  A.  Jorge Ortiz.

01:41  3  Q.  When you say he was writing; what was he using to write?

01:41  4  A.  The satellite phone.

01:41  5  Q.  So he got on the satellite phone, he wrote something and a

01:41  6  little while later these other people showed up?

01:41  7  A.  Yes.

01:41  8  Q.  How many people showed up?

01:41  9  A.  A boat with two people.

01:41  10  Q.  What did they have on the boat that you needed?

01:41  11  A.  Fuel.

01:41  12  Q.  What did they do with that fuel?

01:41  13  A.  They passed it over to the boat where we were and we passed

01:42  14  over the empty container.

01:42  15  Q.  After you had the fuel did you start up again?

01:42  16  A.  Yes.

01:42  17  Q.  How long did you go before you stopped again?

01:42  18  A.  All night, all day, and then the next day we stopped again

01:42  19  at around 5:00 p.m.

01:42  20  Q.  When you stopped again what did the captain do?

01:42  21  A.  He went over to the bow and he started texting; and after a

01:43  22  while two small boats came over again with fuel.

01:43  23  Q.  So this time the captain texted using the satellite phone

01:43  24  and two boats showed up?

01:43  25  A.  Yes.

01:43  1    Q.   And then did you start again with the new fuel?

01:43  2    A.   Yes.

01:43  3    Q.   How long did you go before you stopped for a third time?

01:43  4    A.   All night and the next day up until 10:00 a.m.

01:43  5    Q.   At 10:00 a.m. what happened then?

01:43  6    A.   We ran out of fuel, we were adrift, and the captain again

01:44  7    used the phone, made some calls and started texting.

01:44  8    Q.   And after the captain did that who showed up?

01:44  9    A.   After about 5:00 p.m. a white boat arrived with two people

01:45  10   inside, and there I found Julio Cesar, Alvarez Martinez and

01:45  11   David Gomez Corado.

01:45  12   Q.   Do you see either of them in the courtroom today?

01:45  13   A.   Yes.

01:45  14   Q.   Where is he sitting?

01:45  15   A.   In front of me.

01:45  16   Q.   What is he wearing?

01:45  17   A.   A suit.

01:45  18   Q.   This man?

01:45  19   A.   Yes.

01:45  20   Q.   What was the first thing that happened when his boat got

01:45  21   close to yours, what is the first thing the captain said?

01:46  22   A.   They used a code; and so the captain that was coming in my

01:46  23   boat with my crew said 888.

01:46  24   Q.   And what did Mr. Alvarez Martinez say?

01:46  25        THE INTERPRETER: Your Honor, the interpreter would

01:46   1   request the witness repeat what he said.

01:46   2        THE COURT:  Of course.

01:46   3        THE INTERPRETER: The witness had said the word huevo

01:47   4   de velo; and as far as the interpreter knows it does not mean

01:47   5   anything.

01:47   6   Q.  So the captain of your boat got on the satellite phone and

01:47   7   made some calls and some texts?

01:47   8   A.  Yes.

01:47   9   Q.  And Mr. Alvarez Martinez showed up?

01:47   10   A.  Yes.

01:47   11   Q.  And the first thing that was said -- was your captain said

01:47   12   888?

01:47   13   A.  Yes.

01:47   14   Q.  In response he said huevo de velo?

01:47   15   A.  Yes.

01:47   16   Q.  What happened next?

01:48   17   A.  Then they said to us we should help them to cross the

01:48   18   cocaine over to their boat.

01:48   19   Q.  And did you help him?

01:48   20   A.  Yes.

01:48   21   Q.  Then what did Mr. Alvarez Martinez tell you to do?

01:48   22   A.  To sink the boat.

01:48   23   Q.  To sink your boat?

01:48   24   A.  And to cross over to his.

01:48   25   Q.  Could you sink your boat?

01:48  1    A.   No.

01:48  2    Q.   Why not?

01:48  3    A.   Because we did not have anything to sink it with.

01:48  4    Q.   How about the electronics you had on board?

01:49  5    A.   It remained there.

01:49  6    Q.   So you left them on your boat?

01:49  7    A.   Yes.

01:49  8    Q.   Did they have any bait and ice on their boat?

01:49  9    A.   Yes, but they got rid of it.

01:49  10   Q.   When did they get rid of it?

01:49  11   A.   They threw it out when they told us to bring the cocaine

01:49  12   over onto their boat.

01:49  13   Q.   Now, you were there and you could see the face of your

01:49  14   captain and the face of the defendant Mr. Alvarez Martinez,

01:49  15   correct?

01:50  16   A.   Yes.

01:50  17   Q.   Did they seem surprised to see each other?

01:50  18   A.   No.

01:50  19   Q.   Were you calling out help, help, help?

01:50  20   A.   No.

01:50  21   Q.   They just showed up and passed a code?

01:50  22   A.   They arrived to where we were at.

01:50  23   Q.   Once you loaded the cocaine on their boat and left the

01:50  24   electronics on your boat what did you guys do then?

01:50  25   A.   Could you repeat that once more?

01:51 1  Q.  Of course.  Once you loaded the cocaine from your boat to

01:51 2  his boat what did you do then?

01:51 3  A.  We took off in their boat.

01:51 4  Q.  Did you bring the satellite buoy with you?

01:51 5  A.  Yes.

01:51 6  Q.  Once you got started where were you headed?

01:51 7  A.  Guatemala.

01:51 8  Q.  What did Mr. Alvarez Martinez tell you about where you were

01:51 9  going?

01:52 10  A.  That we had to navigate 150 miles, and from there that

01:52 11  there would be another boat for us, and they would go on with

01:52 12  the cocaine.

01:52 13  Q.  Did he say anything about turning this over to the

01:52 14  authorities?

01:52 15  A.  No.

01:52 16  Q.  In fact, he told you there were going to be other boats

01:52 17  150 miles away?

01:52 18  A.  We would navigate or go forward 150 miles so that we would

01:53 19  get onto another boat, and they would go on with the cocaine.

01:53 20  Q.  How long were you traveling before you first saw the

01:53 21  helicopter?

01:53 22  A.  More or less more than an hour.

01:53 23       MR. QUENCER:  Your Honor, with your permission we would

01:53 24  like to have use of the video.

01:53 25       THE COURT:  Yes.  If you would bring up the video

01:54  1    screens, please.

01:54  2         MR. QUENCER: For the record the United States will be

01:54  3    playing Government's Exhibit 5, video two.

01:55  4              VIDEOTAPE PLAYED FOR THE RECORD

01:55  5    Q.   Can you see the video?

01:55  6    A.   Yes.

01:55  7    Q.   Just watch for a minute and then I will ask you some

01:55  8    questions.

01:55  9    A.   Okay.

01:55  10   Q.   Who is driving the boat?

01:55  11   A.   Mr. Julio Cesar.

01:55  12   Q.   Him?

01:55  13   A.   Yes.

01:55  14   Q.   Where are you sitting on the boat?

01:55  15   A.   Forward; this one up here.

01:55  16   Q.   You can circle the screen if you like; circle where you

01:55  17   are.

01:56  18   A.   (Witness indicates)

01:56  19        MR. QUENCER: Let the record reflect he has identified

01:56  20   a person in the front right of the boat.

01:56  21        THE WITNESS:  Okay

01:56  22        VIDEOTAPE PLAYED FOR THE RECORD

01:56  23   Q.   What's happening here?

01:57  24   A.   Here the helicopter was already there; and I saw the

01:57  25   helicopter.

01:57  1   Q.  What did you do when you saw the helicopter?

01:57  2   A.  I told them that something was coming from behind. I told

01:57  3   them there was a bird.

01:57  4   Q.  And what did the captain do when you said that?

01:57  5   A.  He told us to crouch down so they couldn't see us.

01:58  6   Q.  Is that you crouching down?

01:58  7   A.  Yes.

01:58  8   Q.  Who told you to crouch down?

01:58  9   A.  The captain Julio Cesar.

01:58  10  Q.  Him?

01:58  11  A.  Yes.

01:58  12  Q.  When you were crouched down were you able to see the

01:58  13  helicopter?

01:58  14  A.  No, I could only hear the noise.

01:58  15  Q.  So you could hear the noise of the helicopter nearby?

01:58  16  A.  Yes.

01:58  17  Q.  Were you able to see when they fired warning shots -- let

01:59  18  me withdraw that question. Did you ever hear gun fire?

01:59  19  A.  Yes.

01:59  20  Q.  After you heard the gunfire what did the captain do?

01:59  21  A.  He kept on running.

01:59  22  Q.  Did you ever tell him to stop?

01:59  23  A.  When they shot at the engines then, yes.

01:59  24  Q.  And what happened after you told him to stop?

01:59  25  A.  He kept on running, and then he finally stopped when the

02:00  1   helicopter placed the lasers to the bodies.

02:00  2   Q.  After the boat came to a stop what did the captain do?

02:00  3   A.  He pulled the plug from the bow.

02:00  4   Q.  When you pull the plug what happens?

02:00  5   A.  Water comes in.

02:00  6   Q.  What did you say when you saw him pull the plug and water

02:01  7   come in?

02:01  8   A.  To put it back because we were going to drown because a lot

02:01  9   of water came in.

02:01  10  Q.  What did the captain do after you said that?

02:01  11  A.  A while later he put it back.

02:01  12  Q.  Do you remember two boats from the Coast Guard coming to

02:01  13  your boat?

02:01  14  A.  Yes.

02:01  15  Q.  Did you leave your boat and go onto one of the Coast Guard

02:01  16  boats?

02:02  17  A.  The Coast Guard they approached us and boarded us.

02:02  18  Q.  What happened to you after the Coast Guard boarded your

02:02  19  vessel?

02:02  20  A.  The Coast Guard they tied our hands; and then after they

02:02  21  released them then afterwards they put us onto a Coast Guard

02:02  22  boat.

02:02  23          MR. QUENCER: We would like to have use of the ELMO.

02:03  24          THE COURT:  If counsel could approach. I have given

02:03  25  you a lot of room, Mr. Quencer.  The fact you may be a great

1    defense attorney one day does not mean you get to lead as much

2    as you have been doing today.

3            While I know this is a difficult witness; asking this

4    man and pointing to the defendant, you are not permitted to

5    lead in this fashion.

6            MR. QUENCER: Understood.

7            THE COURT:  Okay. What exhibit are we at?

8            MR. QUENCER: Government's Exhibit 1 C.

9            THE COURT:  You may proceed

10   Q.  Do you recognize this photo?

11   A.  Yes.  The boat's name was James, Coast Guard.

12   Q.  Were you ever brought to that boat?

13   A.  Yes.

14   Q.  After you were on the Coast Guard cutter did anyone ever

15   speak with you?

16   A.  Not the Coast Guard.

17   Q.  Who spoke to you when you were on the cutter?

18   A.  Julio Cesar and David Gomez Corado.

19   Q.  What did Julio Cesar Alvarez Martinez tell you?

20   A.  As soon as we would get somewhere we would be taken to --

21   that we were gong to be taken to Guatemala.  That we had been

22   rescued, that we were sinking; that they were going to give us

23   to the authorities mand they knew what we were carrying.

24   Q.  And who told you that?

25   A.  Julio Cesar Alvarez Martinez.

02:06  1   Q.   And what did he tell you?

02:06  2   A.   To say that when we got to Guatemala.   That if we said that

02:07  3   their boss were going to get us out.

02:07  4   Q.   Whose boss?

02:07  5   A.   The boss of Mr. Julio Cesar and David Gomez Corado.

02:07  6   Q.   Is that the only time he asked you to tell that story?

02:07  7   A.   No.

02:07  8   Q.   How many times did he ask you to tell that story?

02:07  9   A.   I don't remember very well, but from 10 to 13 times more or

02:07  10  less.

02:07  11  Q.   Did he only tell you that on the boat or did he tell you to

02:08  12  do that somewhere else too?

02:08  13  A.   In every place we were taken to do the same thing.

02:08  14  Q.   Tell the jury the different places you were taken where he

02:08  15  told you that.

02:08  16  A.   They transferred us to seven different Coast Guard boats,

02:08  17  and in every single boat where we were at he would tell us to

02:08  18  say the same -- the exact same thing, no changes.

02:09  19        MR. QUENCER: I don't have any further questions, but

02:09  20  the attorney for the defendant may have some questions for you.

02:09  21        THE WITNESS:   Okay.

02:09  22        THE COURT:   Cross examination.

02:10  23  Q.   Mr. Bautista, as I understand it you were contacted by text

02:10  24  in Ecuador to get involved in this venture?

02:10  25  A.   Yes.

02:10   1    Q.   That was by Francisco Ortiz?

02:10   2    A.   No.

02:10   3    Q.   Who was it?

02:10   4    A.   His name is Fernando Ortiz.

02:10   5    Q.   Excuse me, Fernando Ortiz.  Did you know Fernando Ortiz was

02:10   6    a member of a drug trafficking organization?

02:11   7    A.   I did not know because I never saw him.

02:11   8    Q.   Did you know him?

02:11   9    A.   I knew him from back then, when we studied together, but

02:11   10   from then on no.

02:11   11   Q.   Was that in school?

02:11   12   A.   Yes, in school.

02:11   13   Q.   And he texted you and said -- he offered you $10,000?

02:11   14   A.   Yes.

02:11   15   Q.   And when were you supposed to get paid?

02:12   16   A.   Between 10 and 15,000; and if everything went well they

02:12   17   said I was going to get a gift.

02:12   18   Q.   What did they tell you would happen if you got arrested,

02:12   19   would you still get paid?

02:12   20   A.   No.

02:12   21   Q.   How many other trips have you made with cocaine for this

02:12   22   organization?

02:13   23   A.   Never in my life; this was my first time.

02:13   24   Q.   When you were friends with Mr. Ortiz back in school did you

02:13   25   tell him you would like to get involved with a drug trafficking

02:13   1   organization?

02:13   2   A.   Never.   We played soccer; we never spoke about that.

02:13   3   Q.   So you are saying an old friend you had never seen just

02:13   4   texted you to get involved in a drug trip?

02:13   5   A.   That's right.

02:13   6   Q.   What was the name of the boat that you were on, the last

02:13   7   boat that you were on that had the cocaine?

02:13   8   A.   I did not see it because it was at night.

02:14   9   Q.   But you were on it in the daytime also, right?

02:14   10  A.   No, it was only at night.

02:14   11  Q.   You got on the boat at night, is that what you are saying?

02:14   12  A.   That's right.

02:14   13  Q.   And you were out in the ocean for a number of days; is that

02:14   14  right?

02:14   15  A.   That's right.

02:15   16  Q.   And Mr. Cadena was the captain?

02:15   17  A.   No.

02:15   18  Q.   Mr. Ortiz was the captain?

02:15   19  A.   Yes.

02:15   20  Q.   This boat you estimated to be the size of about eight and a

02:15   21  half meters?

02:15   22  A.   More or less.

02:15   23  Q.   It had three engines; is that correct?

02:15   24  A.   Yes.

02:15   25  Q.   It was bigger than the boat Julio was driving, correct?

02:15  1   A.   Longer and taller.

02:15  2   Q.   Now, you have spoken with the A.U.S.A on a number of

02:16  3   occasions before you came in here to testify, correct?

02:16  4   A.   That's correct.

02:16  5   Q.   Did he show you the video that the Coast Guard took?

02:16  6   A.   Yes.   Just as I told you they showed it to me.

02:16  7   Q.   Did you see a video that showed the boat you had been on

02:16  8   just sitting there empty?

02:17  9   A.   No.

02:17  10  Q.   Do you know how far offshore you were when you were stopped

02:17  11  and out of fuel for the last time?

02:17  12  A.   I don't know.

02:17  13  Q.   Beside being out of fuel, you were also out of food,

02:17  14  correct?

02:17  15  A.   No.

02:17  16  Q.   Water?

02:17  17  A.   We had food and water.

02:18  18  Q.   And you don't know who Mr. Ortiz was talking to or texting,

02:18  19  do you?

02:18  20  A.   No.

02:18  21  Q.   Now you talked about some conversations with Julio onboard

02:18  22  the cutter,, didn't you?

02:18  23  A.   He told us -- our conversation was about what we had to say

02:18  24  wherever we would go.

02:18  25  Q.   And that was -- he asked you to tell the Coast Guard or the

02:19    1    authorities that he was taking the cocaine to the Guatemalan

02:19    2    Navy, correct?

02:19    3    A.   Yes.

02:19    4    Q.   When you were taken onboard the Coast Guard Cutter James,

02:19    5    the first vessel, you were in custody?

02:19    6    A.   Yes.

02:19    7    Q.   And you were handcuffed?

02:19    8    A.   Yes.

02:19    9    Q.   In fact, you were handcuffed on the deck of the vessel,

02:20   10    correct?

02:20   11    A.   Yes.

02:20   12    Q.   You were not allowed to walk around free on the vessel,

02:20   13    were you?

02:20   14    A.   No.

02:20   15    Q.   When you got onboard the James and the other vessels along

02:20   16    the way, it wasn't just the five of you onboard, correct?

02:20   17    A.   It was many of us.

02:20   18    Q.   There were many people that had been arrested, almost 30 on

02:20   19    that vessel?

02:20   20    A.   Around 30, 40 more or less.

02:20   21    Q.   All of you who were arrested, the 30 to 40, were not on the

02:21   22    same deck of the vessel, were you?

02:21   23    A.   Inside the boat; we were all laying down like in rows.

02:21   24    Q.   Were you being guarded?

02:21   25    A.   Yes.

02:21  1    Q.   There were many guards?

02:21  2    A.   Yes.

02:21  3    Q.   How far away from Julio were you being held?

02:22  4    A.   We were near each other, the five of us.

02:22  5    Q.   How many people were there between you and Julio?

02:22  6    A.   We are sleeping one attached to the other, like this,

02:22  7    together.

02:22  8    Q.   So you were right next to Julio?

02:22  9    A.   Yes, beside him.

02:22  10   Q.   Who else heard him tell you this besides you?

02:23  11            THE COURT:   Are you asking who was in the area who

02:23  12   could have heard him?

02:23  13            MR. BLUMENFELD: Yes.

02:23  14            THE COURT: Who else was close to you?

02:23  15            THE WITNESS:   Mr. Cadena, Jorge and Corado.

02:23  16   Q.   Did you ever hear Julio talk to the Coast Guard officers?

02:23  17   A.   Never.

02:23  18   Q.   Now when you got here to the United States you spoke with

02:24  19   Agent Shine; is that correct?

02:24  20   A.   Correct.

02:24  21   Q.   Did you tell Agent Shine about this code 888?

02:24  22   A.   I don't remember in all truth. I don't remember if I told

02:24  23   him or I didn't tell him; the truth is.

02:24  24   Q.   You don't remember if you told him the truth is that what

02:24  25   you said?

02:24   1    A.   I told him the truth, but I did not tell him all.

02:25   2    Q.   So you held something back?

02:25   3    A.   Yes, of course I did keep something, but then afterwards I

02:25   4    told the entire truth; I told everything how it went.

02:25   5    Q.   Once you were asking for a plea agreement, right?

02:25   6    A.   When I was assigned an attorney she interrogated me; and I

02:25   7    told her the entire truth.

02:25   8    Q.   And you did not tell Agent Shine about supposedly meeting

02:25   9    another boat out 150 miles, did you?

02:26   10   A.   I don't remember very well but -- I don't remember no, no.

02:26   11   Q.   And you don't remember telling him that Julio asked you to

02:26   12   tell the story about going to the Guatemalan Navy -- you did

02:26   13   not remember that when you spoke with Agent Shine, did you?

02:26   14   A.   That I did tell him, yeah.

02:27   15   Q.   The first time, the first conversation?

02:27   16   A.   Yes.

02:27   17   Q.   When you were preparing to testify in this case did the

02:27   18   prosecutor let you see a copy of the report that Special Agent

02:27   19   Shine made about your conversation with him?

02:27   20   A.   Yes.

02:27   21   Q.   Is there anything in that report -- Agent Shine's report --

02:28   22   about his conversation with you about Julio talking to you

02:28   23   about taking the drugs to the Navy?

02:28   24   A.   If there is -- I'm sorry, I did not understand what you

02:28   25   wanted me to say.

02:28  1  Q.   The fact is that there is nothing in that report about

02:28  2  Julio Cesar Alvarez Martinez telling you anything; isn't that

02:28  3  correct, sir?

02:28  4  A.   Yes.

02:29  5  Q.   There is nothing in that report about a code of 888, is

02:29  6  there, sir?

02:29  7  A.   Yes.

02:29  8  Q.   There's nothing in that report about allegedly meeting

02:29  9  boats 150 miles from the coast of Guatemala, is there, sir?

02:29  10  A.   Yes.

02:29  11  Q.   The fact is you were indicted and facing a sentence of no

02:29  12  less than ten years up to life; isn't that correct?

02:30  13  A.   Yes.

02:30  14  Q.   And you knew and believed that if you could become a

02:30  15  witness for the Government that sentence would be reduced; is

02:30  16  that correct, sir?

02:30  17  A.   I simply told my version.  This is exactly what I lived;

02:30  18  this is the way things happened. It has nothing to do with my

02:30  19  sentence; it's not for reducing my sentence.

02:31  20      This is just the truth; this is how I lived things.  I have

02:31  21  never been with drugs or involved in drugs.

02:31  22  Q.   But you expect or hope to get a sentence of less than ten

02:31  23  years, correct?

02:31  24  A.   Let it be what God wishes it to be.

02:31  25  Q.   God and Judge Williams, correct?

02:31   1   A.   Yes, I am sorry; God and Judge Williams.

02:32   2   Q.   You understand the only way you can get a sentence less

02:32   3   than the ten years to life you are facing is if you cooperate

02:32   4   and help the Government, correct?

02:32   5   A.   I am simply telling my story the way I experienced it.

02:32   6   Q.   Now, you have entered what is called a plea agreement in

02:33   7   this case, correct?

02:33   8   A.   Also that, yes.

02:33   9   Q.   That is an agreement with the prosecutors, correct?

02:33   10  A.   Yes.

02:33   11  Q.   And that agreement provides that you agree to plead guilty,

02:33   12  correct?

02:33   13  A.   Yes.

02:33   14  Q.   And it also says that you promise to cooperate with the

02:33   15  Government and become a witness with the Government, correct?

02:34   16  A.   Yes.

02:34   17  Q.   And that agreement also says, sir, that if the Government

02:34   18  -- only if the Government is satisfied with your testimony will

02:34   19  they ask Judge Williams to give you less than ten years?

02:34   20  A.   Yes.

02:34   21  Q.   Were you also offered a sum of money?

02:34   22  A.   For the safety of my family.

02:34   23  Q.   To relocate your family?

02:34   24  A.   Yes.

02:34   25  Q.   In Ecuador?

02:34   1   A.   Yes.

02:34   2   Q.   You don't have family in Guatemala, do you?

02:35   3   A.   I have never been to Guatemala.

02:35   4   Q.   You were offered up to $15,000, correct?

02:35   5   A.   From ten to $15,000.

02:35   6   Q.   So less than ten years and ten to $15,000?

02:36   7   A.   What they offered me to take that trip?

02:36   8   Q.   No, what they offered you to testify.

02:36   9   A.   No; they didn't give me a figure, no.

02:36  10   Q.   I thought you just said ten to $15,000.

02:36  11   A.   But that is what they offered me to take the trip.

02:36  12   Q.   I am not talking about the trip, I am talking about the

02:36  13   money to relocate your family.

02:36  14   A.   No, they never gave me a number.

02:37  15   Q.   Did you ever ask them for a particular sum?

02:37  16   A.   Never.

02:37  17        MR. BLUMENFELD: May I have a moment to approach the

02:37  18   prosecutor.

02:37  19        THE COURT:  Sure.

02:37  20        OFF THE RECORD DISCUSSION HELD BETWEEN COUNSEL

02:37  21        MR. BLUMENFELD: I have nothing further, Your Honor.

02:37  22        THE COURT:  Redirect.

02:37  23   Q.   How many times have you and I met before today?

02:37  24   A.   Several times.

02:38  25   Q.   For long periods of times each time?

02:38  1    A.   Yes.

02:38  2    Q.   Enough time to go through all of the details of your trip?

02:38  3    A.   Yes.

02:38  4    Q.   How long did you meet with Agent Shine when you first

02:38  5    arrived off of the plane?

02:38  6    A.   Special Agent Shine about an hour.

02:38  7    Q.   How many times have we spent together more or less?

02:38  8    A.   Talking like 40 minutes to an hour.

02:38  9    Q.   With me?

02:38  10   A.   Yes.

02:39  11   Q.   And how many times have we done that?

02:39  12   A.   About two or three times.

02:39  13   Q.   So you and I have spoken for approximately how long, three

02:39  14   hours?

02:39  15   A.   All together in all the times we have spoken more or less,

02:39  16   yes.

02:39  17   Q.   Do you remember all the details of what you said to Special

02:39  18   Agent Shine in October?

02:39  19   A.   Yes.

02:39  20   Q.   Every single detail?

02:40  21   A.   Not all of it.  You can imagine a long time has elapsed,

02:40  22   but I do remember about the things I told him.

02:40  23   Q.   Do you remember telling him that you believed that the

02:40  24   other crew was coming to pick you and your crew members up?

02:40  25            MR. BLUMENFELD: Objection, leading.

02:40  1        THE COURT: Sustained.

02:40  2   Q.  What do you remember telling him about the other crew and

02:40  3   what they were going to do?

02:40  4   A.  What I said is that we were adrift and being adrift we

02:41  5   raised our hands, and then a white boat came over and then they

02:41  6   aligned themselves with our boat, and then we crossed over to

02:41  7   their boat, and then we transferred everything and they kept on

02:41  8   navigating.

02:41  9   Q.  Where did you tell the DEA agent you were going to take the

02:41  10  cocaine?

02:41  11  A.  To Guatemala.

02:42  12  Q.  Do you remember meeting with an attorney that was provided

02:42  13  for you?

02:42  14  A.  There when I was interviewed at the airport -- no, later

02:42  15  with my attorney.

02:42  16  Q.  Was that before or after you met with me?

02:42  17  A.  Before I met with -- with you the prosecutor

02:43  18  Q.  Do you trust your attorney?

02:43  19  A.  Yes.

02:43  20        MR. BLUMENFELD: Objection to relevance; whether he

02:43  21  trusts his attorney.

02:43  22        THE COURT: Sustained.

02:43  23  Q.  When you met with me what was the one thing I told you over

02:43  24  and over again?

02:43  25  A.  To say the whole truth.

02:43 1   Q.   And what did I tell you would happen if you did not tell

02:43 2   the truth?

02:43 3   A.   That if I lied they were going to sentence me to what they

02:44 4   had offered, which was ten to life.  And you know what I have

02:44 5   told is the whole truth.

02:44 6   Q.   And what did I say would happen if you told the truth?

02:44 7   A.   That if I told the truth my sentence could be reduced.

02:44 8   Q.   When we met together who else was in the room with you and

02:44 9   me?

02:44 10  A.   My attorney, the interpreter and the agent that is right in

02:45 11  front of me.

02:45 12  Q.   So your attorney was there?

02:45 13  A.   She has always been present.

02:45 14  Q.   And did I ever tell you that you needed to say anything

02:45 15  specifically?

02:45 16  A.   The truth.

02:45 17            MR. QUENCER: If I could have a moment sidebar.

02:45 18            THE COURT:  All right.

02:45 19            MR. QUENCER: There is something we need to address

02:45 20  from the cross. My recollection of my debriefing with the

02:46 21  witness is that at some point he told me that he heard the

02:46 22  Coast Guard talking to the defendant.

02:46 23            I believe the question may have been confusing, or he

02:46 24  may not remember, but I remember he answered Mr. Blumenfeld's

02:46 25  question about did you ever hear the defendant saying anything

02:46    1    to the Coast Guard in the negative.

02:46    2         I would like a little latitude on this issue -- in

02:46    3    this instance to lead -- to see if I can't get what I believe

02:46    4    is the truth out of him to correct what I believe may have been

02:46    5    a misstatement.

02:46    6         THE COURT:  So you are going to say when you talked to

02:47    7    me -- do you remember talking to me where you said that you

02:47    8    overheard the defendant talking to the Coast Guard?

02:47    9         I'm not sure how you ask that.

02:47   10         MR. BLUMENFELD: Your Honor, I will be honest with you;

02:47   11    I asked that question because I was told by the Government that

02:47   12    he had told them he heard my client tell the Coast Guard that

02:47   13    he rescued them and he is taking the cocaine to Guatemala.

02:47   14         THE COURT:  But he said he didn't -- he said he didn't

02:47   15    hear -- how do we get around hearsay?

02:47   16         MR. QUENCER: I am just worried that he did not answer

02:47   17    the question a hundred percent correctly based on what he has

02:47   18    told us -- the statement itself is not admissible.

02:47   19         THE COURT:  Unless Mr. Blumenfeld is going to make a

02:48   20    big deal of it in his closing; that he did not overhear a

02:48   21    conversation that is not going to be admitted because it is

02:48   22    hearsay --

02:48   23         MR. BLUMENFELD: Well, I can't -- I know that.

02:48   24         THE COURT:  Well, I guess being facetious really does

02:48   25    not work in this context.

02:48  1              MR. QUENCER: I understand.

02:48  2              THE COURT:  It won't be argued in closing so we should

02:48  3     best let sleeping dogs lie.

02:48  4              MR. QUENCER: I will move on, Judge.

02:49  5     Q.  Mr. Blumenfeld asked if anyone else overheard the defendant

02:49  6     Mr. Alvarez Martinez talking to you.

02:49  7          Do you remember that?

02:49  8     A.  Yes.

02:49  9     Q.  Did you ever see Mr. Alvarez Martinez speaking with anyone

02:49  10    else?

02:49  11    A.  On the ship?

02:49  12    Q.  Yes.

02:50  13    A.  Yes.  He would tell everyone.  He would tell all of us; me,

02:50  14    Corado, his country-mate Cardenas and Ortiz.

02:50  15    Q.  I want to talk a little about your family since defense

02:50  16    counsel has raised that issue.

02:50  17         Do you have a wife?

02:50  18    A.  Yes.

02:50  19    Q.  Do you have children?

02:50  20    A.  Two.

02:50  21    Q.  Do you have parents?

02:50  22    A.  Yes; me, my mom and my foster father, or the dad who raised

02:50  23    me.

02:50  24    Q.  And because you are testifying here today do you have any

02:51  25    concerns about your family?

02:51   1   A.   For their safety.

02:51   2   Q.   And what have I told you about moving your family?

02:51   3   A.   That you would move them to an area where they would feel

02:51   4   secure and safe.

02:52   5   Q.   How have I told you we were going to make that happen?

02:52   6   A.   That you were going to contact my wife; and that you were

02:52   7   going to meet over there with agents in Ecuador.

02:52   8   Q.   Did I tell you it had anything to do with your testimony

02:52   9   here today?

02:52   10  A.   No.

02:52   11  Q.   So what is your belief as to whether or not we are going to

02:52   12  -- let me rephrase -- do you think we are going to pay for your

02:53   13  family to move regardless of what you say here today?

02:53   14  A.   I believe so.

02:53   15  Q.   When you were on the Coast Guard cutter who told you to

02:53   16  lie?

02:53   17  A.   Julio Cesar.

02:53   18  Q.   How many times did he tell you to lie?

02:53   19  A.   I don't remember but 10, 12, 13 times.

02:53   20  Q.   Today in this court did you tell the truth?

02:54   21  A.   Absolutely the whole truth.

02:54   22  Q.   And what was the only thing I asked you to do today?

02:54   23          MR. BLUMENFELD: Objection; repetitious.

02:54   24          THE COURT: Sustained.

02:54   25          MR. QUENCER: No further questions.

02:54   1          THE COURT:  All right. Ladies and gentlemen, we will

02:54   2   take our afternoon recess; let's say about 15 minutes or so.

02:54   3   You can go out in the hallway stretch out.  Remember not to

02:54   4   talk about the case with each other and we will see you back in

02:54   5   15 minutes.

02:55   6          COURT SECURITY:  All rise.

02:55   7                  JURY EXCUSED.

02:55   8          THE COURT: Mr. Quencer, is that your final witness?

02:56   9          MR. QUENCER: Yes, Your Honor.  There is a stipulation

02:56  10   I would like to publish before resting.

02:56  11          THE COURT:  Very good.  Mr. Blumenfeld, you know what

02:56  12   the stipulation is obviously.

02:57  13          MR. BLUMENFELD: Yes, Judge.

02:57  14          THE COURT:  Once the Government announces I take it

02:57  15   you will have a motion.

02:57  16          MR. BLUMENFELD: Yes, Your Honor.

02:57  17          THE COURT:  Why don't I have you present it now while

02:57  18   the jury is out.

02:57  19          MR. BLUMENFELD: Yes, of course.  Pursuant to Rule 29

02:57  20   the defendant would move for a judgment of acquittal.  There is

02:57  21   no question about possession of the cocaine; we concede that.

02:57  22   It is the intent to distribute.

02:57  23          Frankly, this witness -- the only other testimony

02:57  24   about what this defendant was going to do with the cocaine was

02:57  25   to take it in towards Guatemala. Because according to this

02:57   1   witness he was going to get on another boat.  There is also the

02:57   2   testimony of Special Agent Shine; where he said that the

02:57   3   defendant told him it was going to be turned over to the Navy,

02:57   4   which would not be an intent to distribute.

02:57   5        So based on that, Your Honor, it is my argument that a

02:57   6   reasonable jury could not find the defendant guilty of the

02:57   7   offenses charged in Counts 1 and 2.

02:58   8        THE COURT:  Thank you. For the Government

02:58   9        MR. MOTIANI: Your Honor, the Government would submit

02:58   10  that in the light most favorable to the Government all of the

11:47   11  elements of both counts have been proven.

02:58   12       I will bounce off Mr. Blumenfeld's argument.  He has

02:58   13  pretty much said possession and everything is there except for

02:58   14  the intent to distribute.

02:58   15       You have heard in this case from Mr. Bautista Vasquez

02:58   16  who spoke about that. He spoke about the plan in this case

02:58   17  where the defendant's vessel picked them up in the middle of

02:58   18  the ocean.

02:58   19       That the defendant's vessel had thrown the ice and the

11:48   20  bait onboard; that the cocaine was transferred over onto his

11:48   21  boat.  And all of that happened after the coded language was

02:58   22  exchanged between the defendant and the captain of Mr. Bautista

02:58   23  Vasquez' vessel.

02:58   24

02:58   25       They then start traveling and the defendant tells them

02:59  1    that they need to go approximately 150 miles to meet the other

11:49  2    boats in order for the cocaine -- so the cocaine that he is

11:49  3    transporting -- to be taken by another vessel.

02:59  4         Mr. Bautista Vasquez also testified that the defendant

02:59  5    told him to lie approximately 12 to 14 times; and lie to law

02:59  6    enforcement.  To lie about a story the defendant wanted to be

02:59  7    told to law enforcement.

02:59  8         A story that the defendant said he wanted the law

02:59  9    enforcement officials to think he, the defendant, was going to

02:59  10   take the cocaine to the Guatemalan Naval.

02:59  11        So, I think there is more than enough evidence in this

02:59  12   case, Your Honor, for the case to go forward; and for that

02:59  13   reason the motion should be denied.

02:59  14        THE COURT:  All right. The Court is going to deny the

02:59  15   defendant's motion.  We have heard from Special Agent Chris

02:59  16   Wilkins as to the street value of 19,000,000, which in and of

02:59  17   itself indicates distribution.

02:59  18        Also he testified as to the transshipment routes of

03:00  19   the DTO's; the fact that they go from places like Ecuador up to

11:50  20   Guatemala, ultimately to the United States.

11:50  21        The cooperating codefendant testified that this is

03:00  22   indeed what was happening and that when he met with Mr. Alvarez

03:00  23   Martinez the plan was to take it to yet another vessel to bring

03:00  24   it into Guatemala.

03:00  25        He testified as to the lack of surprise when his

03:00    1    vessel encountered Mr. Martinez.  And Mr. Martinez's actions

03:00    2    when approached by law enforcement do not appear to be

03:00    3    consonant with someone who was desirous of giving the boat and

03:00    4    its contents over to any Navy; much less the Guatemalan Navy.

11:52    5           And there is the evidence that he told his boat mates

11:52    6    to lie. So, in the light most favorable to the Government the

11:52    7    Court is going to deny the defense motion at this time.

03:01    8           All right. We will start back at 3:15.  That will give

03:01    9    you time to speak with your client as to next steps, and we

03:01   10    will go from there.

03:01   11           MR. BLUMENFELD: Yes, Your Honor.

03:02   12           THE COURT:  If we complete the evidence portion today

03:02   13    then perhaps we will have the charge conference to get that

03:02   14    taken care of.

03:02   15           MR. QUENCER: I believe all the instructions will be

03:03   16    pattern except for the one instruction that Mr. Blumenfeld

03:03   17    plans on submitting.

03:03   18           MR. BLUMENFELD: That is correct, Your Honor.

03:03   19           THE COURT:  All right. Then I will plan on having the

03:03   20    jury back at ten o'clock tomorrow morning, and we can have our

03:04   21    conference probably at 9 or 9:15 and then proceed.  All right.

03:04   22    I will give you all a few minutes as well.

03:17   23                          RECESS TAKEN

03:17   24           THE COURT:  We are going to bring in the jury and then

03:17   25    Mr. Quencer is going to read the stipulation and rest his case.

03:17  1    Then, Mr. Blumenfeld, you will call your client to the stand.

03:17  2            MR. BLUMENFELD: Yes, Your Honor.

03:17  3            THE COURT:  And if I could ask the Marshals; is it all

03:17  4    right for him to walk across the courtroom to the witness

03:17  5    stand?

03:17  6            THE MARSHAL:  Yes, Your Honor.

03:17  7            THE COURT:  Could one of you be here and one there so

03:17  8    there is less attention drawn to his taking the stand?  Is that

03:17  9    all right with you?

03:19  10           THE MARSHAL:  Yes, Your Honor.

03:19  11           THE COURT:  Bring in the jury, please.

03:19  12           COURT SECURITY OFFICER:  All rise, please.

03:19  13           THE COURT:  Everyone may be seated. Government, call

03:19  14    your next witness.

03:19  15           MR. QUENCER: Your Honor, we have no further witnesses,

11:54  16    but we would like to move Government's Exhibit 6 into evidence

11:54  17    without objection.

11:54  18           THE COURT:  All right.  Government's Exhibit 6 is

03:19  19    admitted without objection.

03:19  20           It is a stipulation, is that right, Mr. Quencer?

03:19  21           MR. QUENCER: It is; and with the Court's permission we

03:19  22    would like to publish to the jury.

03:19  23           THE COURT:  Ladies and gentlemen, a stipulation is

03:19  24    simply an agreement that the parties have reached that certain

03:19  25    evidence should be considered by you. And when we say publish

11:57  1    that means that counsel will read it.

11:57  2            All right then, Mr. Quencer, you may publish the

11:57  3    stipulation at this time.

03:19  4            MR. QUENCER: Thank you, Your Honor. The United States

03:19  5    of America by and through the undersigned United States

03:19  6    Attorney and the defendant Julio Cesar Alvarez Martinez

03:19  7    personally and through his attorney agree and stipulate as set

03:20  8    forth below:

03:20  9            That on August 31st, 2017 the United States Coast

03:20  10   Guard found approximately 647 kilograms of cocaine onboard a

03:20  11   vessel in the Eastern Pacific ocean along with the defendant

03:20  12   Julio Cesar Alvarez Martinez who was also on the same vessel at

03:20  13   the same time.

03:20  14           Thank you, Your Honor.

03:20  15           THE COURT:  Thank you, Mr. Quencer.  Anything further

03:20  16   on behalf of the United States?

03:20  17           MR. QUENCER: Your Honor, the Government rests.

03:20  18           THE COURT:  Ladies and gentlemen, the Government has

03:20  19   completed its case-in-chief; and so I will now turn to Mr.

03:20  20   Blumenfeld.

03:20  21           Mr. Blumenfeld, are there any witnesses on behalf of

03:20  22   the defense?

03:20  23           MR. BLUMENFELD: Yes, Your Honor; the defendant calls

03:20  24   Julio Cesar Alvarez Martinez.

03:20  25           THE COURT:  If you would come to the witness box, Mr.

03:21  1   Alvarez Martinez to be sworn.

03:21  2                    DEFENDANT SWORN

03:21  3              MR. BLUMENFELD: May I proceed?

03:21  4              THE COURT:  You may, Mr. Blumenfeld.

03:21  5   Q.  Julio, tell the jury your full name, please.

03:22  6   A.  My name is Julio Cesar Alvarez Martinez.  I was born on the

03:22  7   27th of February of 1981. I was born in Guatemala. I was born

03:22  8   in the City of Conception.

03:22  9   Q.  Keep your voice up so everyone can hear you. Do you have a

03:22  10  family in Guatemala?

03:22  11  A.  Yes; my entire family is in Guatemala.

03:22  12  Q.  Are you married?

03:22  13  A.  No; together with someone.

03:23  14  Q.  Do you have children?

03:23  15  A.  Yes.

03:23  16  Q.  How many children?

03:23  17  A.  Three.

03:23  18  Q.  What are their ages?

03:23  19  A.  18, 15, 14 -- 13.

03:23  20  Q.  Do you support your children?

03:23  21  A.  Yes.

03:23  22  Q.  What do you do for a living in Guatemala?

03:23  23  A.  I fish when there is fishing to be fished; other wise I

03:23  24  work with sugar cane or as a brick laborer.

03:24  25  Q.  You were arrested on August 31, 2017, correct?

03:24  1   A.   Yes.

03:24  2   Q.   On a vessel?

03:24  3   A.   Yes.

03:24  4   Q.   What was the name of the vessel?

03:24  5   A.   Yin.

03:24  6   Q.   Who is the owner of the vessel?

03:24  7   A.   My brother, Walter Enrique Alvarez Martin.

03:24  8   Q.   Is that boat registered?

03:24  9   A.   It is registered; it has all the paperwork, everything is

03:25  10  in order.

03:25  11  Q.   When did you get on the boat before you were arrested?

03:25  12  A.   24 hours.

03:25  13  Q.   24 hours before you were arrested?

03:25  14  A.   Yes; 24 hours before I was arrested. I went from one day; I

03:25  15  left in the afternoon.

03:25  16  Q.   What was the purpose of that trip?

03:25  17  A.   Fishing.

03:25  18  Q.   Who was on the trip on the Yin beside you?

03:25  19  A.   I was not going to go on that trip, another young person

03:26  20  was going to go, but then he decided not to go and they called

03:26  21  me to go.

03:26  22  Q.   Who called you?

03:26  23  A.   David Gomez Corado.

03:26  24  Q.   Do you know him?

03:26  25  A.   I have known him for seven years, but I did not live there

03:26  1    in that place anymore.

03:26  2    Q.  How long did it take you to get there?

03:26  3    A.  To the port, to the place I was going to fish?

03:26  4    Q.  Yes.

03:26  5    A.  It took me about three hours.

03:26  6    Q.  When did you leave, what time?

03:26  7    A.  I left at 4:00 p.m. to go to the high seas.

03:26  8    Q.  From what port?

03:27  9    A.  From the port of San Jose Buena Vista.

03:27  10   Q.  In Guatemala?

03:27  11   A.  Yes, in Guatemala.

03:27  12   Q.  Before you go fishing are there any licenses or permissions

03:27  13   that are necessary?

03:27  14   A.  Yes.  You have to go all the time to the Naval Base to get

03:27  15   permits because they only give you four days.

03:27  16   Q.  Was that done on this trip?

03:27  17   A.  Yes.  I had the permit to leave and everything all in

03:27  18   order.

03:27  19   Q.  Was that on the boat?

03:27  20   A.  It was in the boat.

03:27  21   Q.  Where was it in the boat?

03:28  22   A.  It was like in a little tub; it was all on the boat.

03:28  23   Q.  Showing you what has been marked as Government's Exhibit 2

03:28  24   C; do you recognize that?

03:28  25   A.  Yes.

03:28  1   Q.   What is that a picture of?

03:28  2   A.   Of my boat.

03:28  3   Q.   What part of the boat is that?

03:28  4   A.   It's the rear where the engines go.

03:28  5   Q.   Do you see where your papers were?

03:29  6   A.   Yes; here.

03:29  7   Q.   Would you use your finger and draw a circle around the

03:29  8   container that had your papers?

03:29  9   A.   Yes.

03:29  10  Q.   That whole big thing?

03:29  11  A.   That is where my clothing was and also my documents.

03:29  12  Q.   Were you allowed to take that with you when you were taken

03:29  13  off the Yin and put on the Coast Guard cutter?

03:29  14  A.   No.

03:29  15  Q.   When you left port how far out were you going to go

03:30  16  fishing?

03:30  17  A.   About 300 miles.

03:30  18  Q.   Why so far?

03:30  19  A.   Because the fish have gone to the high seas a lot since

03:30  20  when you fish in the shore -- since you are killing the fish in

03:30  21  the shore they are like going away, out further.

03:30  22  Q.   What types of fish were you fishing for?

03:30  23  A.   We only fish dolphin and shark. That's the only thing we

03:30  24  fish there.

03:30  25  Q.   How much fuel did you have?

03:30  1    A.   25 containers.

03:30  2    Q.   Do you know how much fuel is in each container?

03:31  3    A.   18 gallons.

03:31  4    Q.   How long were you going to fish?

03:31  5    A.   For four days.

03:31  6    Q.   How much of that fuel would be used to go out fishing for

03:31  7    four days and then to come back?

03:31  8    A.   You use eight to go and eight to come back, and the rest is

03:31  9    used for the equipment and to fish there.

03:31  10   Q.   There is a fish hold on that boat; is that correct?

03:32  11   A.   Yes.

03:32  12   Q.   When you left what was in the fish hold?

03:32  13   A.   We had 20 boxes of bait and we had ten five-kilo bags of

03:32  14   ice.

03:32  15   Q.   So, ten five-kilo bags of ice?

03:32  16   A.   Yes; a hundred pounds.

03:32  17   Q.   A hundred pounds of ice?

03:32  18   A.   For each one of those packages of ice.

03:33  19   Q.   So each ice package had a hundred pounds?

03:33  20   A.   Yes; it is a hundred pounds.

03:33  21   Q.   And how many packages were there?

03:33  22   A.   Ten of those packages of a hundred pounds of ice and

03:33  23   20 boxes of bait.

03:33  24   Q.   Were they all in the hold when you left?

03:33  25   A.   It is everything, food, bait and ice -- food for us.

03:33 1    Q.   What type of communication device did you have?

03:33 2    A.   A little walkie-talkie; it is a small radio that has a

03:33 3    range of 80 miles only.

03:34 4    Q.   Is that the one that was shown during the Government's

03:34 5    case, that photo?

03:34 6    A.   Yes, yes.

03:34 7    Q.   Did you have a GPS also, a hand held GPS?

03:34 8    A.   Yes.

03:34 9    Q.   Did you have a satellite phone?

03:34 10   A.   No.

03:34 11   Q.   How big was that boat the Yin?

03:34 12   A.   It is 23 feet long.

03:34 13   Q.   Did you have fishing gear -- other than the bait and ice

03:35 14   onboard?

03:35 15   A.   Fishing equipment, we call it cimbra, and some nets.

03:35 16   Q.   Explain for the jury how you use the nets to fish.

03:35 17   A.   Every ten hooks you place a little flag, so you put the

03:35 18   little flags for every ten hooks and you lay it.

03:35 19   Q.   Where do the hooks and the net go?

03:36 20   A.   You lay the net along the boat beside your boat and you let

03:36 21   it float, and you leave the hooks to hang even though the net

03:36 22   is partly beside the boat so they don't get tangled.

03:36 23   Q.   So the net is in the boat?

03:36 24   A.   Yes.

03:36 25   Q.   And the bait?

```
03:36    1   A.   The bait is on the hooks.

03:36    2   Q.   Were there fishing poles also?

03:37    3   A.   Yes.

03:37    4   Q.   What were those fishing poles used for?

03:37    5   A.   When there is not much bait to be had what we do with the

03:37    6   fishing pole, we fish sail fish to be able to use those for

03:37    7   bait.

03:37    8   Q.   Now, you heard the Coast Guard officer testify that the

03:37    9   poles or the netting was rusty; is that correct?

03:37   10           MR. MOTIANI: Objection; it is a misstatement of facts.

03:37   11           THE COURT:  The jury will remember what the Coast

03:38   12   Guard officer said about what was rusty on the boat.

03:38   13           You may continue.

03:38   14           THE WITNESS:  The net and everything was in the boat.

03:38   15   I told them to take pictures and save that as evidence.

03:38   16   Q.   Why was it rusty?

03:38   17   A.   Because there is not too much fish, it leaves scars, and

03:38   18   the boat leaves like three, four times a month.

03:39   19   Q.   Did you have food onboard?

03:39   20   A.   Yes.

03:39   21   Q.   And food for whom?

03:39   22   A.   Food for us.

03:39   23   Q.   For you and David?

03:39   24   A.   Yes; only for the two of us.

03:39   25   Q.   Did you have enough food for five?
```

03:39  1   A.   The only thing I gave to them was watermelons.

03:40  2   Q.   Do you recognize Government's Exhibit 2 D? Do you recognize

03:40  3   what is shown there?

03:40  4   A.   Yes.

03:40  5   Q.   Had you begun to fish?

03:40  6   A.   Yes.

03:40  7   Q.   What had you done?

03:40  8   A.   We had laid like almost a hundred of the hooks -- we had

03:40  9   laid a hundred hooks or so. It was like three, four miles of

03:40  10  equipment.

03:40  11  Q.   Did you stop at some point?

03:41  12  A.   I stopped when I saw the boat.

03:41  13  Q.   What did you do with the nets that were in the water?

03:41  14  A.   Those we left. I put a little flag for us to come back for

03:41  15  us to see where they were at when we would come back.

03:41  16  Q.   Did you mark the mark anywhere else beside the flags??

03:41  17  A.   No.

03:41  18  Q.   How about on the GPS?

03:41  19  A.   Not on the GPS, just at the bar and where I was fishing at.

03:41  20  Q.   Did the rest of the net that had not gone in the water stay

03:41  21  in the boat?

03:42  22  A.   No, I only had two nets; the rest that I had was hooks.

03:42  23  Q.   Is that shown on Government's Exhibit 2 D?

03:42  24  A.   Yes.

03:42  25  Q.   And if you could circle that, please.

03:42  1   A.   (Witness indicates on the screen)

03:42  2   Q.   You mentioned you stopped fishing for a reason; what was

03:42  3   that reason?

03:42  4   A.   I stopped fishing for around seven months because there

03:43  5   wasn't much fishing to do.

03:43  6   Q.   I meant that day.

03:43  7   A.   Oh, yeah; I stopped fishing because of the boat. I just

03:43  8   laid down the net and then because of the boat approached the

03:43  9   boat.

03:43  10  Q.   You mean the other boat?

03:43  11  A.   The other boat.

03:43  12  Q.   Do you remember seeing the video during the Coast Guard

03:43  13  testimony of an abandoned boat?

03:43  14  A.   Yes.

03:43  15  Q.   Was that the boat the three men, including Mr. Bautista,

03:43  16  were on?

03:43  17  A.   Yes, I sent the man from the Coast Guard over there to see

03:44  18  where they were coming from.

03:44  19  Q.   How did you send them?

03:44  20  A.   I told them at how many miles I had picked them up and also

03:44  21  the route.

03:44  22  Q.   What drew your attention to that boat.

03:44  23  A.   When I saw it two of them were sick.

03:44  24  Q.   When you first saw it how far away were you?

03:44  25  A.   I was approximately four miles away.

03:44  1   Q.  What could you see?

03:44  2   A.  I really was not able to see that, but who did see was my

03:45  3   Marine ((sic)) who they were making signals to them.

03:45  4   Q.  You mean David?

03:45  5   A.  Yes, David Gomez Corado.

03:45  6   Q.  What kind of signals?

03:45  7   A.  With a shirt they were doing signals; I believe it was a

03:45  8   blue shirt.

03:45  9   Q.  What did you do?

03:45  10  A.  I told David to cut the equipment and put a signal for us

03:45  11  to go and see over there.

03:45  12  Q.  And did you?

03:45  13  A.  We did it; we went to see it.

03:45  14  Q.  Before you went out that day did you intend to meet people

03:45  15  with that boat?

03:45  16        MR. MOTIANI: Objection, leading.

03:45  17        THE COURT: Overruled.

03:46  18        THE WITNESS:  No; at no time.

03:46  19  Q.  What did you see when you got up to that boat?

03:46  20  A.  I saw there were two guys on the boat, one who was black

03:46  21  and had like fainted over the ice box, and another one who was

03:46  22  -- something was coming out of his ear.

03:46  23  Q.  What about the third one?

03:46  24  A.  The third was the one they called over there, Cadena, and

03:46  25  he was the one that asked for my help.

03:46  1   Q.   What were you told?

03:46  2   A.   I was told they had been without fuel -- water or fuel for

03:47  3   eight days.

03:47  4   Q.   Did they tell you where they were going?

03:47  5   A.   They told me they were heading to a port called Manzanillo

03:47  6   in Mexico.

03:47  7   Q.   What country?

03:47  8   A.   Mexico.

03:47  9   Q.   Did you have enough fuel to give them and still have enough

03:47  10  for you to get home?

03:47  11  A.   Not anymore.

03:47  12  Q.   Did you have enough food and water to give them and still

03:47  13  have enough for yourselves?

03:48  14  A.   To reach landfall I would arrive after four days at 11 a.m.

03:48  15  so, yes, I did have enough for them.

03:48  16  Q.   Where did the three men go?

03:48  17  A.   From their boat they transferred over to my boat; two in

03:48  18  front and one was in the back.

03:48  19  Q.   Was anything else transferred?

03:48  20  A.   Nothing else; and I did not speak to them again.

03:48  21  Q.   What about the drugs?

03:48  22  A.   The drugs were going on the boat because when we met up

03:49  23  with them the drugs were already there, and they wanted us to

03:49  24  throw the drugs away, but David did not want me to throw the

03:49  25  drugs away.

| | |
|---|---|
| 03:49 | 1 |
| 03:49 | 2 |
| 03:49 | 3 |
| 03:49 | 4 |
| 03:49 | 5 |
| 03:49 | 6 |
| 03:50 | 7 |
| 03:50 | 8 |
| 03:50 | 9 |
| 03:50 | 10 |

Q.   The drugs away or the ice?

A.   We were bringing ice in our ice box, but we were forced to throw it out because they had a radio buoy that was tied to their drugs.

      And they told us if that buoy was left there they would find their families and kill them because of the radio buoy.

Q.   Who would find their family?

A.   Well, I don't know who was going to find them, but as far as us we were coming straight back home.

Q.   So you agreed to take the cocaine too?

A.   Yes; because they told me they wanted to hand them over to the authorities, or they wanted us to take them to the Naval Base because they wanted to be handed over to the authorities when they got to land.

Q.   And why is that?

A.   When they got to land -- they wanted to get the drugs and the radio buoy onto land because they said that over there where they were coming from there were people who were tracking that radio buoy.

Q.   What were going to do with the cocaine?

A.   Hand it over to the Naval Base.

Q.   Had you had any prior agreement with anyone to give that cocaine to anyone else?

A.   At no time.  I was going to hand it over there because there have been cases like that before in Guatemala where

03:52   1   people have been found and they have been brought over to

03:52   2   there.

03:52   3   Q.   To the Navy?

03:52   4   A.   To the Navy.

03:52   5   Q.   What happened to them when they turned it in to the Navy?

03:52   6   A.   The owners of the boat are investigated for two months,

03:52   7   three months and then when they see that everything is in order

03:52   8   they just let them go.

03:52   9   Q.   How difficult is it to enter Guatemala by the Pacific by

03:52   10  boat without encountering the Navy?

03:52   11  A.   There are in Guatemala -- there are two bars -- one at

03:53   12  Estapa and one at San Marino.  And anywhere you go in between

03:53   13  there are people with fast boats, or there where you have to

03:53   14  show your papers.

03:53   15  Q.   Those are Naval people?

03:53   16  A.   They are people from the Naval Base.

03:53   17  Q.   As you proceeded with the five of them and the cocaine what

03:53   18  happened to the bait and the ice?

03:54   19  A.   We threw it out because we wanted to put the cocaine inside

03:54   20  the ice box because the boat was too small and it wouldn't hold

03:54   21  any more weight.

03:54   22  Q.   You saw the video of you traveling along -- the video from

03:54   23  the helicopter -- how fast were you traveling at that point?

03:54   24  A.   The boat was not navigating at high speeds because when it

03:54   25  is empty it does like 30 miles, but the way it was loaded up it

03:54  1   was doing about 13 to 14 miles because of the load.

03:55  2   Q.   Did you try to outrun the helicopter?

03:55  3   A.   At no time.

03:55  4   Q.   You saw the video of someone standing at the rear of your

03:55  5   boat; who was that?

03:55  6   A.   The one standing was me.

03:55  7   Q.   What were you doing?

03:55  8   A.   I was maneuvering or driving both engines.

03:55  9   Q.   Can you demonstrate for the jury -- stand up and show the

03:55  10  jury how you do that -- withdraw the question. Does to boat

03:55  11  have a wheel?

03:55  12  A.   No; these are outboard engines.

03:56  13  Q.   Stand up and show the jury how you steered and drove the

03:56  14  boat.

03:56  15  A.   Like this.  I would have one handle here and the other one

03:56  16  here, and this is how I would go; and here I am looking at the

03:56  17  compass.

03:56  18  Q.   The compass?

03:56  19  A.   Yes.

03:56  20  Q.   How big were those engines?

03:56  21  A.   75 horse power.

03:56  22  Q.   And were they going as fast as they could go?

03:57  23  A.   Yes; they were then at top speed, they could not run any

03:57  24  faster.

03:57  25  Q.   How loud are those engines?

03:57 1   A.   They make quite a noise.   And there then is the water, and

03:57 2   then it was raining, and they splash water from behind the

03:57 3   boat.

03:57 4   Q.   Did you have any conversation with the other people in the

03:57 5   boat?

03:57 6   A.   No; at no time.

03:57 7   Q.   Could you hear anything anyone would have said to you?

03:57 8   A.   No; you can't here anything in the back because of the

03:57 9   noise of the engines.

03:57 10  Q.   And the sea conditions were what?

03:57 11  A.   The waves were rather high. The boat almost sunk because of

03:58 12  the size of the waves and because it was a little boat.

03:58 13  Q.   Now when did you know the helicopter was overhead?

03:58 14  A.   When they shot at me the first time they burned out the

03:58 15  first engine.

03:58 16  Q.   The warning shots?

03:58 17  A.   No. They at once shot at me and shot out the engine, and

03:58 18  that is why the boat was sinking, and then he turned around and

03:58 19  he shot at me through the bow.

03:59 20  Q.   You noticed on the video that somebody points and then at

03:59 21  some point you turn your head.

03:59 22       Why did you turn your head?

03:59 23  A.   Because I am maneuvering without a visor and because it is

03:59 24  raining and I am constantly wiping water from my face to be

03:59 25  able to look at the compass.

Q.   Why did you turn your head?

A.   I just went like this.

Q.   Did the vessel stop or slow?

A.   When they shot at me all at once I brought down the speed, and that's when they crossed over the bow, and then they shot at us again and that is when it stopped.

Q.   Did they hit one or both engines?

A.   They only hit one; and when they turned around again they hit the other one.

Q.   Okay.

A.   When they hit the second one is when -- the first time I realized that the boat had a hole in it; and I put my visor into it.

Q.   Did you try to pull the plug and sink your boat?

A.   No.

Q.   Why?

A.   Even if you take out the plug it won't sink because it takes like four and a half hours for it to sink because it is only a tiny little hole like one inch.

Q.   On the video you are seen bending over; do you recall that?

A.   Yes.

Q.   Were you pulling the plug when you bent down in front?

A.   No.  You cannot pull the plug from over there; you have to crawl down under it in order to pull the plug.

Q.   This is Government's Exhibit 2 C; do you see that?

A.   Yes.

Q.   Can you show the jury where the plug is?

A.   The plug is over here, but I would have to remove all this in order to get under there so I could reach over here towards where the engines are.

Q.   For the record, you are talking about moving the items between the blue container and the white container, correct?

A.   Yes. Over here there is a battery which gives energy to the light that makes the compass work; so I would have had to have removed that battery to crawl under there.

Q.   You heard the Coast Guard say your vessel turned down-wind. Why after it was shot-out -- why did it turn?

A.   At no time did I turn around.  When they shot out the engines I immediately stopped, and then the boat came and came around us. At no time did I flee.

Q.   After the Coast Guard boarded do you know what happened to the documents?

A.   When the boat was sinking I told them to get their papers out, and they said they didn't care about that they just wanted to get the drugs out of there; and they wanted to themselves get out of there.

Q.   When you were taken to the first cutter, the James, were you arrested?

A.   Yes, I was chained.

Q.   Chained to what?

04:05  1   A.   To a bar that they have where they keep the helicopter.

04:05  2   Q.   Were you on a deck?

04:05  3   A.   Yes.

04:05  4   Q.   And were you allowed to walk around and visit with other

04:05  5   prisoners?

04:05  6   A.   No, not at all.

04:06  7   Q.   Were there other prisoners on the Coast Guard cutter?

04:06  8   A.   There were about 35 to 40 of us, yes.

04:06  9   Q.   From other arrests?

04:06  10  A.   From other arrests from other boats they had brought over

04:06  11  there.

04:06  12  Q.   Were you, as Mr. Bautista Vasquez described, right next to

04:06  13  him?

04:06  14  A.   What was that?

04:06  15  Q.   Did you hear Mr. Bautista testify that he was chained right

04:07  16  next to you?

04:07  17  A.   Yes.  But at no time were we like that because the officers

04:07  18  from the moment they arrested us -- they separated the two

04:07  19  Guatemalans from the two Ecuadorians.

04:07  20      I asked them to bring us together, and they said we had to

04:07  21  be apart, and that is when they separated us.

04:07  22          THE INTERPRETER: The interpreter would like to add

04:07  23  something.

04:07  24          THE COURT:  All right.

04:07  25          THE INTERPRETER: And they put us on two different

04:07  1   ships.

04:07  2   Q.   How many different ships were you on before you got to the

04:07  3   United States?

04:08  4   A.   We were at the Yan (phonetic) for 15 days and then we were

04:08  5   at the Alex about 12 days and then we were at the Begero

04:08  6   (phonetic) and then we were at the de Calseva (phonetic); and

04:08  7   finally at the Stan, which was the last one that brought us

04:08  8   over to Cuba.  And the other one was called Elektra.

04:08  9   Q.   Okay. Were you always chained?

04:09  10  A.   The whole time.

04:09  11  Q.   And outside?

04:09  12  A.   Outside and throughout all the hurricanes that there were,

04:09  13  we were chained and wet, they did not move us.

04:09  14  Q.   Now, did you ever tell Mr. Bautista Vasquez or anyone else

04:09  15  to make up a story that you were taking the drugs to the

04:09  16  Guatemalan Naval Base?

04:09  17  A.   At no time did I speak to them, no.

04:09  18  Q.   Finally, from the time you got that cocaine did you ever

04:10  19  intend to distribute it or give it to anyone other than the

04:10  20  Guatemalan Naval Base?

04:10  21  A.   No.  Even if we wanted to we would not have been able to

04:10  22  because they were constantly patrolling the shores, and also

04:10  23  they were sick.

04:10  24  Q.   Who was sick?

04:10  25  A.   Ortiz was very dehydrated and Cardenas was oozing something

04:11   1    from his ear.

04:11   2              MR. BLUMENFELD: Thank you; nothing further.

04:11   3              THE COURT:  Cross examination.

04:11   4    Q.  Good afternoon, sir.

04:11   5    A.  Good afternoon.

04:11   6    Q.  How are you doing?

04:11   7    A.  Fine

04:11   8    Q.  You are a fisherman?

04:11   9    A.  Yes.

04:11   10   Q.  How long have you been a fisherman?

04:11   11   A.  Since I was 13.

04:11   12   Q.  How old are you today?

04:11   13   A.  37.

04:11   14   Q.  So you have a significant number of years as a fisherman?

04:11   15   A.  As I said, I have fished since that age. As I said before

04:12   16   when there is no fishing I also work cutting sugar cane or

04:12   17   laying brick.

04:12   18   Q.  You mentioned on direct examination about having fuel on

04:12   19   your vessel; do you recall that?

04:12   20   A.  The testimony from where?

04:12   21   Q.  When your attorney was asking you questions.

04:12   22   A.  Oh, yes.

04:12   23   Q.  You testified that you had 25 containers of fuel that held

04:12   24   18 gallons per container -- per gallon -- correct?

04:13   25   A.  Yes.

04:13  1   Q.   And how much do you pay per gallon for fuel?

04:13  2   A.   You pay around 17 Quetzales; so more or less 2.5 dollars.

04:13  3   Q.   So 2.5 dollars per gallon?

04:13  4   A.   Yes.

04:13  5   Q.   You also said you had a hundred pound 10 packages of ice?

04:13  6   A.   That's correct.

04:14  7   Q.   And you had 20 boxes of bait, correct?

04:14  8   A.   That's correct.

04:14  9   Q.   How much does it cost for a hundred pound package of ice?

04:14  10  A.   37 Quetzales.

04:14  11  Q.   Do you know what the dollar conversion is?

04:14  12  A.   About $5 each bag.

04:14  13  Q.   So fifty U.S. dollars total?

04:14  14  A.   Yes, for the ten.

04:14  15  Q.   And what about the boxes of bait?

04:15  16  A.   They weigh about 25 pounds each, and each box costs 770

04:15  17  Quetzales, so 70 Quetzales is about $20.

04:15  18  Q.   How much money do you make as a fisherman?

04:15  19  A.   Well fishing varies; so when we go out fishing we don't

04:15  20  make a lot often because you spend a lot of money on fuel.

04:15  21  Q.   And you spent a lot of money on fuel in this case, correct?

04:15  22  A.   Well, the truth is they give us the ice, the bait and the

04:16  23  gasoline on credit.   It is a fishing company and they give us

04:16  24  that on credit.

04:16  25  Q.   They give you that on credit. And you did not come back

04:16  1   with any fish, correct?

04:16  2   A.   When you return from a fishing trip and you pay for the

04:16  3   next trip they will give it to you on credit.   If you don't

04:16  4   come back and pay then they will not.

04:16  5   Q.   In this instance on August 31, 2017 you did not return to

04:16  6   Guatemala with any fish, correct?

04:16  7   A.   No, I did not come back.   That is the debt that was left

04:17  8   over there; and many boats came to look for us.

04:17  9   Q.   So your entire venture was a loss, you made no money,

04:17  10  correct?

04:17  11  A.   Yes, it was a loss.

04:17  12  Q.   As a fisherman if a boat is light does it tend to travel

04:17  13  faster?

04:17  14  A.   Yes; with those two engines a boat without a load travels

04:17  15  at 30 miles per hour; that is the maximum speed.

04:17  16  Q.   And if a boat is heavy it will travel slower, correct?

04:17  17  A.   Yes.

04:18  18  Q.   If a boat is heavy it will burn more fuel, correct?

04:18  19  A.   More fuel.

04:18  20  Q.   Is that a yes?

04:18  21  A.   Yes.

04:18  22  Q.   You testified on direct examination you were approximately

04:18  23  four miles from Mr. Bautista Vasquez's vessel when it was first

04:18  24  being signaled to you?

04:18  25  A.   That's true.

04:18   1   Q.   Do you recall what the evening was like that day -- was it

04:18   2   day out?

04:18   3   A.   When we saw it the sun was just about to set.

04:19   4   Q.   Was the sky blue?

04:19   5   A.   It was cloudy because it was raining.

04:19   6   Q.   So it was raining and it was cloudy?

04:19   7   A.   It was cloudy.

04:19   8   Q.   It is your testimony today with rain and the fact it was

04:19   9   cloudy from four miles away someone on your vessel saw someone

04:19   10  on Mr. Bautista Vasquez's vessel waving a blue shirt?

04:19   11  A.   Yes; because their boat was pretty big.

04:20   12  Q.   Now, your vessel got close to their vessel at some point,

04:20   13  correct?

04:20   14  A.   Yes, I approached them.

04:20   15  Q.   The captain on Mr. Bautista Vasquez's vessel gave you a

04:20   16  code of 888, correct?

04:20   17  A.   I could not talk any more; the one that talked to me was

04:20   18  Cadena.

04:20   19  Q.   You responded with a code of huevo de velo?

04:21   20  A.   No; at no time did I reply to anything.

04:21   21  Q.   And then you had your bait and your ice thrown overboard?

04:21   22  A.   We threw it away because the boat would not be able to

04:21   23  stand all that weight.

04:21   24  Q.   And then you instructed Mr. Bautista Vasquez and his crew

04:21   25  members to get the cocaine and put it on your boat, correct?

04:21  1    A.   I told them because they asked me -- I told them I would

04:22  2    throw away the bait and the ice so we would be able to arrange

04:22  3    it wherever we would put it on the boat.

04:22  4    Q.   You testified on direct examination when you came upon

04:22  5    their boat that one person had fainted or looked like he had

04:22  6    fainted and one person had a substance coming out of his ear?

04:22  7    A.   Yes, yes.

04:22  8    Q.   There were two people on your boat, correct?

04:22  9    A.   Yes.

04:22  10   Q.   They told you if you did not take their drugs that their

04:23  11   families would be killed, correct?

04:23  12   A.   Of course; because of the radio buoy I had.

04:23  13   Q.   You have a family too, correct?

04:23  14   A.   Yes.

04:23  15   Q.   You have three kids, right?

04:23  16   A.   Yes.

04:23  17   Q.   You have an 18 year old?

04:23  18   A.   Yes.

04:23  19   Q.   A 15 year old?

04:23  20   A.   Yes.

04:23  21   Q.   And a 13 year old?

04:23  22   A.   Yes.

04:23  23   Q.   You weren't concerned about your family's safety at this

04:23  24   time, correct?

04:23  25   A.   No; because I was going to deliver the drugs where I told

04:24  1    them I would deliver it, which was going to be the Naval Base.

04:24  2    Q.  Of course. Now you were the captain of your vessel?

04:24  3    A.  Yes.

04:24  4    Q.  And you demonstrated for the jury how you were steering it?

04:24  5    A.  Yes.

04:24  6    Q.  You testified on direct examination you did not know the

04:24  7    helicopter was there until the warning shots were fired; do you

04:24  8    remember that?

04:24  9    A.  Yes.

04:25  10              MR. MOTIANI: May we play the video, please.

04:25  11              THE COURT:  Yes.

04:25  12              VIDEOTAPE PLAYED FOR THE RECORD

04:25  13              MR. MOTIANI: For the record we are playing

04:25  14    Government's Exhibit 5; and it is time stamped 2103:19.

04:25  15    Q.  Mr. Alvarez Martinez, do you see the vessel on your screen?

04:25  16    A.  Yes.

04:25  17    Q.  Isn't it true you are at the engine on this video?

04:26  18    A.  Yes.

04:26  19              MR. MOTIANI: Please play the video.

04:26  20              VIDEOTAPE PLAYED FOR THE RECORD

04:26  21              THE WITNESS:  That is -- on my side is when I was

04:26  22    handling the engine.  I was looking at the compass in front of

04:26  23    me.

04:26  24              THE COURT:  There's no question, sir, we are just

04:26  25    watching right now. Mr. Motiani will ask you a question in a

04:26  1   few moments.

04:26  2          THE WITNESS:  Okay.

04:26  3   Q.  Now you will see on your screen that the individual in the

04:26  4   front right is going to be pointing back.

04:27  5          VIDEOTAPE PLAYED FOR THE RECORD

04:27  6   Q.  Right there the individual in the front right is pointing

04:27  7   back.

04:27  8   A.  I am not looking at him; I am looking like this to the

04:27  9   side.

04:27  10  Q.  You are saying at this time you had no idea there was a

04:27  11  helicopter behind you, correct?

04:27  12  A.  No.

04:27  13  Q.  When you first saw the helicopter is when you saw the

04:27  14  warning shots, correct?

04:28  15  A.  They shot towards the back originally.

04:28  16  Q.  Okay --

04:28  17  A.  And from there turns towards the bow.

04:28  18  Q.  Do you recall on direct examination you said you never saw

04:28  19  the helicopter until -- excuse me -- the first time you saw the

04:28  20  helicopter was when the warning shots were issued; do you

04:28  21  remember saying that?

04:28  22  A.  No.

04:28  23  Q.  You don't remember saying that?

04:28  24  A.  Not the warning ones.  They shot immediately the engines --

04:28  25  Q.  Please listen to my question --

04:28  1   A.   From there it went directly to shoot at the bow.

04:28  2          THE COURT:   Please wait for the question to be

04:28  3   finished, sir.

04:28  4   Q.   The first time you noticed that a helicopter was behind you

04:29  5   was when shots were fired in front of your vessel?

04:29  6   A.   No.

04:29  7   Q.   That was your testimony on direct examination, correct?

04:29  8   A.   When they asked me the first time I told them that the

04:29  9   helicopter appeared to me on this side.

04:29  10  Q.   Your testimony is your vessel never fled from the Coast

04:29  11  Guard helicopter -- do you recall your testimony on direct?

04:29  12  A.   That I do remember.

04:29  13  Q.   And the Coast Guard helicopter in this case activated its

04:30  14  blue lights; do you recall seeing that on August 31, 2017?

04:30  15  A.   At no time did it turn on any lights.

04:30  16  Q.   You heard the testimony of Lieutenant Andrews, correct?

04:30  17  A.   Yes

04:30  18  Q.   You heard the testimony of Lieutenant Commander O'Donnell?

04:30  19  A.   Correct.

04:30  20  Q.   And you heard the testimony of Officer Edwards, correct?

04:30  21  A.   Yes.

04:30  22  Q.   And all of them testified under oath their helicopter had

04:30  23  activated a blue light; do you remember that testimony?

04:30  24  A.   Yes, but it was not a blue light -- the one they turned on

04:31  25  was a big light they turned to focus on the boat, not blue.

04:31  1    Q.  In fact, they also illuminated a white light on the tail of

04:31  2    the helicopter, correct?

04:31  3    A.  The tail of the helicopter was lit.

04:31  4    Q.  Okay. And you never slowed your vessel down at that time,

04:31  5    correct?

04:31  6    A.  I had already stopped when I saw the helicopter had already

04:31  7    burned out one engine.

04:31  8    Q.  I am talking before they shot out your engines -- you never

04:31  9    stopped or slowed down, correct?

04:32  10   A.  Because I had not seen a helicopter.

04:32  11   Q.  Your testimony is your vessel was not going fast, correct?

04:32  12   A.  Yes.

04:32  13   Q.  For the record, I'm showing you Government's Exhibit 5.

04:32  14   This is video recording number 5, timestamp 2112-08.

04:32  15             VIDEOTAPE PLAYED FOR THE RECORD

04:33  16   Q.  It is your testimony in this video this vessel was not

04:33  17   moving fast?

04:33  18   A.  No.

04:33  19   Q.  Okay; thank you.

04:33  20   A.  Because of the waves; that is why it looks like it.

04:33  21   Q.  Now, isn't it true the first time you stopped your vessel

04:33  22   is when the engines of your vessel were shot out?

04:33  23   A.  Yes.

04:34  24   Q.  After your engine was shot out isn't it true you were

04:34  25   bending down where you were standing to try to pull the plug

04:34  1   out of your vessel --

04:34  2   A.  No, it wasn't the plug.  I was taking out a cigarette and

04:34  3   the paperwork of the boat.

04:34  4   Q.  After you bent down and you were smoking your cigarette is

04:34  5   it your testimony that you never bent down to pull out the plug

04:34  6   of your vessel?

04:35  7   A.  No; I was trying to cover the hole that one of the shots

04:35  8   opened on the boat.

04:36  9            MR. MOTIANI: May I have the ELMO.

04:36  10           THE COURT:  Yes.

04:36  11  Q.  Showing you what has been marked for identification as

04:36  12  Government's Exhibit 1 A. Isn't it true on August 31, 2017 you

04:36  13  were transporting these bales of cocaine?

04:36  14  A.  Yes; that is correct.

04:36  15  Q.  In fact, you were the captain of the vessel and had control

04:36  16  of the vessel?

04:36  17  A.  Yes, it's true.

04:37  18           MR. MOTIANI: No further questions.

04:37  19           THE COURT:  Redirect.

04:37  20           MR. BLUMENFELD: We have no redirect.

04:37  21           THE COURT:  All right.  Mr. Alvarez Martinez, you may

04:37  22  go back to your table.

04:37  23           THE COURT:  Mr. Blumenfeld, are there any further

04:37  24  witnesses on behalf of Mr. Alvarez Martinez.

04:37  25           MR. BLUMENFELD: No, Your Honor, the defense rests.

04:37  1      THE COURT:  Mr. Quencer, Mr. Motiani on behalf of the

04:37  2  United States, is there any rebuttal?

04:37  3      MR. QUENCER: Yes, the Government calls Petty Officer

04:37  4  Mallory.

04:38  5      THE COURT:  All right.  Petty Officer Mallory, you

04:38  6  remain under oath.

04:38  7  Q.  Petty Officer Mallory, I want to redirect your attention to

04:38  8  the events on August 31, 2017.  Did you have a chance to view

04:38  9  the five crew members on the Ian?

04:38 10  A.  Yes, sir.

04:38 11  Q.  When did you view them?

04:38 12  A.  My initial view was when we first got onboard; after we had

04:39 13  to take them off the boat due to safety concerns.  The next

04:39 14  time I saw them was during processing.

04:39 15      As the boarding officer I am in charge of processing the

04:39 16  evidence and the detainees after we catch them. This includes a

04:39 17  head to toe visual examination of their nude body for medical

04:39 18  screening.

04:39 19      We also process their personal effects as well as the mug

04:39 20  shots that we take. Once we are done with the case the boarding

12:43 21  officer will switch hats from what you would consider a police

12:44 22  officer to a corrections officer.

04:40 23      We have to maintain watch for 24 hours.  So I normally saw

04:40 24  them eight days a week -- I'm sorry -- eight hours a day from

04:40 25  the time they stepped onboard until the time they left.

04:40  1   Q.  You testified you had seen them multiple times during and

04:40  2   after. What did you do once you first got onboard the vessel?

04:40  3   A.  When we first got onboard and secured the crew we completed

12:44  4   what is called an initial safety sweep, which is a limited

04:40  5   sweep of the vessel to insure the seaworthiness of the vessel,

04:40  6   which would include a visual examination of the vessel, just to

04:40  7   insure the vessel is not taking on any water or something like

04:41  8   that.

04:41  9   Q.  And did you observe the crew when you got onboard?

04:41  10  A.  Yes, I did. We are right next to them so we can see them

12:46  11  very clearly. We have flashlights and a spotlight on them the

12:46  12  entire time.

12:46  13      The Coast Guard helicopter sometimes will turn on its light

04:42  14  but I can't remember if it did or not. However, it is very

04:42  15  illuminated; every light we have is turned on at that point.

04:42  16  Q.  Did you see anyone passed out?

04:42  17  A.  No, sir; they were all alert.

04:42  18  Q.  Was there anyone that you recall that had an oozing ear?

04:42  19  A.  No, sir.  That would have been noticed once on initial

04:43  20  boarding; and again when we brought them onto our hanger for

04:43  21  screening.

04:43  22  Q.  Did anyone appear to be starving without food or water for

12:47  23  eight days?

04:43  24  A.  No, sir; there was plenty of food and water on the boat

04:44  25  Q.  Now, I want to talk about the condition of the vessel. Did

1    you find any holes in the vessel?

2    A.   No, sir; the only hole that I found was a hole in the

3    transom; that had a hole in it.

4    Q.   So no bullet hole?

5    A.   No bullet hole.

6    Q.   I want to talk about things that you found on the vessel.

7    First, did you do a thorough check of the items onboard the

8    vessel?

9    A.   Yes, sir.

10   Q.   Did you find any fishing poles?

11   A.   No, sir.

12   Q.   Did you find any nets onboard this boat?

13   A.   No, sir. The only fishing equipment they had were the

14   fishing hooks I described earlier and a small bit of line.

15   Q.   You mentioned you sort of transitioned from being a law

16   enforcement officer to being a corrections officer once the

17   detainees are onboard the Coast Guard cutter.

18   A.   Yes.

19   Q.   Are you familiar with Coast Guard procedures with how and

20   where they detain various defendants or detainees aboard the

21   Coast Guard cutter?

22   A.   Yes.

23   Q.   And how do you organize the 40 odd defendants you might

24   have on a boat at any one time?

25   A.   After we process and search them and inventory all of the

04:49  1    personal effects we will shower them, let them use the head and

04:49  2    shackle them and secure them to the deck by case.

04:49  3    Q.   So they are with their case the entire time?

04:49  4    A.   We give -- each individual case has their own arm band just

04:49  5    like you would find at a club that would be positioned on their

04:49  6    wrist with their detainee number, the case number on it, so we

04:49  7    can accurately identify who they are.

04:49  8         Each case would have its own log so we can maintain a log

04:50  9    of everything that happens with that detainee during the time

04:50  10   we have them so that everything is well documented.

04:50  11   Q.   This incident on August 31, 2017 all five defendants, same

01:02  12   case or different case?

04:50  13   A.   They were all together.

04:50  14   Q.   All housed together on the Coast Guard cutter?

04:50  15   A.   If we find them on one boat that whole boat stays together

04:50  16   the whole time.

04:50  17              MR. QUENCER: No further questions.

04:50  18              THE COURT:  Cross examination.

04:50  19              MR. BLUMENFELD: No cross, Your Honor; thank you.

04:50  20              THE COURT:  You may step down. Any further witnesses

04:51  21   on behalf of the Government.

04:51  22              MR. MOTIANI: No, Your Honor.

04:51  23              THE COURT:  Ladies and gentlemen, you have now had

04:51  24   presented all of the evidence in the case.  I have some legal

04:51  25   matters to take up with the lawyers so I am going to excuse you

1    for the night and ask you to return tomorrow at 10 o'clock --

2    give you a little extra time in the morning -- and you will

3    then hear the closing arguments by counsel and instructions by

4    me.

5         So, day two, you go home and they of course want to

6    know what you are doing.  And your answer again is simply

7    silence because you cannot talk to anyone about this case.

8         You cannot even talk to each other until you have

9    heard the lawyers' argument and my instructions on the law.

10         So, have a good night's rest, have a good dinner,

11    don't think about us or the case, and I will see you back here

12    tomorrow at 10:00 a.m.

13         COURT SECURITY:  All rise.

14              JURY EXCUSED

15         THE COURT: I think we should convene at nine o'clock

16    tomorrow morning just so we have sufficient time to have our

17    instructions in order.

18         As I understand it we are only going to be discussing

19    the defendant's theory of defense instruction and that all of

20    the other instructions are patterns.

21         MR. QUENCER:  Correct, Your Honor.

22         MR. BLUMENFELD: Your Honor, there are no objections to

23    the patterns; some of them just may not be applicable.

24         THE COURT:  We will take that up then.

25         MR. QUENCER: I tend to be over inclusive so we can

04:53  1     take out those we don't need.

04:53  2             MR. BLUMENFELD: The crucial one is our theory of

04:53  3     defense.

04:53  4             THE COURT:  And, Mr. Blumenfeld, I assume you renew

04:53  5     any motion with regard to Rule 29?

04:53  6             MR. BLUMENFELD: Yes, Your Honor; thank you.

04:54  7             THE COURT:  All right. I will deny that. If you wish

04:54  8     to supplement with any authority or further argument you may do

04:54  9     so tomorrow when we reconvene.

04:54  10            All right. I will see everyone back at nine a.m.

       11                    COURT IN RECESS

       12

       13

       14

       15

       16

       17

       18

       19

       20

       21

       22

       23

       24

       25

```
 1                        -   -   -

 2                  C E R T I F I C A T E

 3          I hereby certify that the foregoing is an accurate

 4    transcription of proceedings in the above-entitled matter.

 5

 6                                    /S/PATRICIA SANDERS

 7    _____                 _____

 8    DATE FILED                 PATRICIA SANDERS, RPR

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```